[L.A. No. 30119. In Bank. May 12, 1975.]

CITY OF LOS ANGELES, Plaintiff and Appellant, v.
CITY OF SAN FERNANDO et al., Defendants and Respondents.

**COUNSEL**

Roger Arnebergh and Burt Pines, City Attorneys, Edward C. Farrell and Gilmore Tillman, Chief Assistant City Attorneys, Robert E. Moore, Jr., and Ralph Guy Wesson, Assistant City Attorneys, Gilbert W. Lee, Deputy City Attorney, and George G. Grover for Plaintiff and Appellant.

Neville R. Lewis, Joseph W. Rainville and Samuel Gorlick, City Attorneys, Lewis, Varni & Ghirardelli, Jennings, Engstrand & Henrikson, W. H. Jennings, Paul D. Engstrand, Wallace R. Peck, Melby & Anderson, Henry Melby, Nicholas, Kolliner, Myers, D'Angelo & Givens and William Howard Nicholas for Defendants and Respondents.

Martin E. Whelan, Jr., as Amicus Curiae on behalf of Defendants and Respondents.

**OPINION**

**WRIGHT, C. J.**—The City of Los Angeles filed this action on September 30, 1955, (1) to quiet its title and obtain a declaration of its prior rights to the water underlying the Upper Los Angeles River Area (hereafter referred to as "ULARA"), and (2) to enjoin the defendants from extracting such water other than in subordination to the plaintiff's prior rights. Numerous defendants were eliminated from the case before trial by dismissal, disclaimer, default, or stipulated judgment, and are not

parties to this appeal. The remaining defendants now before us are the Cities of San Fernando, Glendale, and Burbank, the Crescenta Valley County Water District, and several private parties whose water claims are all smaller than those of the defendant cities and water district.[1] After a nonjury trial between plaintiff and these defendants, judgment was entered on March 15, 1968, denying plaintiff's claims, awarding prescriptive rights to plaintiff and defendants, and imposing continuous restrictions on the parties' extractions of water commensurate with the available supply. Plaintiff appeals from this judgment and from a judgment entered the same date in favor of the State Water Resources Control Board for its expenses as referee.

The ULARA is the entire watershed of the Los Angeles River and its tributaries above Gauging Station No. F57, which is located just above the junction of the river and the Arroyo Seco, near the intersection of North Figueroa Street and San Fernando Road and the intersection of the Pasadena and Golden State Freeways. The ULARA is bounded by the crests of mountain ranges: the Santa Susana Mountains and San Gabriel Mountains on the north; the San Gabriel Mountains, San Rafael Hills, and Repetto Hills on the east; the Elysian Hills and Santa Monica Mountains on the south; and the Simi Hills on the west. The "valley fill" portion of the ULARA is divided into four subareas, and one of the issues in the case is whether these subareas should be treated as distinct ground water basins or as parts of a single source of the Los Angeles River.

By far the largest of these subareas, comprising 112,047 out of the 123,428 acres in the total valley fill, is the San Fernando subarea, which includes most of the San Fernando Valley plus the Los Angeles River Narrows, located at the southeast corner of the ULARA. The natural course of the Los Angeles River is from west to east along the southern

---

[1]These private defendants are: American Security & Fidelity Corporation, Forest Lawn Cemetery Association, Forest Lawn Company, and Forest Lawn Memorial Park Association, collectively referred to as "Forest Lawn"; Lockheed Aircraft Corp., referred to as "Lockheed"; Toluca Lake Property Owners Assn., referred to as "Toluca"; Valhalla Memorial Park, Valhalla Mausoleum Park, and Valhalla Properties, collectively referred to as "Valhalla"; Van de Kamp's Holland Dutch Bakers, Inc., referred to as "Van de Kamp's"; William O. Bartholomaus and Ellen S. Dubois, collectively referred to as "Bartholomaus"; Celeste Louise McCabe, referred to as "McCabe"; The Wellesley Company, successor of Maxine Duckworth and John E. Mullin, referred to as the "Wellesley Company"; and Dean Peter Moordigian and Kisag Moordigian, collectively referred to as "Moordigian." Each group of two or more defendants thus designated by a common name shares the same water rights in this litigation and therefore will be referred to herein as a single defendant.

edge of the San Fernando Valley until it reaches what is now the northeast corner of Griffith Park and turns abruptly south, paralleling the Golden State Freeway through the Narrows down to Gauging Station No. F57.

The other three subareas of the valley fill are designated as Sylmar, Verdugo, and Eagle Rock. Sylmar is the area north of the City of San Fernando. Most of Sylmar is within the City of Los Angeles, but it also includes a small slice of San Fernando. The Verdugo subarea is the southerly half of the narrow valley east of the Verdugo Mountains, extending along Foothill Boulevard from the middle of the Tujunga district southeast through La Crescenta and Montrose. The Eagle Rock subarea is in the Eagle Rock district of Los Angeles. No issue specifically pertaining to the Eagle Rock subarea remains in the case.

The sources of the respective water supplies of the parties within the ULARA are as follows:

Plaintiff delivers water imported through its aqueduct from Owens Valley and Mono Basin to all parts of its territory within the ULARA, and for most of this territory, such imported water is the exclusive supply. The rest of this territory contains three service areas which receive some of their water from additional sources as follows: (1) The Mission Wells service area, located south and west of the City of San Fernando, receives ground water[2] from the Mission Wells in the Sylmar subarea. (2) The Sunland-Tujunga service area, overlapping the San Fernando and Verdugo subareas northeast of the Verdugo Mountains, receives ground water from nearby wells in the San Fernando subarea. (3) The Narrows service area, including the Los Angeles River Narrows and parts of the Eagle Rock and Highland Park districts, receives ground water from the San Fernando subarea and in addition receives imported water which emanates not only from the Owens aqueduct but also from the Metropolitan Water District (MWD). Until recently, all MWD water came from the Colorado River. Since entry of the judgment below, MWD has commenced to distribute water received from Northern California through the State Water Project.

The ground water which plaintiff extracts from the ULARA and does not deliver to the foregoing three service areas is exported from the ULARA. The exported water is taken from wells in the southeastern San

---

[2] "Ground water" means water beneath the ground surface. (See Wat. Code, § 1005.1; *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 916 fn.* [207 P.2d 17].)

Fernando Valley and in the Narrows and flows by gravity to other parts of the city having a lower elevation.

San Fernando, at the time of the judgment below, obtained its entire water supply from city wells in the Sylmar subarea. Following extensive damage to its water supply system from the earthquake of February 1971, San Fernando joined the Metropolitan Water District and now supplements its ground water supply with MWD water.

Glendale extracts water from its wells in both the Verdugo and the San Fernando subareas and also purchases water from MWD. Burbank extracts ground water from the San Fernando subarea and purchases MWD water. Crescenta Valley County Water District extracts ground water from the Verdugo subarea and purchases MWD water. All the private defendants extract ground water from various points in the San Fernando subarea except the Wellesley Company and Moordigian, which extract from the Sylmar subarea.

### PLAINTIFF'S CLAIMS TO ULARA GROUND WATER

Plaintiff makes separate claims to (1) *native* ground water, and (2) ground water derived from *imported* water. Native water is derived from rain and snow within the watershed. Imported water reaches the ground supply by two principal means: it may be deliberately "spread" for the purpose of "recharging" the ground supply, or it may return to the ground after use by customers. As of 1955, about 27 percent of the water delivered to customers in the ULARA returned to the ground supply. Of the annual additions to the ground supply, about 42.5 percent was derived from imported water, and the rest was native water.

### *Claim to Native Water: Pueblo Right*

Plaintiff asserts a pueblo right to all the native waters of the Los Angeles River and the native waters supplying it, paramount to all other claims insofar as such waters are needed by plaintiff for ordinary municipal purposes and the use of its inhabitants within the city. This pueblo right, ascribed to Spanish and Mexican law, has been recognized by a long line of cases, commencing as early as *Feliz* v. *City of Los Angeles* (1881) 58 Cal. 73, and continuing most recently with *City of L. A.* v. *City of Glendale* (1943) 23 Cal.2d 68 [142 P.2d 289]. The pueblo right has been held to attach to the water needs of inhabitants of areas annexed to the city rather than being confined to the needs of inhabitants

of the original pueblo. (*City of Los Angeles* v. *Pomeroy* (1899) 124 Cal. 597, 649 [57 P. 585].)[3] The right has been held to attach not only to the waters of the Los Angeles River itself but also to ground waters of the San Fernando Valley supplying the river. (*City of Los Angeles* v. *Hunter* (1909) 156 Cal. 603, 607-608 [105 P. 755].) Plaintiff now claims that the pueblo right gives it a prior claim to all the native ground waters of the ULARA, including those underlying the Sylmar and Verdugo subareas.

### Claim to Return Flow From Imported Water

The first Los Angeles Aqueduct water from the Owens River Valley reached the San Fernando Valley on November 5, 1913. At first this water was piped directly into distribution mains south of the Santa Monica Mountains. In May 1915, plaintiff annexed most of the San Fernando Valley and in the same month began to distribute Owens water for irrigation within the valley. Plaintiff contends that in delivering this imported water in the San Fernando Valley, it intended that the water would return to the ground after use and thereby become available for recapture in its wells in the southeastern part of the valley where it had been extracting water since the turn of the century. Plaintiff further asserts that this intent has continued with respect to water delivered to, and returned from, *urban* customers in the San Fernando Valley. Consistent with this theory, plaintiff contends that the defendants who purchase and distribute imported MWD water in the ULARA have prior rights in such water when it is returned to the ground after use. The amount of such imported water delivered in the ULARA by defendants is very small in comparison to the amount of imported water delivered by plaintiff. Plaintiff also claims the right to recapture imported water which it deliberately spreads to recharge the underground supply. The amount of spread imported water has been greatly reduced in recent years.

### Res Judicata

Plaintiff brought a prior action against the Cities of Glendale and Burbank in which it obtained a judgment declaring its prior right to native and imported ground waters in the San Fernando Valley. The

---

[3]Confusion over this holding may result from the manner in which *Pomeroy* is reported. The initial opinion, written by Beatty, C. J., states at page 639 of 124 Cal. that the pueblo right is confined to inhabitants within the boundaries of the original pueblo. This statement is superseded by the concurring opinion of Temple, J., with whom four other members of the court joined, holding that the pueblo right does extend to the expanded boundaries. (124 Cal. at p. 649.)

judgment was affirmed with a modification in favor of plaintiff in *City of L.A.* v. *City of Glendale, supra,* 23 Cal.2d 68.[4] We unanimously reaffirmed plaintiff's pueblo right to "all of the waters of the Los Angeles River and the waters supplying it," (23 Cal.2d at p. 74), and we declared that the right is "measured, and therefore circumscribed, by the needs of the city." (23 Cal.2d at p. 75.) We also upheld plaintiff's prior right to imported water returned underground after being sold to and used by farmers in the San Fernando Valley, citing "evidence that plaintiff sold water in the San Fernando Valley because the water would have seeped underground in other valleys without reaching a destination where it could be recovered." (23 Cal.2d at p. 76.) Because there was a conceded surplus of water under the San Fernando Valley, plaintiff at that time had no grounds for an injunction and defendants could claim no prescriptive rights. (23 Cal.2d at pp. 78-80.) Plaintiff therefore claims that the *Glendale* decision collaterally estops defendants Glendale and Burbank from questioning the plaintiff's pueblo right to native waters and its right to recapture returned imported waters.

*Injunctive Relief*

All parties concede that at least as of 1955, when this action was commenced, there was an annual overdraft, and therefore no longer a surplus, in the San Fernando subarea and in the ULARA as a whole. Plaintiff now asserts a need for, and capacity to distribute to its inhabitants, the entire safe yield of the ULARA. Plaintiff claims that defendants' taking of its ground water causes it irreparable injury because imported water is more costly than ground water. Plaintiff further asserts this is not a case about water but about money, i.e., who should pay for the more expensive imported water. If granted an injunction, plaintiff is willing to consider a "physical solution."

DEFENDANTS' CLAIMS

*Plaintiff Has No Pueblo Right*

Defendants deny that the prior decisions of this court require recognition of plaintiff's pueblo water right in the present case.

---

[4] The modification concerned flood waters in streams tributary to the Los Angeles River impounded by the Los Angeles Flood Control District and later released and abandoned by the district. We held that these waters were within the pueblo right even though under natural conditions they would have rushed to the sea without reaching the underground basin.

Defendants Glendale and Burbank deny that recognition of the pueblo right is res judicata as to them under *City of L. A. v. City of Glendale, supra,* 23 Cal.2d 68, and all defendants deny that recognition of the pueblo right is required on principles of stare decisis. Numerous reasons are given for this position. The principal ones may be grouped under two general contentions: (1) that recognition of a pueblo right is grossly unfair under modern conditions and (2) that the judges and courts who previously declared the existence of a pueblo water right were misled and mistaken as to the true state of Spanish and Mexican law in that regard.

Defendants also contend that even if the pueblo right is recognized under principles of res judicata or stare decisis, the right does not extend to all the native ground waters of the ULARA as claimed by plaintiff. At most, they insist, the pueblo right extends only to waters having a significant effect on the supply to the Los Angeles River and does not allow plaintiff to claim water whose flow to the river is substantially blocked by underground formations or barriers. Thus, San Fernando contends that the pueblo right in no event extends to the waters under the Sylmar subarea; Glendale and Crescenta Valley County Water District contend that the pueblo right in no event extends to waters under the Verdugo subarea; and various private defendants assert that the ground waters claimed by them are sufficiently isolated, geologically and hydrologically, from the Los Angeles River to be immune from the pueblo right.

### The Right to Return Flow From Imported Water

Defendants deny that plaintiff has a prior right to ground water derived from water imported by plaintiff and sold by it to customers who returned it after use to the ground. *City of L. A. v. City of Glendale, supra,* 23 Cal.2d 68, which upheld such a right as against defendants Glendale and Burbank, is distinguished as dealing only with returns from imported water *sold to farmers for irrigation* and not with the present urban conditions of the San Fernando Valley.

Defendants further contend that there is no affirmative showing that the sale of imported water by plaintiff was accompanied by any affirmative intent to reserve the right of subsequent recapture. Defendants contend that in any event it is not practical to determine what part of the total recharge added to the ground supply is derived from water delivered to customers by a particular party.

*Mutual Prescription*

Defendants claim they have acquired rights by mutual prescription under the principles of *City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908 [207 P.2d 17]. They assert that these prescriptive rights supersede all other water rights including those claimed by plaintiff based on a pueblo right and on a right to recapture returns from imported water. Defendants also contend that the present case falls squarely within the precedent of the *Pasadena* case under the following theory: (1) More than five years before the complaint was filed, the total annual extractions of ground water exceeded the "safe yield," which is, in essence, the maximum amount of water that could be extracted annually, year after year, without eventually depleting the underground basin. (2) When annual extractions exceeded safe yield, there was an "overdraft" signalling the beginning of a prescriptive period. (3) Each party has a prescriptive right to its "highest continuous production of water for beneficial use in any five (5) year period" after the beginning of overdraft and before commencement of the present action "as to which there has been no cessation of use by it during any subsequent continuous five (5) year period." (33 Cal.2d at p. 922.) (4) The trial court properly awarded each party a pumping right calculated by adjusting the prescriptive rights proportionately so that the total extractions from the basin were limited to its safe yield.

Defendants further contend that in applying the *Pasadena* formula it was proper to calculate separate safe yields for the San Fernando, Sylmar, and Verdugo subareas, and to base the prescriptive rights to water in each subarea on each party's extractions in that subarea.

## Plaintiff's Reply To Mutual Prescription Claim

Plaintiff contends that its water rights are not subject to prescription, mutual or otherwise, because of the express provisions of Civil Code section 1007. Between 1935 and 1968, this section stated that "no possession by any person, firm, or corporation no matter how long continued of any land, *water, water right,* easement, or other property whatsoever dedicated to or owned by any . . . city . . . shall ever ripen into any title, interest or right against such . . . city . . . ." (Italics added.)

Plaintiff asserts that *Pasadena* did *not* hold that the water rights of cities were subject to mutual prescription or that Civil Code section 1007

is not an obstacle to such prescription. The sole appellant in *Pasadena* was a public utility to which section 1007 did not then apply.[5] All the other parties in the case, including a number of cities, had *stipulated* to a judgment limiting their rights to extract ground water from the basin in accordance with the formula of mutual prescription as described above. The sole question on appeal was whether the judgment could be imposed on appellant without its consent. Since the cities did not object to being subjected to the judgment imposing mutual prescription, there was no occasion to decide whether they would have been entitled to resist such a judgment under Civil Code section 1007. This view of the *Pasadena* case is reinforced by the fact that section 1007 is not cited in the opinion.

Apart from section 1007, plaintiff contends that the prior judgment in *Glendale* (*supra,* 23 Cal.2d 68), declaring plaintiff's pueblo and imported water rights against defendants Glendale and Burbank, collaterally estopped those defendants from claiming to have taken water adversely to plaintiff at least until such time as they should give express notice of a claim that their extractions of water were not in subordination to those rights. Defendants do not contend that such express notice was ever given before commencement of the present action.

And finally, plaintiff contends that the necessary five-year prescriptive period could not have run prior to the filing of the complaint because the surplus of water did not end and overdraft did not commence until within five years before the complaint was filed. Plaintiff concedes that the *safe yield* was exceeded for more than five years before the complaint was filed in that the annual volume of extractions of ground water, if continued indefinitely into the future, would eventually have depleted the basin. However, plaintiff contends that when the safe yield was first exceeded by extractions, there was a *temporary* surplus, and that overdraft did not commence (or any prescriptive period become operative) until that temporary surplus ended. The temporary surplus, it is asserted, was the amount of water whose extraction from the basin would prevent waste in subsequent wet years by providing underground storage space in which rainfall in excess of the annual average could be stored for future use. It is not until this storage space has been provided and temporary surplus ended that plaintiff considers it proper to measure overdraft by safe yield.

---

[5]In 1968 Civil Code section 1007 was amended so as to exempt from prescription any water right or other property "dedicated to a public use by a public utility, or dedicated to or owned by the state or any public entity."

## PROCEEDINGS IN TRIAL COURT

On September 30, 1955, the same day it initiated the present action, plaintiff filed a motion for modification of the judgment and for an injunction in its consolidated actions against the Cities of Glendale and Burbank in which a declaratory judgment in favor of plaintiff had been affirmed by this court in *Glendale, supra,* 23 Cal.2d 68, and in which jurisdiction had been retained to grant such additional relief as might be necessary (23 Cal.2d at p. 81). Judge Philip H. Richards denied the motion on two grounds: (1) that by seeking to enjoin defendants from taking water on the ground that the available quantity of water no longer exceeded plaintiff's needs the application for injunction raised issues of the *quantities* of the water supply and of the parties' respective needs and accordingly was beyond the scope of the jurisdiction retained under the declaratory judgment which dealt only with priorities in a ground basin containing more than enough water to satisfy the parties' needs, and (2) that since the same issues were being concurrently raised by commencement of the present case, the court in its discretion should in any event deny permission to raise them by reopening the prior actions involving only two of the present defendants (Glendale and Burbank). A subsequent similar application to reopen the prior cases and consolidate them with the present case was denied on similar grounds in May 1964.

In the present action, after the pleadings were filed and the case was at issue, in 1958, Judge Virgil M. Airola referred the case to the State Water Rights Board (succeeded in 1967 by the State Water Resources Control Board, Wat. Code, § 1003.5) for investigation of and report on the physical facts. (Wat. Code, § 2001.) The referee was ordered to report on the geography and geology of the area, the available water resources, and the parties' respective supplies of and needs for water. The referee's report, consisting of two volumes plus two supplements, was completed in October 1964. Plaintiff objected to the reference order and has appealed from the judgment in favor of the referee, entered pursuant to Water Code section 2048, apportioning the reference expenses of $493,264 among the parties. By statute, the referee's report is "prima facie evidence of the physical facts therein found." (Wat. Code, § 2019.) The accuracy of the referee's report remains substantially unchallenged but both plaintiff and defendants introduced vast amounts of other evidence on matters within the general scope of the referee's report.

In September 1964, the case was assigned to Judge Edmund M. Moor. Extensive pretrial proceedings consuming 86 court days before Judge

Airola and 18 days before Judge Moor culminated in a pretrial conference order of August 26, 1965. Trial began March 1, 1966 and continued for 181 court days until June 15, 1967. The trial judge's memorandum of decision (134 pages plus 174 pages of addenda) relating to the principal issues was filed October 30, 1967. After further proceedings, comprehensive findings of fact and conclusions of law were filed on March 14, 1968, and the judgment was entered the following day.

## TRIAL COURT'S FINDINGS AND JUDGMENT

In essence the judgment of the trial court awarded the parties mutually prescriptive rights patterned after the *Pasadena* decision, *supra,* 33 Cal.2d 908, and rejected plaintiff's claims of a pueblo right in native waters and of a right to reclaim ground water returned from imported Owens water sold to customers.

### *Pueblo Right*

The findings of the trial court stated that "[m]any cases have held" that plaintiff succeeded to the "pueblo water right," defined as "a prior and paramount right to all the waters of the Los Angeles River so [*sic*] far as is reasonably necessary for the needs of the pueblo and its inhabitants." It was found, however, that the judgment rolls, appeal transcripts, and briefs from these cases which were introduced into evidence at the trial support the defendants' claim "that the so-called 'pueblo water right' had no support in Spanish or Mexican law and that its statement in some of the cases was based solely upon erroneous translations, incomplete and inaccurate citations, and unsupportable conclusions drawn therefrom." The findings listed 11 civil actions, all reviewed by this court, involving plaintiff's rights to take waters of the Los Angeles River.

It was found that in the three earliest of these cases we did not rule on the pueblo water right. A lengthy finding on the fourth case (*Vernon Irrigation Co.* v. *City of Los Angeles* (1895) 106 Cal. 237 [39 P. 762]) described numerous errors and omissions in the record and in plaintiff's brief in that case. The subsequent seven cases were distinguished as not involving the kind of injunction requested here and four of them (including the actions against Glendale and Burbank, affirmed in *Glendale, supra,* 23 Cal.2d 68) were found to have enunciated the pueblo water right principle by reason of stare decisis. Another finding referred to all seven of these cases as having "followed *Vernon.*"

The court also found that the 1943 decision against Glendale and Burbank in *Glendale* is not res judicata in this case because (1) there have been subsequent changes in ·factual circumstances and in the law applicable to relative rights in underground water supplies,[6] (2) great public interests are involved and application of res judicata would defeat the ends of justice, and (3) the res judicata objective of preventing vexatious litigation cannot be accomplished by reason of the time and expense already spent in litigating the issues.

The court further found that the doctrine of stare decisis does not require it to recognize plaintiff's pueblo right against *any* defendant for the following reasons: (1) There is no precedent case on the pueblo right on which the court can completely rely to fix the parties' rights here; (2) to follow the prior cases would be unsound and unjust and would drastically affect thousands of people; (3) to follow the prior cases "would be contrary to the principles announced" in *Pasadena;*[7] (4) the prior cases were wrongly decided in that: (a) none of them refers to any Spanish or Mexican law that used the words "pueblo water right" or their equivalent; (b) the pueblo water right doctrine was never substantially tested by an adversary trial court proceeding with expert testimony on Spanish and Mexican law; (c) the reasons for a pueblo water right stated in *Lux*[8] and *Vernon* were "clearly and unequivocally wrong"; (d) the remaining cases followed *Vernon,* and to apply them here "would be unsound and unjust."

The trial court then found that it was required to examine Spanish and Mexican law pertaining to the pueblo water right because of uncertainties in the prior cases, vast changes in circumstances since they were decided, the inclusion in the present case of parties and areas not

[6]By changed factual circumstances the court referred to urbanization of the San Fernando Valley which it described in detail in a separate finding. The changed law referred to *Pasadena, supra,* 33 Cal.2d 908, decided in 1949. The position of plaintiff is that urbanization was fully anticipated at the time of the *Glendale* decision, and that *Pasadena* is inapplicable to the pueblo right issue.

[7]This finding apparently referred, inter alia, to the statement in *Pasadena* that a decree based on mutual prescription "will promote the best interests of the public because a *pro tanto* reduction of the amount of water devoted to each present use would normally be less disruptive than total elimination of some of the uses." (33 Cal.2d at p. 933.) No pueblo right was asserted or involved in the *Pasadena* case.

[8]*Lux v. Haggin* (1886) 69 Cal. 255 [4 P. 919, 10 P. 674] held that riparian rights generally must be recognized as against private appropriators. No pueblo right was asserted but in 69 Cal. at pages 313-334 the court set forth the basis for the pueblo right in answer to the appropriator's contention that Mexican law dedicated running waters to the common use of all inhabitants.

previously involved in similar litigation and the allegation in plaintiff's complaint that its rights are based on Spanish and Mexican law.

The trial court made extensive findings on the Spanish settlement of California and particularly the Pueblo of Los Angeles, Mission San Fernando, and the ranchos in the ULARA. It was found that the dominant institutions were not the pueblos but the presidios and missions which were planned as the nuclei of future cities, that the purpose of the pueblo was to help supply the agricultural needs of the presidios, and that the Pueblo of Los Angeles was under direct control of the Spanish royal government and never became an independent, self-governing entity during the Spanish period. Findings further described the Spanish-Mexican governmental and legal systems. Numerous additional findings were made to the effect that under Spanish-Mexican law river waters were to be shared and used by all persons subject to the king's authority to apportion water equitably in times of shortage. It was found that the sovereign could grant specific quantities of river waters for irrigation subject to common usage for domestic needs and subject to governmental authority to apportion in time of shortage. It was also found that a pueblo's rights to take river water for municipal purposes were equivalent to the rights of individuals, that a pueblo could not go outside its boundaries to take water for its inhabitants in the absence of an express grant and that the Pueblo of Los Angeles had no such grant. In addition there were numerous findings negating the existence of various forms of pueblo water rights under Spanish-Mexican law.

It was also found that the Spanish-Mexican law governing well and spring water was different from such law governing river water, that all landowners had a right to take and use water from wells and springs on their lands as long as they did not harm their neighbors with malice or intent to cause harm, that the parties to the present action are extracting only well and spring water (as distinct from river water) from the ULARA, that each of the defendants owns land with wells located thereon as successor in interest to owners who enjoyed these well water rights under Spanish and Mexican law, and that well water rights constitute a limitation on the Pueblo of Los Angeles' rights to take and use waters of the Los Angeles River.

The court further made findings on the sources of water supply available to plaintiff in addition to ground water extracted from the ULARA. These sources are the water imported from Inyo and Mono

Counties (also called "Owens" water), ground water from the West Basin and Central Basin of the Los Angeles Coastal Plain and imported MWD water. The court found that water from these sources is sufficient to satisfy plaintiff's needs through the year 2020 even if plaintiff were to take no further water from the Los Angeles River or the ULARA.[9]

### Rights to Return Flow From Imported Water

The court found that each party which imported water and delivered it within the ULARA did so to meet existing water needs and did not do so for the purpose of (1) storing the water underground, (2) conveying it underground to diversion facilities or (3) recapturing any portion of it. It was also found that the return flow from the water imported and delivered by any particular party was commingled with the return flow from other delivered waters and became part of the conglomerate underground water supply of which no part can be traced to any particular source. An additional finding dealt with Owens water spread by plaintiff into spreading grounds in the San Fernando Basin continuously from 1931 to 1944 and sporadically thereafter until 1964-1965. It was found that such waters became part of the conglomerate water supply, that plaintiff had no means of separately extracting it and that there was no proof of an intent by plaintiff to recapture the water which it spread.[10]

### Award of Mutually Prescriptive Rights

The court found that its determination of mutually prescriptive rights and limitation of extractions of water will result in an equal sharing of burdens and promote the public interest and that a *pro tanto* limitation of water devoted to its present uses would be less disruptive than total elimination of some of the uses. The court expressly found and concluded that its award of mutually prescriptive rights is not barred by

---

[9]Defendants argue that this finding eliminated any operative effect of the pueblo water right in that plaintiff does not "need" the water. The accepted formulation of the pueblo right gives the city priority only to the extent that the water is "reasonably necessary" for the needs of the city and its inhabitants. Plaintiff's position is that the water is reasonably necessary if water from the alternative sources is more expensive.

[10]Plaintiff contends that (1) commingling of the water is irrelevant because one can add to a common supply with the intent of extracting an equal amount from such supply at a later time and/or different place and (2) plaintiff's intent to recapture the return flow from imported water and spread water was established by the evidence.

Civil Code section 1007 (relied on by plaintiff as immunizing cities from prescription).

Additionally the court found that the ULARA valley fill is divided into four separate ground basins (corresponding to the subareas previously described) and made separate awards of prescriptive rights in the San Fernando, Sylmar, and Verdugo basins, respectively. The tiny Eagle Rock basin (0.6 percent of the valley fill) was excluded from the judgment, none of its water being claimed by any of the defendants before the court. As factual support for the separateness of the basins, the court found: "The extractions of water in the respective basins affect the other water users within that basin but do not significantly or materially affect the ground water levels in any of the other basins." Rejecting plaintiff's contention that the ULARA contains a single basin, the court found: "The mere existence of hydraulic continuity between ground water reservoirs does not cause them to become one basin or one ground water body."

In the San Fernando basin, the court found that in each of the water years (Oct. 1 - Sept. 30) 1941-1942 through 1964-1965 there was a condition of overdraft in that the annual draft on the ground water of the basin exceeded the safe yield. Implicitly rejecting plaintiff's theory of a temporary surplus created by the desirability of lowering the ground water level to prevent waste from rising water outflow and other causes in wet years, the court found that plaintiff was capable of preventing rising water outflow waste from San Fernando basin by reasonable methods without the necessity of permanently removing ground water from storage in the basin.

Having found the overdraft in the San Fernando basin beginning in 1941-1942, the court awarded mutually prescriptive rights consisting of the "highest continuous annual production of water for beneficial use in any five (5) year period subsequent to the commencement of overdraft and prior to the filing of the complaint by each of the parties from the San Fernando Basin as to which there has been no cessation of use by it during any subsequent continuous five (5) year period." The court then reduced these mutually prescriptive rights proportionately insofar as necessary to limit the total extractions from the basin to its safe yield for 1964-1965, and enjoined future extractions in excess of these limited amounts, designated "restricted pumping." The mutually prescriptive

rights and restricted pumping rights thus adjudicated in the San Fernando basin in acre feet of water were as follows:

| | Mutually prescriptive right | Restricted pumping |
|---|---|---|
| Los Angeles | 82,310 | 63,257[11] |
| Glendale | 16,141 | 12,405 |
| Burbank | 17,760 | 13,649 |
| Private defendants | 1,781 | 1,369 |
| | 117,992 | 90,680 |

In the Sylmar basin, the court found that there was overdraft from 1936-1937 through 1941-1942, 1944-1945 through 1953-1954, and 1959-1960 through 1964-1965, and that in the intervening years there was surplus, i.e., the draft was less than the safe yield. Based on the commencement of this overdraft, the court fixed mutually prescriptive rights in the Sylmar basin, applying the same formula as was used to fix such rights in the San Fernando basin. However, the court found that the Sylmar basin's safe yield for 1964-1965 exceeded the total of the mutually prescriptive rights, and provided for the "restricted pumping," to which each party is limited in the judgment, by *increasing* the mutually prescriptive rights proportionately so as to aggregate the 1964-1965 safe yield. The respective rights fixed by the court in Sylmar basin, in acre feet, were as follows:

| | Mutually prescriptive right | Restricted pumping |
|---|---|---|
| Los Angeles | 2,440 | 2,818 |
| San Fernando | 2,370 | 2,737[12] |
| Two private defendants | 567 | 655 |
| | 5,377 | 6,210 |

[11]The judgment deducted from this restricted pumping right of Los Angeles all amounts extracted under previously entered stipulated judgments based on separate stipulations between an original defendant and Los Angeles as plaintiff. In 1972-1973 Los Angeles' pumping allowance was reduced by 4,150 acre feet on account of these extractions.

[12]As a "physical solution" the judgment allowed San Fernando to extract up to 850 additional acre feet per year, conditioned on its paying plaintiff (Los Angeles) $10 per acre foot plus the cost to plaintiff of purchasing an equal amount of water from MWD. This provision was based on findings that Sylmar ground water constitutes San Fernando's sole water supply, that the restricted pumping allowance falls short of San

In the Verdugo basin, the court found that there was overdraft (annual extractions exceeded safe yield) from 1940-1941 through 1949-1950, and surplus (safe yield exceeded extractions) from 1950-1951 through 1964-1965. The court fixed mutually prescriptive rights under the formula applied to the San Fernando and Sylmar basins and, as with Sylmar, allotted restricted pumping rights by increasing the mutually prescriptive rights proportionately to the extent necessary to make their total equal to the 1964-1965 safe yield. The rights in the Verdugo basin, in acre feet, were fixed as follows:

| | Mutually prescriptive right | Restricted pumping |
|---|---|---|
| Glendale | 2,327 | 3,856 |
| Crescenta Valley | 1,988 | 3,294 |
| | 4,315 | 7,150[13] |

A "flexibility" provision of the judgment provided that any party may exceed its restricted pumping right in any basin by up to 10 percent in any year with the excess to be offset by a reduction the following year. Conversely, any decrease below the restricted pumping right, not exceeding 10 percent, may be made up the following year.

### Restriction on Artificial Recharge of Underground Basins

The judgment enjoined the parties from spreading imported water over the ground for the purpose of artificially recharging the underground basins except pursuant to order of court made after notice and hearing. Certain minor spreading incidental to plaintiff's water system operations was exempted. The injunction was based on a finding that such artificial recharge "affects ground water storage capacity, ground

Fernando's needs and that the arrangement will not work an undue hardship on plaintiff.

As previously noted, after the judgment was entered, San Fernando's water facilities were severely damaged by the Sylmar earthquake of February 1971 and San Fernando thereafter joined MWD and can directly purchase MWD water. Plaintiff now asks that the physical solution provision be formally deleted from the judgment.

[13]It will be noted that (1) restricted pumping rights exceeded mutually prescriptive rights by over 63 percent (compared to under 16 percent in Sylmar) and (2) plaintiff was awarded no rights in Verdugo. Plaintiff asserts an interest in reversal of the Verdugo award because (1) it claims Verdugo is tributary to the Los Angeles River and so included in the pueblo right and (2) if Verdugo is separate, the court had no power to allot water in excess of the mutually prescriptive rights and so the judgment deprives plaintiff of the opportunity it would otherwise have to appropriate such excess water as surplus.

water in storage, ground water movement (rate and direction), and ground water levels," and that its control is necessary to protect the public interest and will equitably apportion the parties' use of underground reservoirs for regulatory storage and preserve the water therein for emergency conditions.[14]

### Administration of Judgment

To enforce the judgment the court appointed the California Department of Water Resources, Southern District, as watermaster, and provided for a six-member advisory board appointed by the major parties to advise the watermaster. In addition to collecting information and submitting periodic reports and recommendations to the court, the watermaster was empowered, subject to court review, to adjust the restricted pumping rights of any party "because of emergency requirements or in order that such party may secure its proportionate share of its rights as determined herein."

The court reserved continuing jurisdiction to redetermine the total amount of available water in the ULARA and to make changes in various details of the judgment but generally precluded changes in the proportionate pumping rights of the parties in the absence of abandonment or forfeiture.

### Separate Judgment for Reference Expenses

The State Water Resources Control Board was entitled to reimbursement of expenses (but not to a fee) as referee. (Wat. Code, § 2040.) On August 31, 1967, pursuant to Water Code section 2043, the board (then the State Water Rights Board) filed with the trial court a statement that its total reference expenses were $493,264 and that it had made a formal finding that these expenses should be apportioned 50 percent against plaintiff and the balance against those defendants who appeared in the action without disclaimer in proportion to the average amount of water pumped annually by each such defendant during the five years preced-

---

[14]Plaintiff objects to the anti-spreading provision as without legal foundation. Defendants describe it as designed to forestall claims by the spreader of additional pumping rights and to allocate use of limited underground storage space equitably and in a manner that avoids waste of water and interference with the property or rights of others. Plaintiff replies that the days of high water tables and limited underground storage space are over and that the injunction erects procedural barriers around a beneficial conservation practice.

ing commencement of the action. On this basis, the apportionment was as follows:

| | |
|---|---:|
| Los Angeles | $246,632 |
| San Fernando | 11,075 |
| Glendale | 101,307 |
| Burbank | 97,754 |
| Crescenta Valley | 12,291 |
| Other defendants | 24,205 |
| | $493,264 |

Plaintiff and defendants filed objections to the board's report which were orally argued. (Wat. Code, § 2045.) At the time that the court rendered its judgment on the merits, it rendered a separate judgment in favor of the board determining the total reference expenses to be as stated by the board but ordering a different apportionment. (Wat. Code, § 2048.) Under this judgment Glendale and Burbank were required to contribute to the reference expenses "in the proportion that their respective mutually prescriptive rights bear to the total mutual prescriptive rights" awarded by the judgment on the merits. No other defendants now before this court were required to contribute, but the interim partial payments previously made under Water Code section 2042 by former defendants who had been eliminated from the case were to be retained by the referee and were not to be refunded. The balance of the expense was to be paid by plaintiff. The amounts apportioned under this judgment were as follows:

| | |
|---|---:|
| Los Angeles | $344,547 |
| Glendale | 69,473 |
| Burbank | 66,816 |
| Other defendants before the court | None |
| Former defendants | 12,428 |
| | $493,264 |

Plaintiff appeals from this judgment, objecting to the apportionment itself and to the court's refusal to receive evidence at the hearing on apportionment of the assistance rendered by plaintiff to the referee. The total amount of the referee's expense is not in issue. The judgment recites that $488,786 out of the total $493,264 has been paid and orders that out of the $97,480 for which judgment is entered against plaintiff, $93,002 shall be refunded to defendants in stated proportions. According

to defendants' brief, the water board has received the entire amount due it under the judgment.

### Provision for Costs in the Principal Judgment

The judgment as originally entered provided that each defendant before the court should recover its costs of suit from plaintiff leaving the amounts blank. (Code Civ. Proc., § 1033.) Two months after the judgment was filed the court entered an "Order re Motion to Plaintiff to Tax Costs," setting out the costs awarded to each defendant which were thereafter inserted in the original judgment, as follows:

| | |
|---|---:|
| San Fernando | $ 3,046.31 |
| Glendale | 96,384.45 |
| Burbank | 93,727.45 |
| Crescenta Valley | 1,721.27 |
| Other defendants before the court | 1,244.32 |
| | $196,123.80 |

The bulk of the costs awarded to Glendale and Burbank were reference costs (their apportioned shares of the separate judgment in favor of the referee) and reporters' fees, as will appear from the following break-down:

| | *Glendale* | *Burbank* |
|---|---:|---:|
| Reference costs | $69,473.00 | $66,816.00 |
| Reporters' fees | 24,023.06 | 24,023.06 |
| Other costs | 2,888.39 | 2,888.39 |
| | $96,384.45 | $93,727.45 |

The combined effect of the separate judgment in favor of the referee and the award of costs in the judgment on the merits was to impose upon plaintiff $480,836 of the total reference costs of $493,264.

### PUEBLO RIGHT

### Existence of Pueblo Right: Res Judicata Issue

Plaintiff claims that the declaration of its pueblo right in its prior judgment against defendants Glendale and Burbank (*City of L. A.* v.

*City of Glendale, supra,* 23 Cal.2d 68) makes the existence of that right res judicata against those defendants in the present proceeding. The present action is for injunctive relief, not adjudicated in *Glendale,* and so is based on a different cause of action from that underlying *Glendale. (Langley* v. *Schumacker* (1956) 46 Cal.2d 601 [297 P.2d 977]; *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 141 [231 P.2d 6, 21 A.L.R.2d 1387].) ■ Under the collateral estoppel aspect of the doctrine of res judicata, any issue necessarily decided in the prior final determination of a cause of action by a court of competent jurisdiction is conclusively established between the parties or their privies in a subsequent lawsuit on a different cause of action. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439]; *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 810 [122 P.2d 892].) We hereafter examine the possible exception to this rule when the prior determination was of an issue of *law* rather than of *fact.*

Defendants Glendale and Burbank contend that plaintiff waived its claim of res judicata by (1) failing to plead the prior judgment (see Code Civ. Proc., former § 1962, subd. 6), (2) pleading that the pueblo right was based on Spanish and Mexican law and (3) requesting that the trial court take judicial notice of Spanish and Mexican law. Plaintiff replies that its res judicata claim was raised in its demurrer to these defendants' answer and cross-complaint, which was overruled. In any event, the water rights of the respective parties based upon "the doctrines of res judicata, law of the case and/or stare decisis" were expressly put in issue by the pretrial conference order, which superseded any inconsistent pleading. (Cal Rules of Court, rule 216.)

Defendants Glendale and Burbank contend that the declaration of the pueblo right in the *Glendale* judgment is not res judicata because of changes in the factual circumstances. The two changes relied upon are (1) the urbanization of the valley fill areas and some of the hill areas of the ULARA and (2) the disappearance of surplus in the underground water supply.

In 1940, at the time the trial court's judgment was rendered in *Glendale,* the Sylmar subarea and the plaintiff's portion of the San Fernando subarea were predominantly rural and agricultural. Before the trial of the present action, most of the valley fill areas had become urban and highly developed land. Defendants Glendale and Burbank fail to point out, however, any specific relevance of such changes to the legal effect to be given to the prior judicial declaration of plaintiff's pueblo

water right. Urbanization was anticipated long before the *Glendale* action. The clearest indication of this is the fact that most of the San Fernando Valley was annexed to Los Angeles in May 1915. The annexation included the Sylmar subarea and most of the San Fernando subarea outside the territories of the three defendant cities. The change from agricultural to urban uses has been more marked in the Los Angeles portion of the ULARA than in the Cities of Glendale and Burbank. No reason appears why this anticipated shift in the use of delivered water from agricultural irrigation to domestic purposes should detract from the weight to be given the prior adjudication of the pueblo right. Since domestic use is declared by law to be a higher use than irrigation (Wat. Code, § 106) the proportionate increase in domestic uses within Los Angeles territory, if relevant at all, may serve to enhance and not to diminish the public importance of the water rights protecting plaintiff's municipal supply.

Another factual change relied upon by defendants—disappearance of surplus in the underground water supply—affects our determination of such issues as the existence of prescriptive rights and the nature of the relief which should be granted but does not alter the effect to be given *Glendale's* declaration of the *existence* of plaintiff's pueblo water right.

Defendants contend that application of res judicata with respect to *Glendale's* determination of the pueblo right is precluded by an intervening change of law. This contention might have merit if the change of law were relevant to the issue on which res judicata is to operate. (See *Pacific Tel. & Tel. Co.* v. *City & County of San Francisco* (1961) 197 Cal.App.2d 133, 158 [17 Cal.Rptr. 687].) However, the only change of law which defendants point to is the decision in *Pasadena (City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908). That decision does not determine or even discuss the pueblo right but deals with *prescriptive rights* in the waters of an underground basin. Regardless of any effect that decision might have had on the creation of prescriptive rights to water claimed under a pueblo right, it is clear that it does not affect the issue on which res judicata is asserted here, to wit, the existence of the pueblo right in the first place.

Additional objections by defendants Glendale and Burbank to the application of res judicata may conveniently be considered together. These objections are: (1) that the res judicata objective of preventing vexatious and expensive litigation (see *O'Connor* v. *O'Leary* (1967) 247 Cal.App.2d 646, 650 [56 Cal.Rptr. 1]) cannot be accomplished here

because the presence of numerous other defendants to whom res judicata does not apply necessitated the relitigation of the pueblo right at the trial; (2) that the res judicata rule should be relaxed where great public interests are involved; (3) that the evidence at the trial supported the findings of the trial court that the pueblo right is without foundation, and therefore to establish its existence by res judicata would defeat the ends of justice; and (4) that to establish the pueblo right as to defendants Glendale and Burbank by means of res judicata and then to hold that there is no pueblo right as against the other defendants would result in inconsistent judgments.

All four of these additional objections must be considered in light of this court's historic treatment of the existence of plaintiff's pueblo right as a proposition of law rather than of fact. This treatment is most strikingly illustrated by *City of San Diego* v. *Cuyamaca Water Co.* (1930) 209 Cal. 105 [287 P. 475], in which this court relied on its earlier decisions upholding the pueblo right of Los Angeles in the waters of the Los Angeles River to hold as a matter of law that the City of San Diego has a similar pueblo right in the waters of the San Diego River.[15] Refusing to consider arguments to the contrary based on Spanish-Mexican history and law, we declared that by virtue of the prior line of cases the existence of a prior right of pueblos and their successors to use the waters of rivers passing through the pueblo territory as far as necessary for ordinary municipal purposes and for the use of their inhabitants was no longer an open question and had "long since become a rule of property in this state, which at this late date in the history and development of those municipalities which became the successors of such pueblos we are not permitted, under the rule of *stare decisis*, to disturb." (209 Cal. at p. 122.) Similarly, in *Glendale* we did not examine the factual historical basis for the existence of a pueblo right but commenced our discussion of the issue by declaring: "It has long been established that as successor to the pueblo of Los Angeles, the city of Los Angeles has a right, superior to that of a riparian or an appropriator, to satisfy its needs from the waters of the Los Angeles River. (Citations.)" (23 Cal.2d at p. 73.) (See also *City of Los Angeles* v. *Hunter* (1909) 156 Cal. 603, 608 [105 P. 755]; *City of Los Angeles* v. *Los Angeles Farming & Milling Co.* (1908) 152 Cal. 645, 652 [93 P. 869, 1135], writ of error dism., 217 U.S. 217 [54 L.Ed. 736, 30 S.Ct. 452]; *City of Los Angeles* v. *Pomeroy, supra* (1899) 124 Cal. 597, 641, writ of error dism. *sub nom. Hooker* v. *Los Angeles,* 188 U.S. 314 [47 L.Ed. 487, 23 S.Ct. 395].)

---

[15]San Diego and plaintiff are the only California cities for whom a pueblo water right has been adjudicated by reported decision.

■ The res judicata effect of the prior determination between the parties of a question of *law* may differ from the effect of such prior determination of a question of *fact.* This court observed in *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 757 [22 Cal.Rptr. 14, 371 P.2d 758], as follows: "An important qualification of the doctrine of collateral estoppel is set forth in section 70 of the Restatement of Judgments, which reads as follows: 'Where a *question of law* essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; *and in any event it is not conclusive if injustice would result.*' (Italics added.) Comment f to this section explains: 'The determination of a question of law by a judgment in an action is not conclusive between the parties in a subsequent action on a different cause of action, even though both causes of action arose out of the same subject matter or transaction, *if it would be unjust to one of the parties or to third persons to apply one rule of law in subsequent actions between the same parties and to apply a different rule of law between other persons.*' (Italics added.) The conclusion and reasoning of the Restatement find support in *United States* v. *Stone & Downer Co.,* 274 U.S. 225, 235-237 [47 S.Ct. 616, 71 L.Ed. 1013]." (See also *Cochran* v. *Union Lumber Co.* (1972) 26 Cal.App.3d 423, 427-428 [102 Cal.Rptr. 632].) The *Louis Stores* opinion also states that the public interest attached to the resolution of a question of law may require that it be determined without restriction from the collateral estoppel effect of prior litigation. (57 Cal.2d at p. 758.)

These principles apply to our consideration in this case of the legal issue of the existence of plaintiff's claimed pueblo right. If we were to decide that the prior decisions declaring the existence of such a right should no longer be followed with respect to the defendants who were not parties to *Glendale,* it would be unjust to hold defendants Glendale and Burbank bound to the pueblo right solely because of the doctrine of collateral estoppel. Another reason for disregarding collateral estoppel under such circumstances would be the public interest attaching to the proper determination of the conflicting claims of major public entities to water resources capable of furnishing substantial portions of their respective water needs. Accordingly we must determine whether the pueblo right exists for reasons other than collateral estoppel and res judicata.

*Existence of Pueblo Right: Historical Data
on Spanish-Mexican Law*

Irrespective of res judicata, plaintiff urges us to follow prior decisions of this court upholding the existence of its pueblo water right under the doctrine of stare decisis. Defendants, on the other hand, ask us to overrule these prior decisions by adopting the trial court's conclusion that the Pueblo of Los Angeles did not have any prior or paramount right to any of the waters of the Los Angeles River under Spanish or Mexican law and that plaintiff therefore acquired no such right as the pueblo's successor. The trial court based its conclusion upon its extensive findings on (1) the history of the Spanish and Mexican settlement and development of the Pueblo of Los Angeles, the Mission San Fernando, the ranchos of the ULARA, and surrounding areas of Southern California and on (2) the laws, orders and regulations of Spain and Mexico relevant to the pueblo water right question. These findings were based in turn on the trial court's inferences and conclusions from lengthy expert testimony and voluminous historical documents and other exhibits.

Even if the existence of the pueblo right were a question of first impression in our appellate courts, we would not apply to these findings the standard of appellate review by which findings must be upheld if supported by substantial evidence. ■ Spanish and Mexican laws governing property rights in California before the annexation remained in effect after the change of sovereignty unless duly repealed or altered, and we are required to take judicial notice of such laws as part of the law of this state. (*Ohm* v. *San Francisco* (1891) 92 Cal. 437, 450 [28 P. 580].) Historical facts concerning the Spanish and Mexican settlement of California are also proper subjects of our judicial notice. (*City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. at p. 124; *Ocean Industries, Inc.* v. *Superior Court* (1927) 200 Cal. 235, 241 [252 P. 722].) ■ Thus, in adjudicating California property rights dependent on a question of Spanish or Mexican law never before considered by us, we are called upon to make our own determination independently from the conclusions of the trial court even though we may be greatly aided by expert testimony and historical documents presented to and considered by the trial court and made part of the record on appeal. (*Estate of Chichernea* (1967) 66 Cal.2d 83, 85-87 [57 Cal.Rptr. 135, 424 P.2d 687].)[16]

---

[16]These principles of judicial notice are now incorporated into section 310, subdivision (b), and division 4 (§§ 450-460) of the Evidence Code which, however, did not apply to

A different approach must be taken, however, to an issue such as the existence of plaintiff's claimed pueblo water right under Spanish and Mexican law which has already been decided by this court in several prior cases. Even assuming that the exhibits and expert testimony in the present record would have persuaded us to decide against the pueblo right as an original question, we should not now so rule if to do so would unjustly impair legitimate interests built up over the years in reliance on our former decisions. (See *United States* v. *Maine* (1975) 420 U.S. 515 [43 L.Ed.2d 363, 95 S.Ct. 1155]; *Hart* v. *Burnett* (1860) 15 Cal. 530, 597-612.) Accordingly, we should not undertake the formidable task of reviewing in detail the vast mass of material in the record on the issue of pueblo water rights under Spanish-Mexican law[17] unless we are first assured of a reasonable possibility of finding grounds for denying the pueblo right which would outweigh the countervailing policies of stare decisis. To consider this possibility, we now summarize the major points covered by this material.

The case for the existence of the pueblo right is essentially based on inferences from historical circumstances rather than on any express provision of Spanish or Mexican law. These circumstances relate to the founding of the pueblo and to subsequent events involving conflicts or potential conflicts between the pueblo's claims and the claims of others to the water of the Los Angeles River. The pueblo was established by order of the royal Spanish government as a permanent settlement to be inhabited principally by farmers who would grow crops on irrigated tracts of farm land as well as raise livestock and would furnish an essential source of agricultural supplies for the presidios. The pueblo was deliberately located to take maximum advantage of the Los Angeles River as a source of water for irrigation and the orders for the pueblo's founding included detailed provisions for an irrigation dam and canals. These circumstances strongly suggest a governmental policy of assuring the pueblo a supply of water sufficient for its maintenance and growth, at least in the absence of any other town or settlement of comparable importance competing for the same water supply.

Events subsequent to the pueblo's founding in 1781 indicated continued recognition and protection of the pueblo's priority to the river water.

---

the trial of the instant case or to appellate review of rulings at the trial because the trial commenced before January 1, 1967. (Evid. Code, § 12, subd. (b).)

[17]Seventy trial days were consumed in presenting this material to the trial court. There are hundreds of exhibits on the issue, some of which are very lengthy. An additional 19 trial days were devoted to the prior cases decided by this court on the pueblo water right issue during which the records, briefs and evidence of those cases were analyzed and compared with other material.

Rancho San Rafael, directly north of the pueblo, was granted in 1784 and 1798 but only after the grantee had given express assurances that the pueblo would not be injured. In 1797 the Mission San Fernando was founded, not along the Los Angeles River, but in the northern San Fernando Valley where it could use the water available from the artesian springs of the Sylmar subarea. The mission carried on agricultural operations throughout most of the San Fernando Valley in the course of which it used water from the Los Angeles River for irrigation. Yet the recorded incidents of concern over the possible infringement of these operations upon the pueblo's water supply show consistent recognition of the pueblo's priority. In 1810, when the pueblo complained to higher authority about possible injury from the mission's using the river for irrigation, the mission agreed to desist whenever injury to the pueblo was shown. In 1817 the governor granted permission to the mission to irrigate land along the river *only* after first summoning pueblo officials and ascertaining from them that the proposal would not injure the pueblo. In 1836, after the mission lands were secularized, pueblo officials examined and investigated a dam on the river in the same area and obtained assurances that the administrator of the dam would break it if the pueblo ran short of water. Although most of the secularized mission land was granted to private parties by the Mexican government between 1840 and 1846, the trial court in *Feliz* v. *City of Los Angeles* (1881) 58 Cal. 73, 76, found that throughout the period of Mexican rule all of the owners of land along the river from its source to the pueblo recognized and acknowledged the pueblo's prior right.

The historical evidence relied upon by defendants as supporting the trial court's findings against the pueblo right falls well short of demonstrating that our prior holdings upholding the right were palpably erroneous or unreasonable. Principal reliance is placed upon Laws 5 and 7 of Title 17, Book IV, of the Laws of the Indies.[18] Law 5 states in pertinent part: "We command that the use of all pastures, woods and waters of the provinces of the Indies be common to all the citizens of them, that are now, and afterwards may be so that they can use them freely." Law 7 states in pertinent part: "The woods, pastures and waters of the settlements . . . must be common to Spaniards and Indians." Although defendants claim that these provisions for "common" use are inconsistent with a prior pueblo right, they necessarily concede that prior rights to water did exist. Irrigation rights could be granted, and

[18]The Spanish referred to their American territories as the "Indies." The Recopilación de Leyes de los Reynos de las Indias, referred to herein as the Laws of the Indies, was compiled in 1680.

defendants' expert, Lic. Oñate, testified that a grant of "irrigable" land adjoining a river conveyed a right to irrigate. Thus, these provisions of the Laws of the Indies were not necessarily inconsistent with an *implied grant* to the Pueblo of Los Angeles of a prior right to use water from the river to the extent necessary to carry out the governmental orders and policies for which the pueblo was founded. Similarly, the provisions of the Laws of the Indies were not necessarily inconsistent with the establishment of a pueblo water right based on *usage*, as exemplified by the repeated instances of acknowledgment of the right by the mission fathers, higher governmental officials and upstream landowners.

Nor is the existence of the pueblo right necessarily precluded by the qualifications which defendants cite as being placed upon grants to use water for irrigation. The subjection of these grants to common use of the water for *domestic purposes* permitted the filling of portable containers directly from the river with water for domestic use but did not necessarily cover the delivery of water through pipes or other conduits. Another qualification to which irrigation grants were subject was the governmental authority to apportion water in the event of drought or shortage, but such authority was a form of police power exercisable to alleviate physical deprivation caused by drought or other emergency and did not necessarily impair the pueblo's priority for its needs under normal conditions.

A further qualification relied upon by defendants. is the right of landowners to use water from springs or wells on their land. This private right was concededly subject to the pueblo's right to take water needed for its inhabitants but defendants assert that the owner was then entitled to compensation from the pueblo. No compensation was required, however, if the pueblo had acquired the use of the water by means of title or prescription. If the ground water supplying the well or spring was part of an underground flow to a river subject to the pueblo right, it can reasonably be concluded that the pueblo could use the water to satisfy its needs free from any obligation of compensation.

Defendants dispute the historical predominance of pueblos over other forms of Spanish settlements such as presidios, missions and ranchos, but it can reasonably be concluded from the evidence that the pueblo was selected as the primary instrument for the permanent settlement and development of Spanish America. A different question is raised by the contention of the three defendant cities that they are entitled to share in the water which plaintiff claims under the pueblo right because multiple

pueblos located along the same river were required by Spanish law to share the river water with each other. Whether, to what extent, and under what circumstances Spanish law (1) gave multiple pueblos equal rights in the river or (2) gave priority to the earliest established pueblo is not clear. Since no pueblo other than Los Angeles was located along the Los Angeles River during the Spanish-Mexican period, any Spanish or Mexican law or usage on the subject could have no practical effect on the rights of the Pueblo of Los Angeles. The defendant cities were never pueblos and did not come into existence until well over half a century after California became part of the United States. Their claim to share in the native waters of the Los Angeles River cannot be judged by speculation on what would have been the rights of additional pueblos had they been established along the river, but only by the circumstances which actually preceded and accompanied the defendants' establishment as California cities, including the development of water law in this state and conduct in reliance thereon.

We conclude from this historical data considered by the trial court that at the very least there is a colorable basis for the existence of the pueblo water right claimed by plaintiff. Regardless of how we might determine the issue if the slate were clean of precedent, we are not convinced by this historical showing that our prior decisions upholding the pueblo right were palpably erroneous or unreasonable and should be ignored or overruled.

*Basis of Prior Decisions Upholding Existence of*
*Pueblo Right Under Spanish and Mexican Law*

The adequacy of the data and the reasoning on which a prior decision purports to be based are relevant factors in determining whether the decision should be followed under the doctrine of stare decisis. (See, e.g., *DeBurgh* v. *DeBurgh* (1952) 39 Cal.2d 858, 863-867 [250 P.2d 598]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 698, p. 4615.) In accordance with this principle, defendants contend that we should overrule our prior decisions upholding the existence of the pueblo water right because those rulings were allegedly based directly or indirectly on incomplete and distorted presentations of historical data about the water rights of pueblos under Spanish and Mexican law.

In only two decisions, *Lux* v. *Haggin* (1886) *supra,* 69 Cal. 255. 313-334, and *Vernon Irrigation Co.* v. *City of Los Angeles* (1895) *supra,* 106 Cal. 237, 244-251, has this court examined Spanish-Mexican history

and law pertaining to the existence of the pueblo water right claimed by plaintiff. Prior cases in which the issue was raised were disposed of on other grounds. Two such cases resulted in reported opinions. In *City of Los Angeles* v. *Baldwin* (1879) 53 Cal. 469, the city's action to quiet title to Los Angeles River waters against the owners of certain land in Los Feliz Rancho bordering the west bank of the river in the Narrows was held barred by a prior judgment denying the city an injunction against the same defendants' use of the river. The city had not appealed the prior judgment; hence it was only res judicata, not stare decisis, before this court. In *Feliz* v. *City of Los Angeles* (1881) *supra*, 58 Cal. 73, owners of other tracts also located in Los Feliz Rancho were denied the right to have the city enjoined from cutting off the flow from the river into the owners' irrigation ditches insofar as the city was taking such action to maintain the volume of river water necessary to supply the city's needs. As previously stated, the decision was based on the long-standing recognition and acknowledgment of the city's pueblo water right by the owners, their predecessors, and other upstream riparian owners, in view of which the court found it unnecessary to examine the Spanish and Mexican laws applicable to pueblos.

In cases raising the pueblo water right issue *after* the *Lux* and *Vernon* decisions, this court has treated the existence of the pueblo water right as a rule of law based on the precedent of those two decisions and of decisions relying on them. (See *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d 68, 73; *City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. 105, 122; *City of Los Angeles* v. *Hunter, supra,* 156 Cal. 603, 608; *City of Los Angeles* v. *Los Angeles Farming & Milling Co., supra,* 152 Cal. 645, 652; *City of Los Angeles* v. *Pomeroy, supra,* 124 Cal. 597, 641.) Therefore, *Lux* and *Vernon* are the key decisions on the issue.

*Lux* v. *Haggin, supra,* 69 Cal. 255, is a landmark case establishing for California the doctrine that riparian water rights generally have priority over appropriative rights based on appropriations made after the riparian land became private property. The part of the court's exhaustive opinion relevant here is that dealing with and rejecting a contention that riparian rights were precluded by Mexican law which dedicated running waters to the common use of all inhabitants. (69 Cal. at pp. 313-334.) Although the opinion does not mention Law 5 or Law 7 of Title 17, Book IV, of the Laws of the Indies, on which defendants rely here as establishing the principle of commonality of water use under Spanish and Mexican law in California, the court does recognize the principle and analyzes its relationship to riparian rights and to the pueblo water

right. Generally, the court views Mexican law as (1) permitting common use of the waters of unnavigable streams while flowing in their natural channels but (2) treating such water as "capable of appropriation as private property, independent of any common use, where the quantity of water is so small as to be incapable of being fully enjoyed without exclusive possession." (69 Cal. at p. 320.) The court states that Mexican law gave pueblos a property right in the waters of an unnavigable river on which the pueblo was situated *in trust* for the purpose of equitably distributing the water for the benefit of its inhabitants. "The trust is within the supervision and control of *the state.* Thus the legislature has provided for the mode and manner in which shall be exercised the trust of distributing the waters by the *city,* the successor of the pueblo of *Los Angeles.*"[19] (69 Cal. at p. 329.) Turning to the relationship between pueblo rights and the riparian rights of private landowners, the court quotes a passage from the Spanish legal writer, Escriche, including the following key sentence about rivers: " 'If not navigable, the owners of the lands through which they pass may use the waters thereof for the utility of their farms or industry, *without prejudice to the common use or destiny which the pueblos on their course shall have given them . . . .*' " (69 Cal. at p. 330.) The court then states that "it appears" that a pueblo had a prior right to use the waters of a stream passing through it for the benefit of its inhabitants "even as against an upper riparian proprietor." The court adds, however, that "[i]t is not necessary here to decide that the pueblos had the preference above suggested," or "to speak of the relative rights of two or more municipalities on the same stream" because no pueblo existed on the watercourse under litigation. (69 Cal. at pp. 331-332.)

Defendants' principal response to the merits of the *Lux* court's views favoring the pueblo water right is to attack the credibility of the quotation from Escriche. In this regard, defendants adopt the view of the trial judge's memorandum of decision which in turn is based on statements of the Texas Court of Civil Appeals in *State* v. *Valmont Plantations* (1961) 346 S.W.2d 853, 867-869, affd. 163 Tex. 381 [355 S.W.2d 502]. In *Valmont* the court ruled that owners holding land along the lower Rio Grande River under Spanish and Mexican grants did not have riparian rights to use the river water for irrigation. In so holding, the court rejected the riparian owners' contention that Escriche's

---

[19]The court probably refers here to legislation empowering the city to irrigate the public and common lands formerly claimed by the pueblo (Stats. 1851, ch. 78, p. 329; Stats. 1852, ch. 110, p. 186; Stats. 1854, ch. 95, p. 205) and to legislatively enacted provisions in the city charter purporting to grant the city rights in the Los Angeles River. (Stats. 1873-1874, ch. 447, p. 633; Stats. 1875-1876, ch. 476, pp. 692, 693; Stats. 1877-1878, ch. 440, pp. 642, 643.)

statement, quoted above, showed the existence of riparian rights under Spanish or Mexican law.[20] This rejection was based on (1) an asserted absence of Spanish legal authority to support the existence of riparian rights and (2) a theory that Escriche borrowed his ideas from the Code Napoleon of France (a country in which he lived from 1823 to 1833 which was prior to the publication of his treatise in 1847) and that his work imitated the organization of a treatise, published in 1834, of a French legal writer named Duranton. The Texas court's criticism, however, was directed solely to Escriche's views on *riparian* rights (346 S.W.2d at p. 868, fn. 31) and not to the part of his statement indicating that a private landowner's use of river water must be "without prejudice to the common use or destiny" given to such water by pueblos along the river's course. It is clear from French legal material submitted by plaintiff and not disputed by defendants that neither Duranton nor the French laws of his time recognized any municipal water right equivalent to or resembling the pueblo right referred to by Escriche. Thus the *Valmont* discussion sheds little light on the soundness of Escriche's indicated view of the existence of pueblo water rights.

The other case in which this court examined the question of the existence of the pueblo water right under Spanish and Mexican law is *Vernon Irrigation Co.* v. *City of Los Angeles, supra,* 106 Cal. 237. In *Vernon,* an owner of land downstream from the city claimed riparian and appropriative rights in water of the Los Angeles River and sought an injunction and decree quieting title against the city. The city asserted the pueblo water right and was sustained by the trial court. The Supreme Court upheld the pueblo right not only by relying on the above described discussion in *Lux* v. *Haggin, supra,* 69 Cal. at pages 326-332, but also by making an independent review of Spanish and Mexican law and of the pueblo's early history. The court did not point to any specific governmental act or rule of law expressly creating the pueblo right but concluded that the existence of the right was implied by the role which the Spanish and Mexican governments assigned to the pueblo as an instrumentality for settling vacant territory. The needs of the pueblo settlers for wood, pastures, and water were supplied by the pueblo from public or common lands administered for the benefit of the inhabitants. Spanish laws directed that pueblos be located with a view to ample water supply and this was done in the case of Los Angeles. "Since the water

---

[20]The harshness of this rejection of Escriche's statement is mitigated by the court's concession that Escriche may have been correct even under Spanish-Mexican law if his statement referred to the riparian owner's *permissive* use of river water in the absence of a conflicting license or grant.

belonged to the nation, and could not be acquired from it by condemnation, it would seem to follow, as a matter of necessity, that, when the pueblo was organized under the [Spanish] laws, a sufficiency of this water for the pueblo was appropriated to it." (106 Cal. at p. 248.) The court concluded (1) "that pueblos had a right to the water which had been appropriated to the use of the inhabitants, similar to that which it had in the pueblo lands," (2) "that the right of its successor, the city, to the water, for its inhabitants and for municipal purposes, is superior to the rights of plaintiff as a riparian owner," and (3) "that such right could be asserted only to the amount needed to supply the wants of the inhabitants." (106 Cal. at pp. 250, 251.) The opinion states these conclusions were supported (1) by the history of the Pueblo of Los Angeles, including the instructions for its founding in 1781 and the pueblo's complaint in 1810 of the San Fernando Mission's diversion of river water at Cahuenga, upstream from the pueblo, followed by the mission's acknowledgment of the pueblo's superior right, (2) by the "translations of numerous ordinances, laws, rules, and regulations of Spain and Mexico relating to this subject" (106 Cal. at p. 250), (3) by *Lux* v. *Haggin, supra,* 69 Cal. 255, and (4) by *Feliz* v. *City of Los Angeles, supra,* 58 Cal. 73.[21]

Defendants make a broad attack on the *Vernon* case, based primarily on the present trial court's lengthy finding 55, which states the following as its basic proposition: "A review of the *Vernon* case reveals many instances of erroneous translations of Spanish documents, incomplete references to source materials and omissions of important sentences. The effect thereof was to create confusion and to present incorrect and distorted statements about the water rights of pueblos under Spanish and Mexican law." Both this finding and defendants' brief offer numerous examples to support this proposition, but after comparing them with the present record we conclude that some are inaccurately stated and after correction for such errors, in total, they are not of sufficient seriousness to have misled the *Vernon* court.[22]

After reviewing the showing in the present record of the briefs and record before the court in *Vernon,* we are satisfied that the court had before it the same major contentions and considerations which are now being advanced for and against the historical existence of the pueblo

---

[21]While upholding the existence of the pueblo right, *Vernon,* quoting statements to this effect in *Feliz,* 58 Cal. at pages 79-80, also held that the pueblo right did not entitle the city to priority in taking water for the purpose of selling it to users *outside* the city limits.

[22]Because of its length, this footnote appears in the Appendix.

water right claimed by plaintiff. That court based its conclusion in favor of the existence of such a right on the very same historical circumstances on which plaintiffs rely here, including (1) the primary role played by the river's availability for irrigation in the Spanish government's selection of the pueblo's location and instructions for its establishment and development and (2) the subsequent recognition of the pueblo right manifested by such incidents as the resolution in the pueblo's favor of the 1810 dispute with the mission over the dam at Cahuenga. The portions of the *Vernon* appeal transcript which defendants introduced into evidence in the present case include summaries of the testimony of four witnesses whose personal familiarity with the use of the Los Angeles River for irrigation dated back to periods beginning between 1837 and 1854. All of them testified that during these periods it was common knowledge that the pueblo or the City of Los Angeles controlled the use of the river for irrigation and that such use by private owners was only with the city's permission.

Despite defendants' strenuous contentions to the contrary, the *Vernon* court did have before it the essentials of their objections to the existence of the pueblo right. The court was told of the provisions of Law 5 and Law 7 of Title 17, Book IV of the Laws of the Indies to the effect that the use of water should be in common, of the rights of landowners in water from springs and wells, and of other principles on which defendants rely. It is true that the present record includes extensive testimony by experts on early California history and on Spanish and Mexican law and apparently includes far more voluminous documentation on the pueblo water right issue than was considered by the *Vernon* court. On the other hand, the *Vernon* court was in a position to consider documents that have since disappeared and testimony of witnesses with personal recollection of the Mexican era. We are not convinced that the justices who heard and decided either *Lux* or *Vernon* were misled in any material aspect of their consideration of the existence of the pueblo right or that their conclusions on the issue would have been substantially different if they had had the benefit of the contents of the present record prepared three quarters of a century after those decisions.

*Plaintiff's Reliance on Pueblo Right*

The doctrine of stare decisis applies with special force to rules of property on which those engaged in business transactions have relied in

gauging the probable returns on their acquisitions and investments. (See *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 456-457 [326 P.2d 484].) The pueblo water right has been declared to be such a rule of property. (*City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. at p. 122.) In considering defendants' ardent contention that the pueblo right should be repudiated, we now examine the nature and extent of plaintiff's reliance on the pueblo right in the development of its water supply and the practical consequences that would attend its abandonment.

The Los Angeles River provided the sole water supply for the Pueblo of Los Angeles and its successor city, plaintiff, from the founding of the pueblo in 1781 through the 19th century and the first decade of the 20th. During the latter part of this period plaintiff entered an era of rapid growth. Its population was 11,183 in 1880, 50,395 in 1890, 102,479 in 1900, and 318,198 in 1910. This growth was accompanied by concern over plaintiff's future water supply. One response by plaintiff to this concern was to obtain judgments declaring and enforcing its claim to a paramount pueblo right to use the water of the river to the extent of its needs. On the basis of serious water deficits during heat waves in the summers of 1904 and 1905, plaintiff obtained an injunction in *City of Los Angeles* v. *Buffington,* decided with the companion case of *City of Los Angeles* v. *Hunter* (1909) *supra,* 156 Cal. 603, prohibiting numerous landowners in the southeastern San Fernando Valley from extracting or diverting water at any time that plaintiff was consuming the entire flow for its municipal supply. In addition to his injunction, plaintiff obtained judgments declaring the paramountcy of the pueblo water right against owners of land along or near the river bed in the southern San Fernando Valley[23] not only in the reported cases of *City of Los Angeles* v. *Hunter, supra,* 156 Cal. 603; *City of Los Angeles* v. *Los Angeles Farming & Milling Co.* (1907) 150 Cal. 647 [89 P. 615]; *id.* (1908) 152 Cal. 645 [93 P. 869, 1135], writ of error dism. 217 U.S. 217 [54 L.Ed. 736, 30 S.Ct.

---

[23]As will be noted in considering the extent of the waters covered by the pueblo right, all of plaintiff's efforts and actions to obtain judicial declarations and enforcement of its prior rights in the Los Angeles River before commencement of the present suit were directed against water users in the southern part of the San Fernando subarea. The record shows no previous action taken by plaintiff against the taking of water from the Sylmar or Verdugo subareas. Apart from the areas in which plaintiff did seek to protect its prior rights, plus northern tracts receiving water from the Sylmar subarea, substantially all the San Fernando subarea was a semi-desert until the introduction of Owens water in May 1915.

452],[24] but also in three superior court cases set forth in exhibits in the present record.[25]

The other response to the increasing water shortage was to obtain new sources of water. Minor additions to plaintiff's Los Angeles River supply were made after 1910 by the drilling of wells in the southern part of the city and the acquisition of private water systems.[26]

In 1907 plaintiff commenced work on its Los Angeles Aqueduct to import large quantities of water from the Owens River in Inyo County over 200 miles away. The first Owens water reached the San Fernando Valley on November 5, 1913, and was all delivered into plaintiff's distribution mains south of the Santa Monica Mountains. In May 1915 plaintiff annexed almost all of the San Fernando Valley thus increasing the area of plaintiff's territory from 115 to 285 square miles. In the same month plaintiff commenced delivery of Owens water to the annexed territory primarily for irrigation purposes. These events had two effects on the quantity of water available from the Los Angeles River and its underground supply in the ULARA: (1) The introduction of Owens water into plaintiff's distribution system reduced the quantity of ground

[24]In the second *Farming & Milling* action, defendant filed an amended cross-complaint to quiet its title to all of its San Fernando Valley holdings including the land designated in the earlier action. The plaintiff city filed a disclaimer, whereupon defendant was granted a judgment declaring that plaintiff had "no interest or estate" in the described premises. Defendants now contend that this judgment estops plaintiff from claiming any of the surface or ground waters on the land described in the cross-complaint. This contention is without merit. Although the pueblo water right can entitle plaintiff to require others to refrain from activities on their own land that will result in the taking of water that would otherwise reach plaintiff's supply, the right is not an interest or estate in land because it cannot entitle plaintiff to enter or use the land of another. (*City of Los Angeles v. Los Angeles Farming & Milling Co., supra*, 152 Cal. at p. 650.)

[25]West Los Angeles Water Co. (1901), Laguna Irrigation Co. (1904), and Amestoy Estate Co. (1903). Defendants point out that *Amestoy* was a default case (see *Amestoy Estate Co. v. City of Los Angeles* (1907) 5 Cal.App. 273 [90 P. 42]) and the other two cases were settled by the city's purchasing certain assets. The relevance of these cases here lies not in what they decided legally but in their exemplification of plaintiff's efforts to secure its pueblo water right.

Prior to this court's enunciation of the pueblo right in *Lux v. Haggin, supra,* 69 Cal. 255, 313-334, and *Vernon Irrigation Co. v. City of Los Angeles, supra,* 106 Cal. 237, plaintiff had sought judicial declarations and enforcement of its prior rights in Los Angeles River water against riparian owners in the Narrows immediately above plaintiff's northern boundary in *City of Los Angeles v. Baldwin* (1879) *supra,* 53 Cal. 469. *Feliz v. City of Los Angeles* (1881) *supra,* 58 Cal. 73, and City of Los Angeles v. Griffith (1885) (default judgment in superior court, based on settlement involving plaintiff's purchase of water rights).

[26]See appendix. Certain footnotes containing factual data of interest to the parties but not necessary to an understanding of this opinion appear in the appendix instead of in the margin of the text.

water plaintiff was required to draw from the ULARA and (2) much of the Owens water used for irrigation in the San Fernando Valley was returned underground and was mingled with and substantially increased the ULARA's ground supply.

In the water year 1913-1914, despite the beginning inflow of Owens water, plaintiff drew what was then a record 62,800 acre feet of ground water from the ULARA. This amounted to almost the entire safe yield of the ULARA[27] and probably equalled or exceeded the safe yield of the San Fernando subarea.[28] The following year, 1914-1915, plaintiff's ULARA extractions dipped to 49,630 acre feet and did not again reach an annual rate above the 1913-1914 figure until 1923-1924. But even this decrease in extractions does not reflect the full reduction effected by the new aqueduct in plaintiff's dependence on the native underground supply. In 1913-1914, the year of maximum extractions, plaintiff was already using Owens water in substantial amounts,[29] and the volume of imported water increased drastically during the ensuing five years.[30] Although some of the imported water was used for irrigation, it is clear that much of it was needed, and used, for the domestic needs of plaintiff's growing population,[31] thus offsetting that population's dependence on the native supply.

The imported Owens water not only replaced water that plaintiff would otherwise have drawn from the ULARA's native underground supply but it also augmented that supply through returns from imported water used for irrigation, thus proportionately decreasing the part of plaintiff's extractions constituting a drain on the native supply.

The extent of this augmentation was substantial. About 27 percent of the Owens water delivered to customers in the San Fernando Valley was returned to the underground reservoir.[32] The proportion of the underground supply attributable to imported (as distinct from native) water is a more variable figure depending on such factors as the quantity of imported water used in the ULARA and changes on the land surface affecting the extent to which the native rain and surface runoff can penetrate beneath the ground. Although in 1955, when this action was

---

[27]See appendix.
[28]See appendix.
[29]See appendix.
[30]See appendix.
[31]See appendix.
[32]See appendix.

commenced, imported water provided over 40 percent of the safe yield of the ULARA, the average contribution of imported water to safe yield from 1928 to 1940 was probably somewhat less than 30 percent.[33]

These two responses by plaintiff to its acute water shortage of the 1900's—obtaining judicial protection of its pueblo water right and importing water from the Owens River—were interrelated. Plaintiff could not properly spend its municipal funds to import water from a great distance simply to replace a cheaper local supply and make the replaced water available for appropriation by strangers. Yet without the pueblo right that would be the effect of plaintiff's actions with respect to the Owens water. If plaintiff had refrained from adding Owens water to the ULARA's underground supply and had continued to draw on that supply for substantially all of its domestic needs, it is probable that very little water would have been available for defendants at least in the San Fernando subarea.[34] Plaintiff could have put the subarea's safe yield to beneficial use and could thus have justified its appropriation long before any significant quantities were appropriated by defendants.[35] If prior riparian or overlying rights were asserted, plaintiff might have purchased or condemned such rights for relatively small sums[36] or could have acquired them by prescription (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, 926-927; *Moore* v. *Cal. Oregon Power Co.* (1943) 22 Cal.2d 725, 735 [140 P.2d 798]; *Hudson* v. *Dailey* (1909) 156 Cal. 617, 629-630 [105 P. 748]). The importation of Owens water, however, created a surplus of water enabling others to make competing appropriations from the underground supply. In importing the water, plaintiff relied on the pueblo right to retain priority in its original native supply once this surplus was exhausted. (See *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d 68, 75, 79-80.)

Another course that plaintiff might have followed in the absence of a pueblo water right would have been to proceed as it did with the

---

[33]See appendix.

[34]Plaintiff took all of its ULARA water from the San Fernando subarea until 1919 when it acquired wells in the Sylmar subarea. Plaintiff has no wells in the Verdugo or Eagle Rock subareas.

[35]See appendix.

[36]Prior to importation of Owens water, riparian and overlying uses in the San Fernando subarea were largely confined to irrigation of land relatively close to the bed of the Los Angeles River immediately north of the Santa Monica Mountains and down through the Narrows. The value at that time of the rights to use water for those purposes would have been small in comparison to the benefits to plaintiff in preserving its priority to such water for its municipal supply.

annexation of the San Fernando Valley and the importation of Owens water into the annexed territory as well as other parts of the city and concurrently to sponsor legislation to assure preservation of its prior rights in the cheaper local supply when its needs should outgrow the Owens-created surplus. Such legislation would have been in accord with the policies of subsequent California enactments providing such protection to foresighted municipalities which develop water resources for their future needs.[37] (See Hutchins, *Pueblo Water Rights in the West* (1960) 38 Texas L.Rev. 748, 756.)

### Conclusions Concerning Existence of Pueblo Right

■ In past decisions this court has held (1) that plaintiff and its predecessor pueblo had a paramount right, based on Spanish and Mexican law, to use the waters of the Los Angeles River to the extent of its municipal needs and those of its inhabitants (*Vernon Irrigation Co.* v. *City of Los Angeles, supra,* 106 Cal. at pp. 244-251; *Lux* v. *Haggin, supra,* 69 Cal. at pp. 313-334) and (2) that the existence of this pueblo water right is a rule of law (*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 73; *City of Los Angeles* v. *Hunter, supra,* 156 Cal. at p. 608; *City of Los Angeles* v. *Los Angeles Farming & Milling Co., supra,* 152 Cal. at p. 652; *City of Los Angeles* v. *Pomeroy, supra,* 124 Cal. at p. 641) and a rule of property (*City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. at p. 122) under the doctrine of stare decisis. Ordinarily these circumstances in relation to a prior holding would lead us to treat it as a closed question, not one open to reconsideration. We reconsider our past rulings in this case only because of the extraordinary quantity and complexity of historical and legal data presented to the trial court on the question, the

---

[37]See the following sections of the Water Code:

Section 106.5: "It is hereby declared to be the established policy of this State that the right of a municipality to acquire and hold rights to the use of water should be protected to the fullest extent necessary for *existing and future uses,* but that no municipality shall acquire or hold any right to waste water, or to use water for other than municipal purposes, or to prevent the appropriation and application of water in excess of its reasonable and existing needs to useful purposes by others *subject to the rights of the municipality to apply such water to municipal uses as and when necessity therefor exists.*" (Italics supplied.)

Section 1203: "Any water the right to the use of which is held by any municipality which is in excess of the existing municipal needs therefor may be appropriated by any person entitled to the possession of land upon which such excess water may be put to beneficial use *but the right of such person to use such water shall continue only for such period as the water is not needed by the municipality.* This section supplements but does not otherwise affect Sections 1460 to 1464, inclusive." (Italics supplied: §§ 106.5 and 1203 were enacted by Stats. 1945, ch. 1344, §§ 1, 2, p. 2520.)

See also sections 1005.1 and 1005.2, discussed in footnote 62, *infra.*

trial court's detailed findings and conclusions to the effect that plaintiff's adjudicated pueblo water right should now be abandoned, and the fact that the injunctive relief requested by plaintiff on the basis of the pueblo right would have a much more immediate and far reaching effect on the water rights of major public entities than the relief granted in prior pueblo water right cases. The issue before us is not the existence of the pueblo right as an original question but whether the data relied upon by defendants and the trial court is sufficient to overcome the great weight that must be attached to our prior holdings under the doctrine of stare decisis.

We conclude that our prior holdings should not be disturbed and therefore the existence of plaintiff's pueblo water right must be upheld and reaffirmed, for the following reasons:

1. The data on Spanish-Mexican law and history described and referred to in the briefs, while not conclusively demonstrating the existence of the pueblo right, does not conclusively demonstrate its nonexistence but on the contrary provides a reasonable basis for a judicial determination that the right did and still does exist.

2. There are no serious discrepancies between the legal and historical data now before us on the issue and the data which the parties have drawn to our attention as having been included in the briefs and records in the prior cases in which this court affirmed the existence of the pueblo right. Nor has there been demonstrated any substantial likelihood that the court's consideration in those prior cases of all the data now before us in this case would have changed their results.

3. In building the Los Angeles Aqueduct and importing water from the Owens River, plaintiff relied upon the pueblo right for assurance that all of the imported water would constitute an addition to its water resources rather than replacing any of its less expensive pre-existing supply from the native waters of the Los Angeles River. The imported Owens water not only reduced the quantities which plaintiff was required to draw from the underground waters supplying the river but also added to those waters, thus creating a surplus which was drawn upon by other parties including defendants. Plaintiff looked to the pueblo right to preserve its priority in the underground waters and to entitle it to draw on them for its needs once the surplus was gone.

4. All defendants have been on notice of the existence of plaintiff's pueblo water right since they first commenced extracting water from the ULARA.[38] Hence, in contrast to plaintiff's heavy reliance on the existence of the pueblo right there has been no reliance on any supposition of its nonexistence.

### Waters Reached by Pueblo Right

■ Plaintiff claims that its pueblo water right attaches to all the native surface and subsurface waters of the ULARA which by definition is the watershed of the Los Angeles River above the junction of the river's surface channel with the Arroyo Seco. Relying on the statement in *City of L. A.* v. *City of Glendale, supra,* "that the pueblo right includes the right to all of the waters of the Los Angeles River and the waters supplying it" (23 Cal.2d at p. 74), plaintiff contends that by simple physical principle, all of the water in the watershed necessarily flows downward to the river channel and supplies the river.

Certain defendants challenge plaintiff's claim as an oversimplification. Defendant San Fernando, which extracts all of its ULARA water from the Sylmar subarea, and defendant Crescent Valley County Water District, which extracts all of its ULARA water from the Verdugo subarea, rely on the trial court's finding that the Sylmar, Verdugo and San Fernando subareas each contain separate underground reservoirs or basins with no significant amount of underground flow between them, and that the waters of the Verdugo and Sylmar basins are not tributary to the subsurface water supply of the Los Angeles River. Although the trial court made this finding as a basis for determining mutually prescriptive ground water rights separately within each basin and not because of its bearing on the issue of the extent of the pueblo right, the finding is relevant to the latter issue.

This court has never held that plaintiff's pueblo water right extends to the ground (i.e., subsurface) waters of the Sylmar or Verdugo subareas

---

[38]All the defendants except one commenced extractions after the turn of the century and thus after this court's affirmations of plaintiff's pueblo water right in *City of Los Angeles* v. *Pomeroy, supra,* 124 Cal. 597, 641, and *Vernon Irrigation Co.* v. *City of Los Angeles, supra,* 106 Cal. at pages 244-251. The commencement of extractions by defendants Bartholomaus or his predecessor in 1885 was subsequent to *Feliz* v. *City of Los Angeles, supra,* 58 Cal. 73, in which this court, without deciding whether the pueblo right existed under Spanish-Mexican law, based its decision on the long-standing recognition and acknowledgement of the right by owners of land riparian to the Los Angeles River. As to defendants Glendale and Burbank, see also *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at pages 80-81.

nor has plaintiff ever claimed those waters under its pueblo right prior to the present action. Our prior inclusions of ground water in plaintiff's pueblo right have always been of water *beneath* the San Fernando subarea. The opinion in *City of Los Angeles* v. *Hunter, supra*, characterizes "the San Fernando Valley" as "the great natural reservoir and supply of the Los Angeles River" and "as a great lake filled with loose detritus, into which the drainage from the neighboring mountains flows, and the outlet of which is the Los Angeles River." (156 Cal. at p. 607.) The court had no occasion to determine the outer limits of the "San Fernando Valley" to which it referred because all of the ground water affected by the judgments in the case before it was beneath land in the southeastern part of the San Fernando subarea within three and a half miles of the Los Angeles River. In *City of L. A.* v. *City of Glendale, supra,* the court stated, citing *Hunter:* "Because the flow of the river is dependent on the supply of water in the San Fernando Valley, it has also been held that the pueblo right includes a prior right to all of the waters in the basin." (23 Cal.2d at p. 73.) However, one of the defendants to which the *Glendale* opinion applied, the City of Burbank, was extracting water only from the San Fernando subarea, and although the other such defendant, the City of Glendale, was producing water from wells in both the San Fernando subarea and the Verdugo subarea, the judgment expressly provided that nothing in it should bind or conclude that defendant with respect to the operation of its Verdugo wells. This exclusionary provision of the judgment was apparently based on a stipulation between the present plaintiff and those defendants that the operation of Glendale's Verdugo wells was not in controversy in that case.[39]

Proper determination of plaintiff's pueblo right claims to the ground waters of the Sylmar and Verdugo subareas requires brief consideration of the nature of these waters and the history of their use.

The Sylmar subarea, located to the north of the San Fernando subarea and including 9 percent of the territory of defendant City of San

---

[39]*Glendale* did include within the pueblo right certain *surface* waters outside the San Fernando subarea. The Los Angeles Flood Control District had impounded flood waters in Pacoima and Big Tujunga reservoirs in the hill areas of the ULARA. If not impounded much of these waters would in time of flood have rushed to the Pacific Ocean but when released from the reservoirs in more orderly fashion, some of the waters flowed into the San Fernando subarea or basin. These reclaimed flood waters were held subject to the pueblo right because the flood control district made no claim to them and they had been impounded from and returned back into streams that were natural tributaries of the Los Angeles River. (23 Cal.2d at pp. 73-74.)

Fernando, originally contained substantial areas of cienegas, or marshes, watered by artesian springs. These cienega areas supplied the water for the buildings and original settlement lands of the Mission San Fernando which in 1808 completed a dam to capture the Sylmar cienega waters and which in 1811 completed an aqueduct a mile and a half long to carry the water to its buildings and irrigation system. No record has been brought to our attention of any objection on the part of the Pueblo of Los Angeles to the mission's use of these Sylmar waters. The only reported disputes between the pueblo and mission over water concerned the mission's use of the surface waters of the Los Angeles River at Cahuenga in the southeastern part of the San Fernando subarea.

All water from wells in the Sylmar subarea is drawn from confined aquifers, that is, bodies of ground water cut off from free hydraulic connection with overlying ground water except at the intake. These aquifers reach 12,000 feet in depth, compared to the maximum of 1,000 feet of depth reached by the water-bearing materials beneath the San Fernando subarea. Between 1928-1929 and 1957-1958 there was an average underflow of 560 acre feet of water per year through the Pacoima and Sylmar notches from the Sylmar subarea to the San Fernando subarea and it is estimated that in the absence of the Pacoima submerged dam constructed at Pacoima notch in 1888, this average underflow would have been 750 acre feet. However, the flow did not emanate from the confined aquifers which supply the wells but from the ground waters which supply those aquifers.

The Verdugo subarea, located east of the Verdugo Hills and not contiguous to any subarea of the ULARA other than the San Fernando subarea, contains a large aquifer capable of furnishing a substantial water supply. From 1928-1929 to 1957-1958 there was no significant underflow of ground water between the Verdugo and San Fernando subareas. This lack of underflow was apparently due to the extraction of water from wells in Verdugo and the confining effect of a submerged dam constructed part way across the mouth of Verdugo Canyon in 1895 and reconstructed by defendant City of Glendale in 1935.

There is evidence to support the trial court's finding that the Sylmar, Verdugo, and San Fernando subareas are each separate basins[40] and that the extractions of water in each basin affect the other water users in the same basin but do not significantly or materially affect the ground water

---

[40]Accordingly, we refer to them as "basins" rather than "subareas" hereafter in this opinion.

levels in other basins. However, it also appears from the evidence that the lack of underflow between the basins is due in large part to the ongoing extraction of water through wells and that in a state of nature with no extractions, the Verdugo and Sylmar basins would in effect be filled to overflowing, causing water that they would otherwise receive to enter the San Fernando basin which supplies the Los Angeles River. Plaintiff contends that because extractions in Sylmar and Verdugo thus diminish the river's supply, its pueblo right entitles it to have such extractions enjoined, assuming it can demonstrate a need for all the water that would thus become available to it.

We are of the opinion that the pueblo right does not extend that far even if it be assumed that the maintenance of full basins to support the river's supply would constitute a reasonable beneficial use (see *Rancho Santa Margarita* v. *Vail* (1938) 11 Cal.2d 501, 556-558 [81 P.2d 533]). Nothing in the history or laws of California's Spanish-Mexican period has been drawn to our attention which would indicate or intimate that the paramount right of plaintiff's predecessor to use the waters of the Los Angeles River for its pueblo needs would have entitled it to interfere in any way with the drawing of water from wells in the then remote Sylmar and Verdugo basins. The Spanish authorities authorized and approved the founding of the Mission San Fernando in 1797 at a location 10 miles north of the nearest point on the Los Angeles River and 22 miles north of the pre-existing pueblo, and they further authorized the mission to develop the cienega waters of Sylmar for domestic and agricultural purposes without any expression of concern from any quarter over any consequent interference with the pueblo's water supply. Later when plaintiff, as the pueblo's successor, saw that its municipal needs were rapidly overtaking the available supply from the river, it sought and obtained judicial protection of its paramount pueblo right to the ground water in large tracts of land in the southern and southeastern portions of the San Fernando basin but not to the ground water then being extracted in substantial amounts from the Sylmar basin (see *Burr* v. *Maclay Rancho Water Co.* (1908) 154 Cal. 428 [98 P. 260]) and the Verdugo basin (see *Verdugo Cañon Water Co.* v. *Verdugo* (1908) 152 Cal. 655 [93 P. 1021]). Still later, in *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d 68, plaintiff expressly agreed to exclude the Verdugo basin from the judgment declaring its paramount right to the waters in "the San Fernando Valley," thus confining the scope of the judgment to the waters of the San Fernando basin.

The historical conditions which led to the creation of the pueblo water right have long since disappeared. This court has upheld, and now·

upholds, the existence of that right principally because of the pueblo successor's reliance on the right in planning and developing a municipal water supply. Now for the first time we are asked to extend the pueblo right to encompass ground water in basins which are hydrologically independent from the area of the bed of the river to which the pueblo right attaches. This, we decline to do. There is no showing in this case or in our judicial knowledge that plaintiff ever relied on any supposed paramount right to the ground waters of the Sylmar or Verdugo basins or upon any inflow to the Los Angeles River dependent on absence or cessation of the extraction of such ground water, or that any other claimant of a pueblo right in California ever so relied in a similar situation.[41] Plaintiff's pueblo right in the waters of the Los Angeles River therefore attaches to native ground water within the San Fernando basin and to surface water tributary to such ground water (see fn. 39, *supra*) but not to ground water in the Sylmar or Verdugo basins.

Defendants Bartholomaus, Forest Lawn and Van De Kamp claim that their respective wells, although located in the San Fernando basin, draw upon ground water that is separated from the Los Angeles River by natural fault barriers and so should be excluded from the pueblo right. But these contentions are contrary to the trial court's finding that each basin, including San Fernando, "contain[s] a common source of water supply to parties pumping or otherwise taking water [there]from" and that "[t]he extractions of water in the respective basins affect the other water users within that basin." In any event, as hereinafter discussed, these parties will have an opportunity in connection with the framing of an injunctive decree on remand to be heard on the question of whether and to what extent their extractions affect the water supply to be protected by the decree.

Defendants claim further limitations on the extent of the waters reached by the pueblo right. They assert that the pueblo right does not entitle plaintiff to any restrictions against their using water for domestic, as distinct from agricultural, purposes. This question has already been decided adversely to defendants Glendale and Burbank (see *City of L. A. v. City of Glendale, supra,* 23 Cal.2d at p. 81), and we adhere to that ruling as to all defendants. The contention of defendants Forest Lawn and Valhalla that water used to maintain cemeteries is exempt from the operation of the pueblo right is likewise without merit.

---

[41]Since our holding rests on the historical basis of the pueblo right, it does not necessarily apply to any effect which water rights in a river or stream *other than the pueblo right* may have on rights to extract water from separate ground basins.

Defendant Lockheed claims that the extraction of water from its well in the San Fernando basin is not subject to the pueblo right because Lockheed purchased the property on which the well is located from the United States government which had acquired it directly from the Mexican government in 1848 under the Treaty of Guadalupe Hidalgo. It is clear, however, that during the Spanish-Mexican period the pueblo right gave the pueblo priority in those waters of the Los Angeles River flowing in land owned by the central government as well as those flowing in private lands. For example, the lands used by the Mission San Fernando were owned first by the Spanish crown and then by the Mexican government and remained in government ownership after the secularization of 1834 until transferred to private ownership by Mexican grants in the 1840's. The previously discussed disputes between the mission and the pueblo, which provide some of the clearest historical evidence of the existence and recognition of the pueblo right, pertained to the mission's use of water on land owned by the Mexican government. Since water was not exempt from the operation of the pueblo right merely by virtue of being located on land owned by the Mexican government, there was no such exemption after the ownership passed to the United States government. It is well settled that property rights existing under Mexican rule survived the change of sovereignty. (*United States* v. *Chaves* (1895) 159 U.S. 452 [40 L.Ed. 215, 16 S.Ct. 57]; *Teschemacher* v. *Thompson* (1861) 18 Cal. 11.)[42] Consequently, the antecedent ownership of Lockheed's land by the United States government does not affect the subjection of water underlying that land to the pueblo right.

### *Determination of Needs Satisfiable by Pueblo Right*

■ The pueblo right gives the city holding it a paramount claim to particular waters only to the extent that they are required for satisfying its municipal needs and those of its inhabitants. "It thus insures a water supply for an expanding city (see *City of Los Angeles* v. *Pomeroy, supra,* [124 Cal.] at 649) with a minimum of waste by leaving the water accessible to others *until such time as the city needs it.*" (*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 75.)[43] (Italics added.)

---

[42]Survival of the pueblo right did not require proceedings under the Land Claims Act of March 3, 1851. (*Los Angeles Farming & Milling Co.* v. *City of Los Angeles, supra,* 217 U.S. 217, dismissing writ of error from *City of Los Angeles* v. *Los Angeles Farming & Milling Co., supra,* 152 Cal. 645.)

[43]By the phrase "expanding city" we reaffirmed the *Pomeroy* holding that the pueblo right gives priority for meeting the needs of the city and its inhabitants not only within

Defendants contend, and the trial court found, that none of the waters of the Los Angeles River and none of the ground waters of the ULARA are required to meet plaintiff's needs because "plaintiff's total water supply exceeds its water needs, and it is estimated that until at least the year 2020, the total water supply of the plaintiff will continue to exceed its water needs." This finding is supported by a graph in evidence depicting plaintiff's past and projected population, water consumption, and water supply available from local wells, the Owens aqueduct, and the two sources from which water is distributed to plaintiff by the Metropolitan Water District, (1) the Colorado River, and (2) the State Water Project bringing water from Northern California. The graph shows that the water available to plaintiff from all these sources will exceed its consumption in the year 2020 based on a projected population of four million. However, the graph also shows that plaintiff's consumption has exceeded its local well supply since before 1920 and that such consumption has exceeded the sum of the local well supply and the Owens aqueduct supply since about 1950.

Defendants' theory is that so long as plaintiff has sufficient water from any source to meet its requirements, it has no "needs" to be satisfied under the pueblo right. They rely on comments which this court made in

---

the pueblo's original territory but also within the territory added to the city by annexation. The *Pomeroy* holding is misstated in *City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. 105, 121, where the court apparently relied on a statement in Chief Justice Beatty's *Pomeroy* opinion (124 Cal. at p. 639) that was not adopted by the majority (124 Cal. at p. 649). (See *City of Los Angeles* v. *Los Angeles Farming & Milling Co., supra,* 152 Cal. 645, 653.)

This issue appears not to be material here in view of evidence in the record that the consumption of water within the original pueblo's boundaries exceeded the safe yield attributable to the native water supply reached by the pueblo right. Following is a comparison between the consumption of water in the original pueblo territory and the native safe yield of the San Fernando subarea and the whole ULARA, as found by the referee:

| Water year | Acre feet used in original pueblo territory | Native safe yield, in acre feet, of | |
| | | San Fernando subarea | Entire ULARA |
| --- | --- | --- | --- |
| 1949-1950 | 73,533 | 54,390 | 62,100 |
| 1954-1955 | 62,564 | 50,440 | 57,700 |
| 1957-1958 | 60,692 | 47,500 | 54,700 |

From 1958-1959 to 1964-1965, the annual amount of water used in the original pueblo territory varied between 57,810 and 61,780 acre feet, averaging 59,983 acre feet.

*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at pages 78-79, in rejecting an offer of proof that the supply of Owens water from the aqueduct was sufficient to meet plaintiff's current and future needs. The court stated that the evidence was irrelevant to the quiet title action then before the court which dealt only with " 'priority of right, and not the quantity of water to be taken . . . .' [Citation.]" (23 Cal.2d at p. 79) but commented that "the offered evidence would have been pertinent to the question whether an injunction should issue against the defendants" and "if received for the purpose intended by the defendants, would have required the court to determine the amount of water necessary, and the amount available, for the plaintiff's present and future needs." (23 Cal.2d at p. 78.) Defendants also rely on the statement in *Cuyamaca Water Co.* v. *Superior Court* (1924) 193 Cal. 584, 588 [226 P. 604, 33 A.L.R. 1316], that the amount of water "needed" for the purpose of priority under the pueblo right "is necessarily uncertain and conjectural and dependent upon conditions such as rainfall and other established sources of supply."

To confine the operation of the pueblo right to situations of physical shortage, as urged by defendants, would deprive the pueblo right of all realistic meaning and would penalize the holder of such a right for developing more remote sources of supply. Water imported from greater distances costs more; thus, MWD water is more expensive for plaintiff than is Owens water, which in turn is more expensive than plaintiff's native local supply.[44] Defendants' theory of need would give a city having a pueblo right an incentive to restrain and minimize its importation of water in order to entitle it to take advantage of its priority to less expensive local water. Such a theory would be contrary to "the policy inherent in the water law of this state to utilize all water available." (*Allen* v. *California Water & Tel. Co.* (1946) 29 Cal.2d 466, 488 [176 P.2d 8].)

In *City of Los Angeles* v. *Hunter, supra,* 156 Cal. at page 609, this court approved a judgment declaring plaintiff's pueblo right and enjoining "the defendants from diverting water from the river at any time when the [plaintiff] city was taking the entire surface flow for the purposes for

---

[44]It was stipulated that the cost of MWD water delivered in the ULARA exceeds the cost of pumping water from local wells. In addition, the trial court found that from 1960-1961 to 1965-1966 in plaintiff's Mission Wells service area, the average cost per acre foot to plaintiff of ground water from wells (located in the Sylmar basin) was $14.63 and for Owens water was $24.99. The court also found that under 1965-1966 conditions the average annual cost per acre foot to plaintiff of MWD water was $35.52; plaintiff contends the cost exceeded that figure.

which the city and its inhabitants required the water." In other words, water which was in fact *used* for pueblo right purposes was deemed to be *needed* for those purposes. The added fact, not present in *Hunter*, that plaintiff has a legal right to purchase more expensive water from the MWD does not cancel its "need" for the water that it actually uses for municipal purposes and the needs of its inhabitants. (See *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 934.)

The previously quoted statements from *Glendale* and *Cuyamaca* relied upon by defendants are not inconsistent with these conclusions. A prediction of whether or when a city will "need" the water to which the pueblo right attaches does, as those statements indicate, depend on the existence of alternative sources of supply, but it also must take into account the relative costs of those alternative sources. If the city demonstrates an ability and intention to apply the water to reasonable beneficial uses in satisfaction of its municipal needs and the needs of its inhabitants, it thereby demonstrates the need requisite for priority to the water under the pueblo right.[45]

### GROUND SUPPLIES ATTRIBUTABLE TO IMPORTED WATER

*Return Flow Derived From Delivered Imported Water: San Fernando Basin*

According to the referee's unchallenged findings,[46] over 40 percent of the safe yield of ground water from the San Fernando basin

---

[45]The pueblo right requirement of "need" is thus satisfied by compliance with the constitutional limitation of water rights to "such water as shall be reasonably required for the beneficial use to be served" (Const., art. XIV, § 3). (*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at pp. 74-75.)

Defendants argue that plaintiff is barred from obtaining an injunction to enforce its pueblo right because plaintiff "sells over 8,000 acre feet of water annually to *non-inhabitants* of the City of Los Angeles *outside* of its city limits." The pueblo right does not confer priority to water for the purpose of sale to users outside the city. (*Vernon Irrigation Co.* v. *City of Los Angeles, supra,* 106 Cal. at pp. 250-251; *Feliz* v. *City of Los Angeles, supra,* 58 Cal. at pp. 79-80.) However, the fact that plaintiff possesses a pueblo right as to some water does not preclude it from entering into arrangements to obtain water from sources *not subject to the pueblo right* even though such arrangements require deliveries of water outside the city. (*Fellows* v. *City of Los Angeles* (1907) 151 Cal. 52, 61-64 [90 P. 137].)

The extra-city deliveries made by plaintiff were in four categories: (1) to customers formerly served by a water company purchased by the city; (2) to public agencies; (3) to unincorporated areas, e.g., integrated subdivisions partly in and partly out of the city; and (4) to the territory of an adjacent city or water district in exchange for a like amount of water delivered to plaintiff by such entity. The total amounts of these extra-city deliveries were less than 2 percent of the water delivered by the city. Their existence did not preclude the city from demonstrating its needs for pueblo-right water for use within the city.

[46]The referee's report is prima facie evidence of the physical facts therein found. (Wat. Code, § 2019.)

during the water years 1949-1950, 1954-1955, and 1957-1958 was derived from water imported from outside the Los Angeles River watershed.[47] Apart from the relatively small quantities of imported water spread by plaintiff for direct recharge of the basin,[48] this ground water consisted of a return flow attributable to *delivered* imported water reaching the ground as waste, seepage, or spillage, or by similar means in the course of use.[49] Most of this delivered water had been imported by plaintiff from Owens Valley and Mono basin; the remainder was Colorado River water purchased by plaintiff and by defendants Glendale and Burbank from the Metropolitan Water District.[50]

Ground water is extracted from San Fernando basin by plaintiff, defendants Glendale and Burbank, and seven private defendants.

[47]The annual safe yield in acre feet of water was found to be as follows:

| | 1949-1950 | 1954-1955 | 1957-1958 |
|---|---|---|---|
| Safe yield derived from average import | 37,020 | 40,470 | 40,300 |
| Safe yield derived from normal native supply | 54,390 | 50,440 | 47,500 |
| Total safe yield of San Fernando basin | 94,410 | 90,910 | 87,800 |

[48]Acre feet of Owens water spread by Los Angeles amounted to 8,453 in 1949-1950, 10,867 in 1954-1955, and 6,278 in 1957-1958. The issues arising out of these spreading operations are distinct and will be discussed hereinbelow.

[49]To ascertain the proportion of delivered water which was recharged into the underground basin, the referee made detailed studies of such conditions as soil, climate, native vegetation, farming operations, and residential and commercial development prevailing in the area during each of the water years for which safe yield was determined.

[50]The acre feet of Owens and Colorado River water delivered by plaintiff and by defendants Glendale and Burbank in the San Fernando basin in the water years in question amounted to the following:

| | 1949-1950 | 1954-1955 | 1957-1958 |
|---|---|---|---|
| Owens water delivered by plaintiff | 142,710 | 151,030 | 156,310 |
| Colorado (MWD) Water delivered by: | | | |
| Glendale | 270 | 780 | 1,260 |
| Burbank | 210 | 1,430 | 3,320 |
| Plaintiff | 480 | 6,530 | 7,050 |

All of the Colorado River water delivered by plaintiff in the San Fernando basin went to plaintiff's Narrows service area, which is south of the City of Glendale.

Plaintiff claims a prior right to the ground water attributable to the return flow from its Owens imports and from the delivered water it purchases from MWD. Plaintiff asserts that defendants Glendale and Burbank are entitled to such return water in the basin derived from their MWD purchases. Those defendants, on the other hand, deny any special rights in return water as such and are joined by the seven private defendant claimants of San Fernando basin ground water in opposing plaintiff's claim to priority in return waters.

 In *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d 68, this court affirmed a judgment which declared that plaintiff had prior rights, as against defendants Glendale and Burbank, to "return waters" beneath the San Fernando Valley. These return waters were described as those which were imported by plaintiff and "sold to the farmers of the San Fernando Valley, and which settle after use beneath the surface and join the mass of water below, as anticipated when sold." (23 Cal.2d at p. 72.) It was held that plaintiff had a prior right to the water when it was imported (23 Cal.2d at p. 76) and that "[t]he use by others of this water as it flowed to the subterranean basin does not cut off plaintiff's rights." (23 Cal.2d at p. 77.)

This holding had a dual basis. One basis for the holding was the trial court's finding that before commencing the importation of Owens water, plaintiff had formed an intention to recapture the return waters used for irrigation in the San Fernando Valley whenever such return waters were needed for its municipal purposes and the use of its inhabitants, and that the Los Angeles Aqueduct had been planned and located to facilitate the availability and recapture of such return waters. Under these circumstances, plaintiff retained its prior right to the return waters wherever they might appear. (*Id.,* 23 Cal.2d at p. 78; *Ide* v. *United States* (1924) 263 U.S. 497, 506-507 [68 L.Ed. 407, 412-413, 44 S.Ct. 182]; *United States* v. *Haga* (D.Idaho 1921) 276 F. 41.)

The other basis for the *Glendale* holding, found in the reasoning of *Stevens* v. *Oakdale Irr. Dist.* (1939) 13 Cal.2d 343 [90 P.2d 58], did not depend on the existence of an intent to recapture return waters *before* importation began. In *Stevens,* water brought from the Stanislaus River into the defendant district's irrigation system reached Lone Tree Creek as seepage, waste and spill from irrigation uses. Lone Tree Creek was in a different watershed from the Stanislaus. After an owner of land traversed by Lone Tree Creek downstream from the district's territory had commenced irrigating with the water, the district for the first time

manifested an intention to recapture the water from the creek within its own boundaries for irrigation uses, thereby cutting off the lower user's supply. The district's right to do so was upheld. Even though the district had abandoned the particular quantities of water it had allowed to flow downstream, it retained the right to recapture a subsequent flow as long as it did so within its own irrigation works or on its own land. Applying *Stevens,* the *Glendale* court pointed out that the return waters claimed by plaintiff had "reappeared in the basin of the San Fernando Valley, used by plaintiff for the storage of other imported waters [through spreading] and containing natural waters to which plaintiff had a prior [pueblo] right. Once within the basin, en route to plaintiff's diversion works, it was in effect within plaintiff's reservoir." (23 Cal.2d at pp. 77-78.)

The adjudication in *Glendale* of plaintiff's prior right to return waters derived from delivered Owens water is binding in the present case on defendants Glendale and Burbank. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd., supra,* 58 Cal.2d 601, 604; Rest., Judgments, § 77.) However, the *Glendale* judgment specifies only the return flow from water delivered to farmers for irrigation. The trial court found in the present case that since the entry of the former judgment "the culture of the area within the San Fernando Basin . . . has been transformed from essentially rural and agricultural to a highly developed urban society . . . ." Much of the land formerly devoted to irrigated crops has been covered by residential and commercial development. Defendants contend that these changed conditions preclude the giving of any res judicata effect to *Glendale* in determining plaintiff's present claim to return waters.

There is no showing that the fact of urbanization has effected any material change since the *Glendale* judgment in the distribution and flow of those return waters which continue to be derived from Owens water sold by plaintiff in the San Fernando basin for *irrigation*. As to these waters, defendants Glendale and Burbank remain barred by collateral estoppel from denying plaintiff's prior right as adjudged in *Glendale*. Plaintiff's claim, however, encompasses returns derived from imported water sold for purposes other than irrigation. The referee's report shows that *some* portion of the water delivered in the basin for practically *any* type of purpose reaches the ground supply. Even commercial and industrial users may contribute to this supply by applying water to landscaped areas or disposing of waste water in unlined sumps or channels or in cesspools. The computations in the referee's report and in various exhibits of the basin's safe yield "derived from average import" comprehends ground water returned from a variety of urban as well as

agricultural uses. Just as a change in an appropriator's place or character of use of the appropriated water does not affect his right to take it (*City of San Bernardino* v. *City of Riverside* (1921) 186 Cal. 7, 28 [198 P. 784]; Hutchins, Cal. Law of Water Rights (1956) pp. 175, 178), an alteration in the type of use from which imported water is returned to the ground does not impair the importer's claim to it as return water.

The trial court made findings that no party delivered imported waters to others with the intent or purpose of later recapturing it or of storing it underground or transporting it underground to diversion facilities. There was no direct evidence that such intent did not exist. Plaintiff introduced evidence that the planners of the Los Angeles Aqueduct took into account the predictions of engineers that water delivered for irrigation in the San Fernando Valley would augment the available underground supply.[51] Plaintiff contends that this evidence establishes as a matter of law that prior to construction of the aqueduct to import water from the Owens Valley plaintiff intended that some of the imported water would be delivered to users in the San Fernando Valley and that the return waters from such use would flow underground and be available for recapture by plaintiff. Plaintiff also contends that this intent was established by other evidence which was offered but excluded by the trial court, and that such exclusion itself was prejudicial error.[52] It is unnecessary for us to rule on any of these contentions because the parties' respective rights to the return flow derived from delivered imported water in this case do not depend on plaintiff's intent prior to importation. From the beginning of plaintiff's delivery of imported water to users in the San Fernando basin up to the present time, a return flow from such deliveries has augmented the basin's ground supply. From an even earlier time up to the present, plaintiff has relied and regularly drawn upon that same basin supply for its municipal water distribution system and has claimed the native waters of the basin under its pueblo right.[53] All these deliveries of imported water have been inside plaintiff's city limits and all plaintiff's extractions and diversions from the basin have occurred either within the city or in areas long since annexed to the city. Since the deliveries and withdrawals were thus "within plaintiff's reservoir" (*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 78), the allegation of an intent to recapture the return waters

---

[51]See appendix.

[52]See appendix.

[53]Plaintiff has also from time to time spread imported water with the intent that the water percolate into the basin's reservoir so that plaintiff could recapture it for its municipal system.

in the present complaint, filed in 1955, was sufficient for purposes of the present case to establish whatever rights would have arisen from plaintiff's manifestation of such an intent before commencing importation in 1915. (*Stevens* v. *Oakdale Irr. Dist., supra,* 13 Cal.2d 343.)

Defendants argue that any intent to recapture return waters is irrelevant because, as found by the trial court, delivered water leaves the deliveror's possession, and it is then impossible to ascertain whether it is consumed, leaves the basin or percolates into the basin's underground supply. Nevertheless, the referee found that a return flow from water deliveries was sufficiently predictable to base its determinations of safe yield on assumptions that certain amounts of return flow would be produced by water deliveries to residential, commercial and industrial, as well as agricultural, users, in service areas having particular natural and cultural characteristics. The fact that the water drawn from a tap into a portable receptacle becomes the customer's disposable personal property (*Stanislaus Water Co.* v. *Bachman* (1908) 152 Cal. 716, 725 [93 P. 858]) does not impair plaintiff's right to recapture the return flow which is in fact produced by deliveries of its imported water. (*City of L.A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 78.)

Defendants further contend that the right of recapture is precluded by the impossibility of tracing particular quantities of ground water to deliveries by a particular party. The trial court found: "The waters which percolate underground from . . . rainfall and delivered water become commingled and are physically unidentifiable as to source of origin." The recapture right, however, does not necessarily attach to the corpus of water physically traceable to particular deliveries but is a right to take from the commingled supply an amount equivalent to the augmentation contributed by the return flow from those deliveries. The right to withdraw amounts of appropriated water contributed to the channel of a stream is provided by Water Code section 7075 (formerly Civ. Code, § 1413) which states: "Water which has been appropriated may be turned into the channel of another stream, mingled with its water, and then reclaimed; but in reclaiming it the water already appropriated by another shall not be diminished." (See *Crane* v. *Stevinson* (1936) 5 Cal.2d 387, 395-396 [54 P.2d 1100].) The rule codified by this statute applies as well to the addition and withdrawal of water in an underground basin. (*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at pp. 76-77.)

Defendants Glendale and Burbank each delivers imported MWD water to users within its territory in the San Fernando basin and each has

been extracting ground water in the same territory before and during the importation. Accordingly, each has rights to recapture water attributable to the return flow from such deliveries for the same reasons that plaintiff has such a right.[54] These multiple rights necessitate apportionment of the ground water derived from return flow into the amounts attributable to the import deliveries of each defendant and plaintiff. The record in this case, including the referee's report, demonstrates that such apportionment can be made within reasonable limits of accuracy. (See Comment (1965) 53 Cal.L.Rev. 541, 548-554.)

Defendants contend that if any party is given rights to a return flow derived from delivered *imported* water, it is "obvious" and "axiomatic" that the same rights should be given to the return flow from delivered water derived from all other sources, including native water extracted from local wells. This argument misconceives the reason for the prior right to return flow from imports. Even though all deliveries produce a return flow, only deliveries derived from imported water add to the ground supply. The purpose of giving the right to recapture returns from delivered imported water priority over overlying rights and rights based on appropriations of the native ground supply is to credit the importer with the fruits of his expenditures and endeavors in bringing into the basin water that would not otherwise be there. Returns from deliveries of extracted native water do not add to the ground supply but only lessen the diminution occasioned by the extractions.[55]

Defendants point out that in two decisions awarding *prescriptive* rights in the ground water of a basin no additional water has been awarded to any party based on a return flow from the party's delivery of imported water. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908; *California Water Service Co.* v. *Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715 [37 Cal.Rptr. 1].) In neither of the cited cases did the

---

[54]After the judgment below defendant San Fernando joined the Metropolitan Water District and has delivered MWD water in its territory in the San Fernando basin, but all of its wells are and have been in the Sylmar basin and so it is not in a position to recapture any return flow from those San Fernando basin deliveries.

[55]The "imported" water to which our present discussion refers is foreign water imported from a different watershed outside the city. (See *Crane* v. *Stevinson, supra,* 5 Cal.2d 387, 389; Hutchins, Cal. Law of Water Rights (1956) p. 393.) No party in the present action claims that returns from ground water extracted from the same basin in which the deliveries occur should be treated any differently than returns from ground water extracted from another basin in the same city and watershed. Accordingly, we do not require that plaintiff be given any priority in San Fernando basin ground water based on its deliveries in that basin of native ground water from Sylmar, or that defendant City of Glendale receive any such priority based on transfers of native ground water between the San Fernando and Verdugo basins.

appellant therein claim or contest any such additional water right nor was the question considered in either opinion. Therefore in our present consideration of return water rights *not* based on prescription, it is unnecessary for us to consider what, if any, effect the production of a return flow from delivered imported water should have on prescriptive rights.

In sum, we conclude that apart from the possibility of prescriptive rights to be discussed hereinafter, plaintiff and defendants Glendale and Burbank each has a prior right to return waters in the San Fernando basin attributable to its deliveries of imported water to users within its own territory in that basin. The imported water to which we refer is the Owens water delivered by plaintiff and the MWD water delivered by plaintiff and each of those defendants. The right to return waters attributable to such deliveries is an undivided right to a quantity of water in the ground reservoir equal to the net amount by which the reservoir is augmented by such deliveries.

*Return Flow Derived From Delivered Imported*
*Water: Sylmar Basin*

Most of the Sylmar basin lies within the territory of plaintiff that was included in its large San Fernando Valley annexation of May 1915. The remainder of the Sylmar basin includes 9 percent of the territory of defendant San Fernando.

All of the water supplied by plaintiff to its Sylmar territory is imported Owens water.[56] A very substantial part of the Sylmar basin's safe yield is derived from this Owens water, which constitutes the basin's only imported water.[57] Plaintiff extracts water from the basin for its Mission Wells service area which is situated wholly within the *San Fernando* basin.[58] Defendant San Fernando obtains most of its water from wells in the Sylmar basin. Throughout the proceedings in the trial court and until defendant San Fernando joined the Metropolitan Water District in November 1971 San Fernando extracted all of its water supply from Sylmar.

Plaintiff claims a prior right in the ground water of the Sylmar basin attributable to its deliveries of imported Owens water to users in the

---

[56]See appendix.

[57]See appendix.

[58]See appendix.

basin. Defendant San Fernando is joined by two private defendants that extract water from Sylmar in opposing plaintiff's claim.[59]

Plaintiff is entitled to this claimed priority for the same reasons for which we have sustained its priority to return waters in the San Fernando basin attributable to plaintiff's deliveries of imported water in its territory in that basin. Plaintiff introduced its imported water into Sylmar through construction of the Maclay High Line and Reservoir in 1917 and did not commence extraction from Sylmar until its purchase of the Mission Land Company in 1919. In the San Fernando basin plaintiff had been extracting ground water for many years *before* importation commenced. This difference in circumstances is immaterial. (*Stevens* v. *Oakdale Irr. Dist., supra,* 13 Cal.2d 343, 351.)

### Spreading of Imported Water by Plaintiff in San Fernando Basin

For some years plaintiff has maintained spreading grounds in the San Fernando basin on which from time to time it spreads imported Owens water for the purpose of replenishing the basin's ground supply. In *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at pages 76-77, plaintiff was held to be entitled to engage in this practice as a means of transporting and storing its imported water and to have a prior right to recapture the water thus stored.

The trial court found that the foreign water spread by plaintiff became part of the conglomerated ground supply, that the evidence did not establish any intention by plaintiff to recapture the water spread by it. and that plaintiff did not recapture such waters "except incidentally by reason of the fact that a small unidentifiable and indeterminable amount of the water which plaintiff did extract from the conglomerated supply may have consisted of imported waters which were once spread." Contrary to this finding, there is evidence in the record of plaintiff's intent to recapture the water spread by it, and no reason other than such intent appears for plaintiff's admitted investment in the construction and operation of its spreading grounds. Plaintiff's intent to recapture its spread water was found as a fact in *Glendale* (23 Cal.2d at pp. 72, 76-77) and to that extent is res judicata here as to defendants Glendale and Burbank. The fact that spread water is commingled with other ground water is no obstacle to the right to recapture the amount by which the available conglomerated ground supply has been augmented by the

[59]See appendix.

spreading. (*Glendale,* 23 Cal.2d at pp. 76-77; see Wat. Code. § 7075 (discussed in *Glendale* as former Civ. Code, § 1413).) Defendants point to no evidence that plaintiff lacked an intent to recapture the water which it spread and we conclude that the trial court's findings are unsupported by the evidence insofar as they negate such intent.

Defendants concede that plaintiff should be permitted to reclaim water that it spreads with the intent of recapture but contend that the trial court acted properly in restricting plaintiff's future spreading operations. As a basis for this restriction the trial court found that artificial recharge of ground water supplies "affects ground water storage capacity, ground water in storage, ground water movement (rate and direction), and ground water levels," and that artificial recharge must be regulated and controlled "to protect the public interest and the rights of the parties in the utilization of the underground reservoirs of the ULARA." Accordingly, the court enjoined artificial recharge except on terms and conditions to be approved by the court which it reserved jurisdiction to determine.

Plaintiff, being the only party engaged in or contemplating spreading or artificial recharge operations,[60] objects to these restrictions in the judgment. We think its objections are well taken. Plaintiff is entitled to use the San Fernando basin for temporary storage of its water by means of artificial recharge and subsequent recapture. (Wat. Code. § 7075 (quoted *supra*); *Glendale,* 23 Cal.2d at pp. 76-77.) No necessity is shown for interfering with this right to use the basin for storage. for there does not appear to be any shortage of underground storage space in relation to the demand therefor.

OVERDRAFT AND PRESCRIPTION

*Relationship of Pasadena Decision to Equitable*
*Ground Basin Management*

As stated above, the trial court's judgment awarded "mutually prescriptive rights" and "restricted pumping" quotas to the parties purportedly pursuant to the decision in *City of Pasadena v. City of*

---

[60]Spreading of native waters from runoff and precipitation within the ULARA is excepted from the injunction. The Los Angeles County Flood Control District has engaged in such spreading since 1932 (see *City of L. A. v. City of Glendale, supra.* 23 Cal.2d at p. 73) but has made no claim to the water so spread and was dismissed from the present action.

*Alhambra, supra,* 33 Cal.2d 908. Determination of the propriety of this application of *Pasadena* to the present case raises a number of serious legal questions not resolved in *Pasadena.* These include the res judicata effect of the prior declaratory judgment in the *Glendale* case, the claimed immunity of cities to prescriptive claims of public and private parties under the 1935 amendment to section 1007 of the Civil Code, the definition of "overdraft," and the requirements of notice of adverse use as they bear on the commencement of the prescriptive period.

In arguing that these and related questions should be resolved in a manner that will sustain the judgment below, defendants seek to reinforce their position by holding up the "mutual prescription doctrine" of the *Pasadena* case as a beneficent instrument for conservation and equitable apportionment of water in ground basins which are subjected to extractions in excess of the replenishment supply. We are urged to declare the law in a way that will preserve this instrument for future use. It is helpful to take a preliminary look at this contention insofar as it might affect our consideration of specific issues arising out of the judgment below.

In the first place, the principle of continuing administration of competing rights to ground basin water through appointment of a watermaster and retention of jurisdiction should be distinguished from the rules by which the limited supply of water is apportioned among the parties. Thus, a determination that the competing rights are all other than prescriptive in nature would not necessarily preclude the exercise of such administration and jurisdiction to conserve and apportion the water in the overdrawn basin. (See Wat. Code, §§ 4025-4032 (watermaster service areas); *Fleming* v. *Bennett* (1941) 18 Cal.2d 518 [116 P.2d 442].)

In the second place, the allocation of water in accordance with prescriptive rights mechanically based on the amounts beneficially used by each party for a continuous five-year period after commencement of the prescriptive period and before the filing of the complaint, does not necessarily result in the most equitable apportionment of water according to need. A true equitable apportionment would take into account many more factors.[61]

---

[61]The principles by which the United States Supreme Court equitably apportions water among states are illustrated in *Nebraska* v. *Wyoming* (1945) 325 U.S. 589, 618 [89 L.Ed. 1815, 1831-1832, 65 S.Ct. 1332]. After observing that apportionment between states whose laws base water rights on priority of appropriation should primarily accord with that principle, the court said: "But if an allocation between appropriation States is to be just and equitable, strict adherence to the priority rule may not be possible. For example,

This does not mean that the *Pasadena* decision fell short of reaching a fair result on the facts there presented. The Raymond basin had been subjected to overdraft commencing with the water year 1913-1914, 23 years before the commencement of the action in September 1937. The issue before the court was whether water rights should be allocated according to priority of appropriation or according to prescriptive principles. In deciding for the latter, the court stated that under the priority rule, "certain of the later appropriations would be completely eliminated," whereas the prescriptive solution would serve the public interest because "a *pro tanto* reduction of the amount of water devoted to each present use would normally be less disruptive than total elimination of some of the uses." (33 Cal.2d at p. 933.)

The uses which would have been eliminated if the priority rule had been applied in *Pasadena* were only those uses which had commenced *after* the total amount being taken from the basin began to exceed the safe yield to which extractions were to be limited by the judgment. (*Id.* at pp. 927-928.) That this cutoff point had been reached many years before the judgment appears probable from the fact that overdraft had existed for all but 2 of the 23 years prior to commencement of the action and could only be eliminated by a one-third reduction in allowed pumping below the adjudicated prescriptive rights. (*Id.* at pp. 922-923.) Thus, a restriction to safe yield on a strict priority basis might have deprived parties who had been using substantial quantities of ground water for many years of all further access to such water.

In the present case, none of the defendants now before us commenced their uses of ground water from the basins of the ULARA after the years in which the trial court found overdraft to have commenced. To the contrary, the amount that each defendant was using at the beginning of overdraft was substantial in relation to such defendant's later use, and there is a notable correlation between the relative levels of usage at the

the economy of a region may have been established on the basis of junior appropriations. So far as possible those established uses should be protected though strict application of the priority rule might jeopardize them. Apportionment calls for the exercise of an informed judgment on a consideration of many factors. Priority of appropriation is the guiding principle. But physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former—these are all relevant factors. They are merely an illustrative, not an exhaustive catalogue. They indicate the nature of the problem of apportionment and the delicate adjustment of interests which must be made."

time of overdraft and the restricted pumping quotas allocated in the decree based on awards of prescriptive rights.

Thus, the mutual prescription doctrine was not needed or applied in the present case for the purpose achieved in *Pasadena*—that of avoiding complete elimination of appropriative rights stemming from uses of recent years in favor of those based on earlier uses. Instead, the effect of the trial court's judgment in the present case was to eliminate plaintiff's priorities based not on the timing of its appropriations but on its importation of Owens water and on its pueblo right. It was in support of the desirability of accomplishing this quite different result that the trial court's findings incorporated the foregoing language from *Pasadena* by declaring that "a *pro tanto* reduction or limitation of the amount of water devoted to its present use would be less disruptive than the total elimination of some of the uses."

A possible undesirable side effect of the so-called mutual prescription doctrine is that it may encourage a "race to the pumphouse" after overdraft commences, each party endeavoring to increase the volume of continuous use on which his prescriptive right will be based. Of course only reasonably beneficial uses will qualify for this purpose, and deliberate increases in qualified extractions from the ground basin are likely to be possible only for those parties who have multiple sources of supply and can manipulate the proportions of the amounts they draw from each source. Plaintiff points out that if it had anticipated that its rights in the San Fernando basin would be limited to a prescriptive right based on ground water usage after 1941-1942, the year found by the trial court as the commencement of overdraft, plaintiff "could easily have engineered its pumping to maximize the amount of prescriptive rights to which it would be entitled under the Pasadena formula." The enactment of Water Code sections 1005.1 and 1005.2 in 1951, two years after *Pasadena* was decided, may have lessened the possibility of such abuse in certain cases, but could have no effect in other situations, including that described by plaintiff.[62] (See 26 Assem. Interim Com. Rep.

[62]Water Code sections 1005.1 and 1005.2 provide, in essence, that in eight (now nine) Southern California counties, the cessation or reduction of ground water extraction as the result of using water from an alternate source shall be credited to the user for the purpose of establishing and maintaining a ground water right. These provisions were not effective until July 1951, and even if they had been in effect earlier, they would not have created any incentive to plaintiff to refrain from increasing its extractions after 1941-1942. The statutes apply only to *reductions* in extractions. Plaintiff increased its extractions in any event; the temptation raised by the prospect of a mutual prescription decree would have been to increase them to an even greater extent.

(1961-1963) No. 4, Ground Water Problems in California, pp. 39-40, 2 App. to Assem. J. (1963 Reg. Sess.).)

### Res Judicata Effect of Glendale Decision on
### Burbank's and Glendale's Prescriptive Claims Against
### Plaintiff in San Fernando Basin

In October 1943, this court affirmed a judgment declaring that as against the defendants Glendale and Burbank plaintiff had a prior right to use all the ground waters of the San Fernando basin to satisfy its needs. (*City of L. A. v. City of Glendale, supra,* 23 Cal.2d 68.)[63] The judgment being reviewed in the present appeal awards defendants Glendale and Burbank prescriptive rights against plaintiff to the very same water, based on those defendants' highest continuous use of the water for any five-year period from the water year 1941-1942 to the filing of the complaint in 1955, subject to reduction for any subsequent five-year cessation of use. This award of prescriptive rights cannot stand against plaintiff in the face of the prior *Glendale* judgment.

In *Glendale* plaintiff did not seek injunctive relief because the basin contained a surplus of water over and above the amounts being beneficially used. (23 Cal.2d at pp. 78-79.) The purpose of that action was not to protect rights in water already being used—there then being enough water for all—but to preserve a potential right to water that would be required for plaintiff's future needs. (23 Cal.2d at pp. 74-75.) Plaintiff was following the procedure appropriate for protecting such a potential right against prescriptive claims by appropriators. Speaking of the riparian owner's right to future reasonable beneficial uses, this court said in *Tulare Dist. v. Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 525 [45 P.2d 972]: "As to such future or prospective reasonable beneficial uses, it is quite obvious that the quantity of water so required for such uses cannot be fixed in amount until the need for such use arises. Therefore, as to such uses, the trial court, in its findings and judgment, should declare such prospective uses paramount to any right of the appropriator. *By such declaratory judgment, the rights of the riparian will be fully protected against the appropriative use ripening into a right by prescription,* but, until the riparian needs the water, the appropriator may use it, thus, at all times, putting all of the available water to beneficial uses." (Italics added.) For the purpose of protection against prescription,

---

[63]The opinion enumerates the four sources of all the ground water then present in the San Fernando Valley (23 Cal.2d at pp. 71-72) and proceeds to uphold plaintiff's prior right to water from all these sources. The Verdugo basin was eliminated from the judgment against defendant Glendale by a stipulation which is presently before us in an exhibit.

the declaratory judgment in *Glendale* was as effective as if it had explicitly restrained defendants from asserting any right to the water except in subordination to plaintiff's paramount right. (*City of Los Angeles* v. *Los Angeles Farming & Milling Co., supra,* 152 Cal. 645, 653.)

Defendants rely on statements in the recital of agreed matters in the pretrial conference order in the present case that each of the parties claims a right, title, estate, and interest in the water being pumped and taken by it, and that for more than five years before the filing of the complaint the taking and beneficial use of the water by each party "was open, notorious, and under a claim of right." But there is no recital that defendant Glendale's or Burbank's taking of water was *adverse* before the filing of the complaint. Consistently with the pretrial recitals, their taking and use of water could have been in asserted subordination to plaintiff's rights as provided in the *Glendale* judgment. Thus, their answer to the amended complaint which they filed in 1957 pleaded, among other affirmative defenses, that there was still a surplus in the basin. Even on this appeal they continue to make arguments which, though we have found them to be without merit, furnish a colorable basis for an assertion that their takings of water after the *Glendale* judgment until the filing of the present complaint were in subordination to plaintiff's rights declared in *Glendale.*[64]

We do not preclude the possibility that a party subjected to a judgment declaring another party's prior water right could start the running of the prescriptive period by unequivocally manifesting to the other party a refusal to be bound any longer by the terms of the judgment. (See *Southern Pac. Co.* v. *City & County of S. F.* (1964) 62 Cal.2d 50, 56 [41 Cal.Rptr. 79, 396 P.2d 383].) Without such affirmative renunciation, however, and in the absence of conduct unambiguously adverse to the judgment,[65] the judgment defendants were presumed to be taking water and otherwise acting in subordination to the plaintiff's rights as provided by the judgment. (*Jaffray* v. *Mies* (1947) 80 Cal.App.2d 291, 293 [181 P.2d 672].) Defendants do not claim to have

---

[64]Two of these rejected contentions are: (1) that plaintiff does not have the "need" for the water required by the pueblo right because plaintiff has access to an alternate, albeit more expensive, supply from the Metropolitan Water District; (2) that the *Glendale* judgment entitled plaintiff to the return flow from its imported water delivered to farmers for irrigation but not from such water delivered to urban customers.

[65]An example of such adverse conduct might arise where a prior judgment imposed *immediate* limitations on the defendant's use of water from a particular source. His taking of water in excess of such limitations would then be adverse to the judgment plaintiff regardless of any express notice. (*Big Rock Mutual Water Co.* v. *Valyermo Ranch Co.* (1926) 78 Cal.App. 266, 273 [248 P. 264].)

given plaintiff any notice of affirmative renunciation of their subordination to the judgment before the present action was commenced.

### *Effect of Civil Code Section 1007 on Prescriptive Claims Against Cities*

The trial court awarded prescriptive water rights against plaintiff to both city and private party defendants in the San Fernando and Sylmar basins. Plaintiff asserts that any prescription of its water rights by defendants was precluded by the 1935 amendment to section 1007 of the Civil Code which provided until 1968 that "no possession by any person, firm or corporation no matter how long continued of any . . . water right . . . or other property . . . dedicated to or owned by any . . . city . . . shall ever ripen into any title, interest or right against such . . . city."[66]

Defendants argue that *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d 908, decided that the acquisition of water rights against cities by prescription was not barred by the 1935 amendment to Civil Code section 1007, which had been in effect for two years when the complaint in that action was filed. But this court did not reach the issue in that case. The City of Pasadena sued numerous users of water from the Raymond basin, including several cities, for an adjudication of ground water rights. All nondisclaiming parties except one stipulated to a judgment awarding

---

[66]As originally enacted in 1872, Civil Code section 1007 provided: "Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar an action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all."

The 1935 amendment imposed a limitation on the operation of the section by changing it to read as follows: "Occupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all, but no possession by any person, firm or corporation no matter how long continued of any land, water, water right, easement, or other property whatsoever dedicated to or owned by any county, city and county, city, irrigation district, public or municipal corporation or any department or agency thereof, shall ever ripen into any title, interest or right against such county, city and county, city, public or municipal corporation, irrigation district, or any department or agency thereof or any agency created or authorized by the Constitution or any law of this State for the administration of any State school, college or university. The exemption of certain classes of governmental property is intended as a limitation and shall not be deemed to subject to the operation of this section any classes of governmental property which would not otherwise be subject thereto."

In 1968 the section was amended into its present form by revising the proviso to read: ". . . but no possession by any person, firm or corporation no matter how long continued of any land, water, water right, easement or other property whatsoever dedicated to a public use by a public utility, or dedicated to or owned by the state or any public entity, shall ever ripen into any title, interest or right against the owner thereof."

prescriptive rights and allocating the water so as to restrict total production to the safe annual yield. The party which refused to stipulate to the judgment was California-Michigan Land and Water Company, a public utility. It was involuntarily included in the judgment after the trial court had heard its presentation of evidence and it was the sole appellant in this court. It could not and did not base any objection to an award of prescriptive rights against it upon the 1935 amendment to Civil Code section 1007 because the amendment did not apply to public utilities.[67] The city parties, on the other hand, had no reason to point to the inclusion of cities among the public entities whose rights the amendment protects against prescription because their objective of sustaining the judgment on appeal required that they waive any defenses they might otherwise have been able to assert. Moreover, the exclusion from this court's decision of any determination of the meaning or effect of the 1935 amendment to Civil Code section 1007 is demonstrated by the absence from the opinion of any mention of the statutory provision or any indication that its effect was put in issue or considered by the court. (*Meehan* v. *Hopps* (1955) 45 Cal.2d 213, 217 [288 P.2d 267].)

Contrary to defendants' contention, the Court of Appeal in *California Water Service Co.* v. *Edward Sidebotham & Son, supra,* 224 Cal.App.2d 715, did not rule on the question of whether the 1935 amendment to Civil Code section 1007 protects a city from having prescriptive rights awarded against it in ground basin litigation.[68] Nor are there any other appellate precedents on the issue.

---

[67]The 1968 amendment of section 1007 subsequently extended the statutory exemptions to apply to property "dedicated to a public use by a public utility . . . ." The use of water appropriated for sale, rental, or distribution is a public use. (Cal. Const., art. XIV, § 1.)

[68]In the *California Water Service* case, the City of Hawthorne appealed from a judgment which (1) awarded prescriptive rights to users of water from the West Coast basin but (2) temporarily refrained from reducing the parties' extractions to the safe yield level to avoid hardship and in anticipation of possible new sources of replenishment of the basin. Although Hawthorne was awarded a prescriptive right of 1,882 acre feet, which exceeded the 1,846 acre feet sought in its answer, it argued on appeal that it should be awarded 3,170 acre feet on the grounds that it had acquired a vested prescriptive right in 1937, that all claims of non-public users who claimed prescriptive rights acquired after 1937 should be eliminated under the 1935 amendment to Civil Code section 1007, and that Hawthorne should share in what was left on a *proportionate* basis. The Court of Appeal pointed out that prescriptive rights are quantitative, not proportionate, that under the judgment Hawthorne was receiving its full prescriptive right, that if Hawthorne's pumping right were ever reduced below *its* prescriptive right it might obtain relief under the reserved jurisdiction provisions of the judgment and that in any event Hawthorne had invited the judgment by failing to raise its argument in the trial court. The court said: "It is true that the effect of the 1935 amendment to Civil Code section 1007 was not argued in *City of Pasadena* v. *City of Alhambra, supra.* However, we

Defendants argue that the limitations placed by Civil Code section 1007 on the acquisition of prescriptive rights apply only to "absolute" prescription and not to "mutual prescription" in which the prescriptive water right is proportionately limited by the continued pumping and use of the water by the owners of the prior rights. Yet defendants correctly acknowledge that this court arrived at its decision in the *Pasadena* case by applying traditional principles of prescription. Moreover, the wording of the statutory restriction is not directed merely at absolute prescriptive rights. The statute declares that "no possession by any person, firm or corporation no matter how long continued" of specified property "shall ever ripen into *any title, interest or right*" against specified public owners. (Italics added.) The restriction clearly encompasses the acquisition of any property interest based on continuous adverse possession or use.[69]

It is further argued that to construe the 1935 amendment to Civil Code section 1007 as exempting the water rights of cities and certain other public entities from loss by prescription brings the statute into conflict with the constitutional limitation of water rights to "such water as shall be reasonably required for the beneficial use to be served" (Cal. Const., art XIV, § 3; *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 925).[70] This argument is without merit. Exemption from prescription does not change the nature of the right itself; the right is inherently the same whether prescription is precluded by exemption or is avoided by appropriate legal action before expiration of the prescriptive period. No

---

need not resolve the question of an alleged inconsistency between the amended statute and the holding in that case, as we are not here confronted with a present disturbance of Hawthorne's 1949 prescriptive rights . . . ." (224 Cal.App.2d at p. 728.)

[69]Similarly, there is no merit in the argument that section 1007's restriction on prescription is inapplicable because a water right cannot be the subject of "possession." The statute itself uses the language "possession . . . of any . . . water, water right . . . or other property," clearly referring to whatever use, control, or similar conduct would lay the foundation for a prescriptive right in the absence of any restriction.

[70]The *Pasadena* decision states this constitutional principle as follows (33 Cal.2d at pp. 925-926):

"Although the law at one time was otherwise, it is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. (*Katz* v. *Walkinshaw*, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351 [40 P.2d 486]; Cal. Const., art. XIV, § 3.) Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368 [40 P.2d 486].) Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water. In California surplus water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed. [Citations.]"

water right, regardless of exemption from prescription, affords entitlement to water in excess of the constitutional limitation. Each kind of water right or claimed water right against which prescription is asserted in the present case is limited in scope to the amount of water which the holder of the right reasonably requires for the beneficial uses that the right authorizes, and no such right entitles the holder to prevent others from using water not so required. (*City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at pp. 74-75 (pueblo right); *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351, 367 [40 P.2d 486] (riparian right); *Stevens* v. *Oakdale Irr. Dist., supra,* 13 Cal.2d 343, 351 (right to recapture return flow from imported water); *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 925-926 (appropriative right; see fn. 70, *ante*); *Burr* v. *Maclay Rancho Water Co., supra,* 154 Cal. 428, 435-437 (overlying right).)

It is claimed that the singling out of the water rights of certain public entities for exemption from prescription under Civil Code section 1007 results in unlawful discrimination against other public and private owners of water rights. However, the legislative power may constitutionally be exercised to prescribe reasonable conditions and priorities in the distribution of water. (*East Bay M. U. Dist.* v. *Dept. of P. Wks.* (1934) 1 Cal.2d 476, 481 [35 P.2d 1027].) The exemption at issue here is that of a city's rights to water for its municipal supply.[71] A legislative decision to give priority to municipal uses of water[72] is a reasonable basis for the classification.[73]

Defendants contend that even if section 1007 immunizes the property of cities and other public entities from the acquisition of prescriptive rights by private parties, it does not interfere with the acquisition of prescriptive rights by public entities against each other. It is argued that

[71]The only governmental parties before us are the plaintiff city, three defendant cities, and the Crescenta Valley County Water District which distributes water to the inhabitants of a sizable service area. The 1935 amendment to Civil Code section 1007 specifies cities but not county water districts among the public entities whose property it exempts from prescription.

[72]This priority is expressly declared by the Legislature in Water Code section 106.5, enacted in 1945, quoted in footnote 37, *supra.* (See also, Wat. Code, §§ 1203, 1460-1464.)

[73]Any question of the subjection of the defendant water district's water rights to prescription need not be reached in the present case for reasons stated *infra* in summarizing the parties' respective rights in the water of the Verdugo basin. In any event, the omission of county water districts from the entities specified in the 1935 amendment does not preclude protection from prescription of its water rights devoted to public use under the decisional law preserved in the final saving clause of the 1935 amendment. (See fns. 74-76, *post.*) The 1968 amendment, enacted since entry of the judgment below, extends the protection from prescription to the property of "the state or any public entity" as well as to property dedicated to a public use by a public utility.

the phrase "person, firm or corporation" by which the statute describes the class of parties whose possession is not permitted to ripen into prescriptive rights against specified publicly owned property refers only to *private* persons, firms, and corporations.

We are of the opinion that the 1935 amendment to section 1007 was intended to enlarge the classes of property exempt from prescription by *any* party rather than to immunize such enlarged classes of property from prescription by private parties only.[74] The immunity from prescription under the prior case law preserved by the last sentence of the amendment (see fn. 74) extended to property owned by the state or any other public entity as long as such property was devoted to a public use. (*City of Oakland* v. *Burns* (1956) 46 Cal.2d 401, 407 [296 P.2d 333]; *People* v. *Chambers* (1951) 37 Cal.2d 552, 556-557 [233 P.2d 557]; *Reclamation Dist. No. 833* v. *American Farms Co.* (1930) 209 Cal. 74, 81 [285 P. 688].)[75] On the other hand the prior case law permitted the rights of the state or a local governmental entity in property not devoted to a public use and owned in a proprietary capacity to be lost through adverse possession culminating in prescription. (*Henry Cowell Lime & Cement Co.* v. *State* (1941) 18 Cal.2d 169, 172 [114 P.2d 331].) If the property was owned by the governmental entity in its proprietary capacity but was nevertheless devoted to a public use, it remained

---

[74]This intent appears to underlie the wording of the amendment's final disclaimer of exclusivity: "The exemption of certain classes of governmental property is intended as a limitation and shall not be deemed to subject to the operation of this section any classes of governmental property which would not otherwise be subject thereto." (1935 amendment of Civ. Code, § 1007.) The "exemption" means the anti-prescription provision of the 1935 amendment, and the "operation of this section" refers to the *original* portion of section 1007 which provides that "[o]ccupancy for the period" of the statute of limitations confers a title by prescription and which contains no designation of or restriction on the persons or entities capable of acquiring such a title. The disclaimer seems to assume that all "classes of governmental property" are either wholly subject to the operation of the section or not—i.e., subject to prescription by *any* entity or not—and to be inconsistent with a construction which would subject a class of governmental property to partial operation of the section—i.e., to a prohibition only on prescription by *private* persons, firms or corporations.

[75]This rule was applied to water rights devoted to a public use in *City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. 105, 135-136, where the court declared that the pueblo water right was governmental property held under a public trust and therefore immune from prescription. In the earlier case of *Big Rock Mutual Water Co.* v. *Valyermo Ranch Co., supra,* 78 Cal.App. 266, 274-275 [248 P. 264], a District Court of Appeal held that the rights of a defunct irrigation district in the waters of a stream had been lost by prescription even though the rights were devoted to a public use. However, the rights in question were appropriative in nature and had been abandoned. (Former Civ. Code, § 1411, now Wat. Code, § 1240.) The decision relied on these circumstances and is therefore distinguishable from any facts now before us.

immune from prescription. (*City of Oakland* v. *Burns, supra,* 46 Cal.2d at p. 407.)[76]

The decisions forbidding acquisition of prescriptive title to property owned by the state or a local governmental body and devoted to a public use make no distinction based on the private or governmental nature of the party making the prescriptive claim. The following statement of the rule demonstrates its absolute nature: " 'It is immaterial where the title—that is, the record title—is held, whether by the state at large, or by a county, or by some municipal department or other official body. There can be no adverse holding of such land which will deprive the public of the right thereto, or give title to the adverse claimant, or create a title by virtue of the statute of limitations. The rule is universal in its application to all property set apart or reserved for public use, and the public use for which it is appropriated is immaterial. The same principles which govern the adverse holding of a street, a public square, a quay, a wharf, a common, apply to the adverse holding of a schoolhouse. The public is not to lose its rights through the negligence of its agents, nor because it has not chosen to resist an encroachment by one of its own number,

---

[76]In *City of Oakland* v. *Burns, supra,* 46 Cal.2d at page 407, this court referred to property on which a city operated an airport as "lands devoted to a public use of proprietary character" and held the property to be exempt from prescription.

Although a city or water district operates facilities for distributing water to its inhabitants in a proprietary capacity (*City of Pasadena* v. *Railroad Commission* (1920) 183 Cal. 526, 529 [192 P. 25, 10 A.L.R. 1425]; *Glenbrook Development Co.* v. *City of Brea* (1967) 253 Cal.App.2d 267, 274 [61 Cal.Rptr. 189]), the water rights through which it supplies such distribution system constitutes property devoted to a public use. (Cal. Const., art. XIV, § 1; Wat. Code, § 31043; *Fellows* v. *City of Los Angeles, supra,* 151 Cal. 52, 57-58, 64; *People* ex rel. *City of Downey* v. *Downey County Water Dist.* (1962) 202 Cal.App.2d 786, 797 [21 Cal.Rptr. 370].)

In *City of San Diego* v. *Cuyamaca Water Co., supra,* 209 Cal. 105, 130, the court commented as follows: "It should at the outset be understood and stated that the pueblo rights, and hence the rights of its successor, the City of San Diego, to whatever of the waters of the San Diego River were from time to time required for the needs of the pueblo and of the city and of the inhabitants of each, were rights which were essentially 'governmental' in character, as much so in fact as were the rights of the ancient pueblo and modern city to the public squares or streets, and that the term 'proprietary,' as employed with reference to certain commercialized uses made by municipalities and other public bodies, of water, light and power, for example, has no application to the fundamental rights of the plaintiff herein to its ownership of its foregoing classes of property dedicated and devoted to public uses. (*Ames* v. *City of San Diego,* 101 Cal. 390, 394 [35 Pac. 1005].)"

In harmony with the foregoing authorities cited in this footnote, the reference in the court's dictum to "the term 'proprietary,' as employed with reference to certain commercialized uses made by municipalities and other public bodies, of water, light and power" should be taken only as an indication of the proprietary capacity in which a city operates its water or power system and not as casting any doubt on the dedication to public use of the property rights underlying the city's water supply.

whose duty it was, as much as that of every other citizen, to protect the state in its rights.' This rule has been often repeated in the opinions of this court. [Citations.]" (*People* v. *Kerber* (1908) 152 Cal. 731, 734 [93 P. 878].)

Relying on prior California decisions and on the 1935 amendment to Civil Code section 1007, this court held that adverse user by the public of land devoted to public use as a municipal airport could not result in any implied dedication of the land as a public street because title to such land cannot be acquired by prescription against a municipal corporation or subdivision of the state. (*City of Oakland* v. *Burns, supra,* 46 Cal.2d 401, 406.) Decisions in other jurisdictions have rejected prescriptive claims by local governmental bodies against property of the state or its subdivisions. (*Hoffman* v. *City of Pittsburgh* (1950) 365 Pa. 386 [75 A.2d 649]; *Board of Education of Memphis City Schools* v. *Shelby County* (1927) 155 Tenn. 212 [292 S.W. 462]; *Trustees of University of South Carolina* v. *City of Columbia* (1917) 108 S.C. 244 [93 S.E. 934].)[77]

No legislative purpose appears for the enactment of the 1935 amendment to Civil Code section 1007 other than to extend to *all* property of the specified governmental entities, whether or not devoted to a public use, the exemption from prescriptive claims theretofore attached only to the property of such entities which *was* devoted to a public use. (See *Southern Pac. Co.* v. *City & County of San Francisco, supra,* 62 Cal.2d 50, 53, fn. 1.)

In support of their contention that the 1935 amendment precluded prescription only by *private* persons, firms or corporations, defendants cite statements by this court that in the absence of express words to the contrary, neither the state nor its subdivisions are included within the general words of a statute. (*Estate of Miller* (1936) 5 Cal.2d 588, 597 [55 P.2d 491]; *Balthasar* v. *Pacific Elec. Ry. Co.* (1921) 187 Cal. 302, 305 [202 P. 37, 19 A.L.R. 452].) But this rule excludes governmental agencies from the operation of general statutory provisions only if their

---

[77]In the last-cited case the South Carolina court reasoned: "The city governing is the State governing through the city in a circumscribed locality; and for a city to claim the property of the State adversely to the State is the same thing as to claim against itself, a manifest incongruity. Such a holding cannot be adverse." (108 S.C. at pp. 253-254.) Although prescriptive rights between states are recognized in the settlement of boundary disputes, such recognition rests on principles of international law evolved for the accommodation of interests between sovereign nations. (*Arkansas* v. *Tennessee* (1940) 310 U.S. 563, 569-570 [84 L.Ed. 1362, 1366-1367, 60 S.Ct. 1026]; *Virginia* v. *Tennessee* (1893) 148 U.S. 503, 523 [37 L.Ed. 537, 544, 13 S.Ct. 728].)

inclusion would result in an infringement upon sovereign governmental powers. "Where . . . no impairment of sovereign powers would result, the reason underlying this rule of `construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only." (*Hoyt* v. *Board of Civil Service Commrs.* (1942) 21 Cal.2d 399, 402 [132 P.2d 804]; see *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 933 [101 Cal.Rptr. 568, 496 P.2d 480]; *Flournoy* v. *State of California* (1962) 57 Cal.2d 497, 498-499 [20 Cal.Rptr. 627, 370 P.2d 331]; *State of California* v. *Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 704 [111 P.2d 651].) Pursuant to this principle, governmental agencies have been held subject to legislation which by its terms applies simply to any "person." *(Hoyt* v. *Board of Civil Service Commrs., supra; Flournoy* v. *State of California, supra; State of California* v. *Marin Mun. Water Dist., supra.)*

We construe the word "person," in the 1935 amendment's provision that "no possession by any person, firm or corporation" shall ripen into prescriptive title against certain public entities, to include governmental agencies. This construction does not infringe on their sovereign powers.[78] Such agencies are thereby deprived of nothing except the power to take away the property rights of their fellow public entities through adverse possession. Those other entities are thus protected against prescriptive invasion of their property rights from public as well as private sources. The result is not a diminution of sovereign powers but only the elimination of prescription as a means of transferring property from one arm of the government to another.[79]

### Commencement of Overdraft

A ground basin is in a state of surplus when the amount of water being extracted from it is less than the maximum that could be withdrawn without adverse effects on the basin's long term supply. While

---

[78]Plaintiff argues that "corporation" includes a municipal corporation (see *City of South Pasadena* v. *Pasadena Land & Water Co.* (1908) 152 Cal. 579, 594-595 [93 P. 490]), but our construction of "person," which includes a corporation (Civ. Code, § 14), makes reliance on this argument unnecessary.

[79]This legislative policy of prohibiting transfers of property between local governmental agencies by prescription (Civ. Code, § 1007) is somewhat similar to that of forbidding such agencies to condemn each other's property while in use for a public purpose for which it was appropriated (Code Civ. Proc., §§ 1240, subd. 3, 1241, subd. 3). One policy prevents a governmental entity from taking advantage of another such entity's being caused to sleep on its rights by the omissions or faults of its agents and the other policy protects local governmental bodies from a forced sale to another local government of property they are currently devoting to a public use.

this state of surplus exists, none of the extractions from the basin for beneficial use constitutes such an invasion of any water right as will entitle the owner of the right to injunctive, as distinct from declaratory, relief. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 926-927; *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 79.) Overdraft commences whenever extractions increase, or the withdrawable maximum decreases, or both, to the point where the surplus ends. Thus on the commencement of overdraft there is no surplus available for the acquisition or enlargement of appropriative rights. Instead, appropriations of water in excess of surplus then invade senior basin rights, creating the element of adversity against those rights prerequisite to their owners' becoming entitled to an injunction and thus to the running of any prescriptive period against them. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 928-929.)

We need not consider here the nature or extent of any appropriative or prescriptive water rights in the San Fernando or Verdugo basins in view of our conclusions with respect to the pueblo right, rights to return flow from imported water and the exemption of municipal water rights from prescription. However, the principles governing appropriative and prescriptive water rights will be relevant to the determination on remand of the conflicting interests of the parties in the water of the Sylmar basin. Hence we deal with these principles for the guidance of the trial court.

▉ The trial court defined "surplus" and "overdraft" in terms of "safe yield." The findings state that "[s]urplus is that condition which exists when the draft on the ground water supply is less than the safe yield," and that overdraft exists when such draft "exceeds the safe yield." "Safe yield" is defined as "the maximum quantity of water which can be withdrawn annually from a ground water supply under a given set of conditions without causing an undesirable result." The phrase "undesirable result" is understood to refer to a gradual lowering of the ground water levels resulting eventually in depletion of the supply. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 929.)

Although the parties differ sharply over the correct meanings of "surplus" and "overdraft" under the present facts, they are in accord over the concept of "safe yield" and the essential correctness of the method by which the referee and the expert witnesses computed the safe yield of the ULARA and its component basins for particular years. Basically, safe yield was deemed equivalent to. an adjusted figure for net ground water recharge, consisting of (A) recharge from (1) native

precipitation and associated runoff, (2) return flow from delivered imported water, and (3) return flow from delivered ground water less (B) losses incurred through natural ground water depletions consisting of (1) subsurface outflow, (2) excessive evaporative losses in high ground water areas and through vegetation along streams, (3) ground water infiltration into sewers, and (4) rising water outflow, or water emerging from the ground and flowing past Gauging Station No. F57 down the river channel to the sea.[80] The component figures for the particular safe yield year being determined were adjusted to eliminate the effect of fluctuations extraneous to the long range calculation. The adjustment of chief importance here was the use of a 29-year base period, consisting of the water years 1928-1929 through 1956-1957, for the computation of all items dependent upon precipitation. This 29-year period was selected as one for which (1) adequate hydrological data was available and (2) precipitation figures were representative, in both average level and fluctuations, of the 85 years for which weather records were relatively complete.

Plaintiff contends that the trial court's definition of overdraft as a condition in which draft exceeds safe yield, although consistent with the *Pasadena* decision, is insufficient for the facts of the present case. According to plaintiff, overdraft commenced in the ULARA only when (1) total extractions exceeded safe yield and (2) the available water storage capacity of the basin was sufficient to permit cycling of the safe yield throughout the 29-year base period of wet and dry years without causing a waste of water in the wet years. The referee's report as well as other evidence showed that when ground basin levels were relatively high, and storage space correspondingly diminished, waste occurred.[81] Ground basin levels tended to vary in accordance with wide fluctuations in precipitation.[82] Thus if a rising level of extractions were halted at the point of the safe yield based on the 29-year average, ensuing heightening of ground water levels during years of higher-than-average precipitation would cause waste.[83] Since this waste would constitute a loss of basin water in addition to the safe yield extractions, it would eventually create enough additional storage space to stop further similar waste, but the wasted water itself would be lost to any beneficial use. On the other hand, a withdrawal of water from the basin over and above its safe yield

[80]See appendix.
[81]See appendix.
[82]See appendix.
[83]See appendix.

in the amount necessary to create the storage space sufficient to prevent the waste would result in a net addition to the beneficially used supply.[84]

We agree with plaintiff that if a ground basin's lack of storage space will cause a limitation of extractions to safe yield to result in a probable waste of water, the amount of water which if withdrawn would create the storage space necessary to avoid the waste and not adversely affect the basin's safe yield is a temporary surplus available for appropriation to beneficial use. Accordingly, overdraft occurs only if extractions from the basin exceed its safe yield plus any such temporary surplus.

Defendants contend that the *Pasadena* decision required the trial court to make its findings equating overdraft with an excess of extractions over safe yield, relying on the following language: "Each taking of water in excess of the safe yield . . . was wrongful and was an injury to the then existing owners of water rights, because the overdraft, from its very beginning, operated progressively to reduce the total available supply." (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 929.) This statement must be read in light of the facts of that case. Prior to the filing of the complaint in September 1937 (33 Cal.2d at p. 916), extractions from the basin had exceeded safe yield for every water year since 1913-1914 except 1934-1935 and 1936-1937 (33 Cal.2d at p. 922), and there appears no suggestion of any temporary surplus caused by lack of ground basin storage space during any of the years relied upon as part of a prescriptive period. On the contrary, the court expressly noted that "the ground water storage capacity is adequate to store the excess during wet years for the following dry years." (33 Cal.2d at p. 921.)[85]

Moreover, the *Pasadena* decision clearly recognizes the reason that such temporary surplus prevents the commencement of overdraft. The court treated as overdraft only a taking in excess of safe yield that "from its very beginning, operated progressively to reduce the total available supply." (33 Cal.2d at p. 929.) A taking of the kind of temporary surplus we are considering here does not reduce but increases the total available supply by eliminating waste emanating from insufficient storage space. As stated in *Pasadena:* "It is the policy of the state to foster the beneficial use of water and discourage waste, and when there is a surplus, whether of surface or ground water, the holder of prior rights may not enjoin its

---

[84]See appendix.

[85]Defendants cite evidence in *this* case of a subsurface outflow from the Raymond basin during the period involved in *Pasadena.* There is no indication that such outflow was related to any lack of ground basin storage space or that its existence or significance was ever considered by the *Pasadena* court.

appropriation. (*Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 368-369, 372 [40 P.2d 486]; see 26 Cal.Jur. 277.)" (33 Cal.2d at p. 926.)[86]

Defendants contend that the temporary surplus does not preclude the commencement of overdraft if the waste resulting from the lack of storage space could have been prevented by reasonable measures other than permanent removal of ground water from basin storage. However, the availability of such measures[87] is not necessarily inconsistent with the existence of a temporary surplus in the basin arising from lack of sufficient ground water storage space. There is no showing in the findings or otherwise that the methods by which plaintiff or any other party extracted, diverted, or spread water exceeded the bounds of reasonable beneficial use. Accordingly, the parties' water rights cannot be varied by any showing that they could have applied any different methods. (*Allen* v. *California Water & Tel. Co.* (1946) 29 Cal.2d 466, 483-484 [176 P.2d 8]; *Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489, 547; *Joerger* v. *Pacific Gas & Elec. Co.* (1929) 207 Cal. 8, 23 [276 P. 1017].) Moreover, if a temporary surplus in fact existed, it would be anomalous to permit a party suing for an injunction to establish merely that he is capable of preventing this surplus in lieu of proving the actual overdraft prerequisite to injunctive relief.

### *Notice of Adversity as Prerequisite to Commencement of Prescriptive Period*

On remand questions may arise as to the acquisition of prescriptive rights by plaintiff or defendant City of San Fernando, or both, against the overlying or appropriative rights of private defendants in the Sylmar basin. ██ "[A]n appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, contin-

---

[86]Defendants contend that a temporary surplus was disregarded in *Allen* v. *California Water & Tel. Co., supra,* 29 Cal.2d 466, where it was held proper to exclude uncertain increments to the Tia Juana River basin supply, derived from leaks at a Mexican dam site and return flow from a Mexican irrigation project, in computing the basin's safe yield. (29 Cal.2d at pp. 476, 481-482.) The issuance of an injunction was based, however, not simply on an excess of extractions over safe yield but on the necessity of maintaining ground water levels to prevent permanent damage from salt water intrusion. The judgment preserved the rights of the defendant appropriator to take any surplus generated by the Mexican dam and project, yet protected the overlying owners from the permanent damage that the defendant's appropriations would cause in the absence of the uncertain Mexican supply. (29 Cal.2d at pp. 485-486.)

[87]See appendix. Since our disposition of this appeal makes the determination in this case of temporary surplus, as defined herein, relevant only with respect to Sylmar basin, our discussion of evidence relating to the possible existence of such surplus in San Fernando basin and in the ULARA as a whole does not imply any conclusions by us as to the existence of such surplus in those areas at any particular time.

uous and uninterrupted for the statutory period of five years, and under claim of right. [Citations.]" (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 926-927.) The pretrial conference order stated among the agreed or admitted matters: "The taking and diversion of waters from [the ULARA], and the beneficial use of said waters, by each of the parties hereto, at the time of the filing by plaintiff of its complaint herein, and for a period in excess of five years prior thereto, was open, notorious, and under a claim of right." The findings declare that each party's taking and use of water from each basin "has at all times been open [and] notorious" and for a period of over five years prior to the filing of the complaint has been "continuous" and "continuously and uninterruptedly asserted by [such party] to be and was adverse to any and all claims of each and all of the other parties taking . . . and using water from [the same] basin." The trial court awarded mutually prescriptive rights in each basin to particular parties based on "[t]he highest continuous annual production of water for beneficial use in any five (5) year period *subsequent to the commencement of overdraft* and prior to the filing of the complaint by each of the parties from the [basin] as to which there has been no cessation of use by it during any subsequent continuous five (5) year period." (Italics added.)

The fact that one party's taking of water from a basin is open, notorious, and under claim of right does not invade any other party's water rights in the basin so as to entitle the other party to injunctive relief or start the running of any prescriptive period against the other party's rights so long as the taking is only from a surplus of basin water, that is, *so long as there is not an overdraft on the basin supply.* (*Id.* at pp. 926-927.) The commencement of overdraft provides the element of adversity which makes the first party's taking an invasion constituting a basis for injunctive relief to the other party. (*Id.* at pp. 928-929.) But if the other party is not on *notice* that the overdraft exists, such adverse taking does not cause the commencement of the prescriptive period.

Thus, in the *Pasadena* case the extractions from the Raymond basin constituted an adverse use entitling the owners of basin water rights to injunctive relief upon the commencement of overdraft in the water year 1913-1914. (*Id.* at pp. 928-929.) The only evidence referred to in the opinion of the element of notice necessary for prescription was the lowering of the water levels in the appellant's wells beginning in 1919, over five years later. Immediately after describing what the record showed about this drop in well levels, the opinion states: "This evidence is clearly sufficient to justify charging appellant with notice that there

was a deficiency rather than a surplus and that the appropriations causing the overdraft were invasions of the rights of overlying owners and prior appropriators. The elements of prescription being present in the record, the statute of limitations ran against the original lawful holders of water rights to whatever extent their rights were invaded." (*Id.* at p. 930.)

Thus in the present case the trial court erred in basing an award of prescriptive rights on the running of a prescriptive period whose commencement coincided with the commencement of overdraft without making any determination of the time at which the owners of the rights being lost by such prescription were first chargeable with notice of the overdraft. The findings that the takings from the basin were open and notorious and were continuously *asserted* to be adverse does not establish that the owners were on notice of adversity *in fact* caused by the actual commencement of overdraft. Nor have the parties called to our attention any evidence in the record from which the trial court could have fixed any time at which the owners of Sylmar basin rights should reasonably be deemed to have received notice of the commencement of overdraft in the basin. Accordingly the parties should be permitted to introduce evidence on this issue on remand insofar as necessary to determine prescriptive claims in Sylmar basin consistently with this opinion.[88]

### Effect of Surplus on Running of Prescriptive Period

In the Sylmar basin, the trial court found that prior to the filing of the complaint at the end of the water year 1954-1955, overdraft existed continuously from 1936-1937 through 1941-1942 and from 1944-1945 through 1953-1954 but that conversely surplus existed in 1942-1943, 1943-1944 and 1954-1955. Prescriptive rights in the basin were awarded to plaintiff, defendant City of San Fernando and two private defendants

---

[88]Another question about the commencement of the prescriptive period, although argued in the briefs in a different connection, may become relevant to a determination on remand of prescriptive claims in Sylmar. In asserting prescriptive rights against plaintiff in the San Fernando basin, defendants argue that the commencement of the prescriptive period five years before the filing of the complaint (Code Civ. Proc., § 318) was established by annual figures showing overdraft during the water year 1949-1950. However, the complaint was filed on September 30, 1955, which is within five years of the end of the water year of 1949-1950 on September 30, 1950, for purposes of the statute of limitations. (Code Civ. Proc., § 12; *Wixted* v. *Fletcher* (1961) 192 Cal.App.2d 706 [13 Cal.Rptr. 734].) Thus, evidence showing overdraft in the Sylmar basin on the basis of total figures for the water year 1949-1950 would not establish adversity for a five-year prescriptive period prior to the filing of the complaint.

based on the "highest continuous annual production of water for beneficial use in any five (5) year period *subsequent to the commencement of overdraft and prior to the filing of the complaint* by each of the parties from the Sylmar basin as to which there has been no cessation of use by it during any subsequent continuous five (5) year period." (Italics added.) From this formula it appears that the award of prescriptive rights may have been based on extractions of water during a continuous five-year period which included years of surplus.[89]

 Years of surplus should not be included in the prescriptive period because the taking of surplus water cannot invade the basin water rights of others. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 926-927; *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 79.) Moreover, since adverse taking is impossible during surplus years their occurrence breaks the continuity required for the running of a prescriptive period. (See *Armstrong* v. *Payne* (1922) 188 Cal. 585, 596-597 [206 P. 638].) Accordingly, the prescriptive period for ground basin water rights must consist of five consecutive years of overdraft.

Defendants argue that the trial court's formula literally follows the wording of the findings underlying the judgment affirmed in *Pasadena,* and that the occurrence of two surplus years (1934-1935 and 1936-1937) between the commencement of overdraft (1913-1914) and the filing of the *Pasadena* complaint (1937) indicates that the inclusion of surplus years in the prescriptive period was approved in that decision. (See 33 Cal.2d at p. 922.) There is no indication in *Pasadena* that the appellant objected to the inclusion of any particular year or years in the prescriptive periods used by the trial court in its computations or that the briefs or record on appeal disclosed which years were included. We therefore cannot presume that the *Pasadena* court approved a computation violative of the principles announced in its own decision. (See 33 Cal.2d at p. 926.)

---

[89]We cannot be certain whether the trial court in fact included extractions during the surplus years in computing prescriptive rights in the Sylmar basin because the parties have not brought before us the evidence of each party's annual extractions on which the court based its computation. However, the parties agree that the trial court did include extractions during surplus years in computing prescriptive rights in the Verdugo basin and plaintiff attacks while defendants support the propriety of this procedure. We are not reviewing the adjudication of water rights in the Verdugo basin because we have concluded that plaintiff is not adversely affected by it and none of the affected parties have appealed. The trial court's approach with respect to the Verdugo basin does, however, indicate that it at least felt free to include surplus years in the prescriptive period in the Sylmar basin and so points to the desirability of our providing guidance for a possible redetermination of Sylmar basin prescriptive rights after remand.

*Prescriptive Rights as Limitation Upon Restricted
Pumping Quotas*

 Under the judgment each party that was awarded a prescriptive right in the Sylmar basin was also assigned a "restricted pumping" quota which was approximately 15 percent greater than such party's prescriptive right. These quotas were arrived at by dividing the 1964-1965 safe yield, found to be 6,210 acre feet, among the parties in proportion to their prescriptive rights.[90] The quotas were not based on any finding that the parties had actually appropriated those amounts.

It was improper to limit total pumping to safe yield by allocating quotas based simply upon a computation of proportionate *increases* in each party's prescriptive right.[91] It was not a foregone conclusion that each party's need for water would increase in exact proportion to its prescriptive right or that other entities would not be desirous and able to apply the increment in supply to other beneficial uses.

The *Pasadena* decision states that where the judgment restricts total pumping to safe yield by making proportionate *reductions* in each party's prescriptive right, "it is proper to provide that, if the amount of the safe yield is increased, the permissible takings shall be increased proportionately up to the amount of the 'present unadjusted right' [prescriptive right] of each party. The adjudication thus applies to existing rights, and there is no declaration as to future rights in water to which a party has no present right." (33 Cal.2d at p. 937.) Appropriative and prescriptive rights in ground basin water are limited to amounts actually taken. (*Eden Township Water Dist.* v. *City of Hayward* (1933) 218 Cal. 634, 638 [24 P.2d 492]; *California Water Service Co.* v. *Edward Sidebotham & Son,*

---

[90]The amounts of these Sylmar basin prescriptive rights and restricted pumping quotas were fixed as follows:

| PARTY | MUTUALLY PRESCRIPTIVE RIGHT (In Acre Feet) | RESTRICTED PUMPING (In Acre Feet) |
|---|---|---|
| City of Los Angeles | 2,440 | 2,818 |
| City of San Fernando | 2,370 | 2,737 |
| The Wellesley Company | 527 | 609 |
| Moordigian | 40 | 46 |
| TOTALS | 5,377 | 6,210 |

[91]The discussion of this issue in the briefs is directed to the allocation of restricted pumping quotas based on proportionate increases in prescriptive rights in the Verdugo, rather than the Sylmar, basin but the parties' arguments are equally applicable to the Sylmar situation.

*supra,* 224 Cal.App.2d 715, 727 (rejecting claim to water in excess of actual appropriation based on theory of proportionate prescriptive right).) If at the time of judgment the parties' actual appropriations had increased so as to create a condition of overdraft despite enlargement of the available supply, a restriction on the parties' extractions would be a proper means for preventing depletion of the basin. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 924.) The trial court lacked authority, however, to allocate unappropriated quantities of water for future taking. (*City of San Bernardino* v. *City of Riverside, supra,* 186 Cal. 7, 25, 30-31.)

## SUMMARY OF RIGHTS AND APPROPRIATE RELIEF

### *Rights of Parties in San Fernando Basin*

Water rights in the San Fernando basin are claimed by plaintiff, the defendants Glendale and Burbank, and seven private defendants. Our conclusions on these claims are as follows:

1. Plaintiff has a pueblo right to all ground water in the San Fernando basin derived from precipitation within the ULARA, insofar as plaintiff uses such water to satisfy its municipal needs and the needs of its inhabitants.

2. Plaintiff has a right to all San Fernando basin ground water derived from water imported by plaintiff from outside the ULARA and either spread or delivered within the ULARA, insofar as plaintiff applies such derived water to reasonable beneficial uses.

3. The defendants Glendale and Burbank each have a prior right to all San Fernando basin ground water derived from water that such city imports from outside the ULARA and delivers within the ULARA, insofar as the city applies such derived water to reasonable beneficial uses.[92]

4. Any prescriptive claims among plaintiff and the two defendant cities and any such claims by any private defendant against plaintiff or either of the two defendant cities are barred by the provisions of section 1007 of

---

[92]These defendants, unlike plaintiff, do not engage in spreading operations. Their imported water is all purchased from the Metropolitan Water District. Plaintiff imports relatively small amounts of MWD water into the basin in addition to its far larger imports of Owens water.

the Civil Code as in effect since 1935.[93] Such prescriptive claims by the two defendant cities against plaintiff are also barred by the judgments affirmed in *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d 68.

5. Plaintiff's pueblo right and the respective imported water rights of plaintiff and each defendant city are mutually exclusive and of equal priority. All such rights are prior to rights dependent on ownership of overlying land or based solely upon appropriation of ground water from the basin. Therefore, all the rights of the private defendants are subordinate to the foregoing rights of the plaintiff and the defendant cities and all rights of the defendant cities other than their imported water rights are subordinate to the foregoing rights of plaintiff.

### Appropriate Relief in San Fernando Basin

In formulating its findings, conclusions and judgment, the trial court was properly mindful of its constitutional duty to protect the parties' rights in a manner that would minimize waste and maximize beneficial use of the water in controversy. (Cal. Const., art. XIV, § 3; *Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d 501, 558-559; see *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 925-926.) Although our conclusions require that a new judgment on remand be based on different substantive rights than those adjudicated by the trial court, the same conserving principle should guide the formulation of the new judgment.

The trial court limited the parties' total extractions from the San Fernando basin to an annual 90,680 acre feet, which it found to be the 1964-1965 safe yield, reserving jurisdiction to redetermine the safe yield from time to time in accordance with changed hydrologic conditions. This finding established the basin's available supply for purposes of injunctive relief, the finding being supported by substantial evidence and there being no claim of any temporary surplus over and above the safe yield in 1964-1965.

[93]It was proper for the trial court to undertake to adjudicate the water rights of the defendants among themselves as well as between them and plaintiff. (Code Civ. Proc., § 578; *Strong* v. *Shatto* (1927) 201 Cal. 555 [258 P. 71]; *Milton E. Giles & Co.* v. *Bank of America* (1941) 47 Cal.App.2d 315, 323-324 [117 P.2d 943].) The defendant cities are free to assert the defense of Civil Code section 1007 against any prescriptive claims made against them on remand even though they have hitherto refrained from asserting the defense in light of their own prescriptive claims against plaintiff. (*Pillsbury* v. *Superior Court* (1937) 8 Cal.2d 469 [66 P.2d 149].)

Undoubtedly injunctive relief is called for in view of the undisputed overdraft prior to rendition of the present judgment. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 929.) Although by far the largest share of the basin's supply must be allocated to plaintiff, the injunction should restrict plaintiff's as well as defendants' extractions. Plaintiff asserts a need for the entire safe yield of the basin and has demonstrated such need by appropriating substantially more than that amount in 1964-1965.[94] Notwithstanding plaintiff's larger interest the defendant cities have a sufficient interest in maintaining the basin supply to warrant the restriction on plaintiff, stemming from their right to recapture the return flow attributable to their imports, which will probably increase as a result of (1) the defendants' substitution of imported water for the ground supply relinquished in deference to plaintiff's prior rights and (2) the overall expansion of their total water needs. The exercise of the return flow right would become more difficult and eventually impossible if the basin levels were continually lowered by an excess of extractions over safe yield.[95]

On remand, the basin's safe yield[96] should be apportioned between amounts attributable to (1) native waters produced by precipitation within the ULARA and (2) water imported from outside the ULARA. The latter amount should in turn be apportioned among the respective quantities derived from imports by plaintiff, defendant Glendale and defendant Burbank. Plaintiff should be awarded an unadjusted pumping right to the portion of the safe yield derived from native waters and from its own imports, and defendants Glendale and Burbank should each be awarded an unadjusted pumping right to the portion of the safe yield attributable to its own imports.

The new judgment should provide for adjustments in each party's pumping right to be administered by the watermaster under supervision of the court. Plaintiff's pumping right should be adjusted to take into account (1) the separate judgments entered under stipulation between plaintiff and defendants who are not parties to this appeal and (2) the imported water spread by plaintiff. The defendants' pumping rights

---

[94]Plaintiff extracted 107,800 acre feet from the San Fernando basin in 1964-1965, which was 17,120 acre feet more than the basin's safe yield.

[95]A continual lowering of ground basin levels would also interfere eventually with any pumping permitted by the judgment as part of a physical solution or for nonconsumptive uses, as discussed hereinafter.

[96]The trial court may deem the present safe yield to be equal to that already found to exist under 1964-1965 conditions or on proper showing it may determine the amount of the safe yield under the conditions of a more recent year.

should be adjusted to reflect return flow from their imports in excess of those for the safe yield year. Each of these adjustments requires additional comment.

Pursuant to stipulations entered into between plaintiff and certain defendants who are not parties to this appeal, judgments were entered prior to the trial permitting those defendants to extract water from the San Fernando basin under specified conditions. Since none of the defendants who participated in the trial had joined in these stipulations, the judgment below provided that the annual extractions from the basin allowed plaintiff were to be reduced by the amounts extracted under the authority of the stipulated judgments. Plaintiff concedes that whatever reduction in the parties' allowed extractions are necessary to offset the extractions allowed the stipulating defendants should all be deducted from plaintiff's allowance. Plaintiff argues, however, that the amount which should be deducted is not the total amount of the stipulating defendants' extractions but only an amount which reflects the net impact of those extractions. This argument has merit.

The particular uses which the stipulating defendants make of their extracted water are unique in that most or all of such water is returned to the ground after use. Some of these defendants use the water in the operation of closed air conditioning systems which return all of the water underground. Others use a combination of such extracted water and water purchased from plaintiff in industrial processes such as the production of sand and gravel in which most of the water is returned underground, the total return flow being sufficient to offset the extractions. The stipulated judgments permit the stipulating defendants to continue their extractions only as long as they do not alter their manner of use in a way that increases its consumptive effect. Under these circumstances it is inequitable to charge the stipulating defendants' *gross* extractions against plaintiff's pumping rights. Upon a proper showing by plaintiff, the trial court should determine what if any proportion of the extractions under each stipulated judgment represents water that is not returned to the basin in like quantity and adequate quality and should charge only that proportion of the extractions against plaintiff's unadjusted right.[97]

[97]According to the five annual reports so far issued by the watermaster pursuant to the judgment below, the extractions of five stipulating defendants have been deducted from plaintiff's pumping rights. Two of these operated air conditioning systems and the other three produced rock, sand, and gravel. (By 1972-1973 a merger had reduced the number of these producers to two.) On account of these stipulating defendants' extractions, 4,150 acre feet were deducted from plaintiff's 1972-1973 pumping rights.

The other kind of adjustment required to be made in plaintiff's pumping right is the crediting of plaintiff with the return flow derived from its spreading of imported water. This adjustment is necessary because such spreading was considered too irregular and unpredictable to be treated as a source of input to the ground supply in computing the safe yield. As already indicated, the provision in the present judgment enjoining spreading of imported water without the court's permission is unsupported by any sufficient showing of necessity and therefore must be eliminated. Provision should be made in the new judgment for determining the amount of credit for any such spreading, taking into account any losses from evaporation or otherwise that may be caused by the spreading operations.

The pumping rights of defendants Glendale and Burbank will have to be adjusted to credit them with increases in the return flow derived from the imported water they deliver in the basin. Such return flow is likely to increase as imported water is substituted for the ground water which must be relinquished to plaintiff. To provide for the credit, the trial court should determine (1) the annual rates of deliveries of imported water by defendants Glendale and Burbank respectively which were assumed in computing the safe yield and (2) the amount of increase in the basin's ground water supply attributable to such deliveries by each defendant calculated as a percentage of such deliveries. The credit for each subsequent water year may then be determined by applying each defendant's percentage to its imports for the year in excess of the annual rate assumed for the safe yield.[98]

In adjudicating a new accommodation of San Fernando basin water rights between plaintiff and defendants Glendale and Burbank, the trial court should consider the possibility of a physical solution. The usual purpose of a physical solution is to avoid a waste of water without unreasonably or adversely affecting the rights of the parties. (*Rancho Santa Margarita* v. *Vail supra,* 11 Cal.2d 501, 559; *City of Lodi* v. *East Bay Mun. Utility Dist.* (1936) 7 Cal.2d 316, 339-341 [60 P.2d 439].) No evidence has been brought to our attention which would indicate that limiting the extractions of plaintiff and these two defendants to their respective water rights would cause any water waste. However, both

[98]The present judgment contains (1) provisions for carryover rights to provide reasonable flexibility in administration of the quantitative pumping restraints and (2) provisions for current estimates of annual adjustments to lessen the time lag in giving them effect. The trial court will have discretion to incorporate such facilitative provisions into the new judgment and to continue its retention of jurisdiction to modify these and other provisions for carrying out the judgment within the limits set by this opinion.

defendant cities have made substantial investments in ground water extraction and distribution facilities (see *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d at p. 72), and it is possible that a strict limitation on their extractions and their consequent increased dependence on imported water would require large expenditures for new and different facilities. It is also possible that a physical solution might avoid the necessity for some or all of these expenditures without imposing any substantial burden on plaintiff. Such a solution might, for example, embody an exchange arrangement whereby under appropriate safeguards a defendant would furnish plaintiff with imported water in return for added ground water rights equivalent to (1) the quantity of such imported water plus (2) the quantity of the return flow rights the defendant would have received if it had delivered the imported water to its own territory in the basin. Whether this or any other solution is fair and just to all parties and interests concerned can only be determined by the trial court from the record and from any additional showing or evidence that may be offered and received after remand and nothing we say should be deemed restrictive of the trial court's equitable discretion in this regard.

Plaintiff seeks injunctive relief against extractions by the private defendants from the San Fernando basin. As already stated, these defendants' rights to the basin ground water are all subordinate to plaintiff's pueblo right and plaintiff's right to the return flow derived from its delivered imported water as well as to such return flow rights of defendants Glendale and Burbank. Accordingly, plaintiff is entitled to have the private defendants' extractions enjoined insofar as they would constitute an overdraft on the basin supply. (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 927-929.)

Some of the private defendants asserted at the trial, however, that a part or all of their respective uses of the basin water did not diminish the supply available to plaintiff. Certain defendants declared, for example, that their uses were nonconsumptive in that substantially all the extracted water was returned underground after use. Other defendants claimed that geological factors such as underground faults would prevent the water they extracted from ever reaching plaintiff's wells even if it were left in the ground. The trial court did not rule on these contentions in view of its award of prescriptive rights to these defendants based on the historic gross amounts of their extractions. On remand these contentions should be considered· in the formulation of any injunctive relief. Plaintiff is not entitled to such relief against extractions which have no immediate or long-range effects on its available supply. If

extractions which affect plaintiff's rights nevertheless preserve water for beneficial use that would otherwise go to waste, the trial court should endeavor to arrive at a physical solution which would avoid such waste. (*City of Lodi* v. *East Bay Mun. Utility Dist., supra,* 7 Cal.2d at pp. 339-341; *Peabody* v. *City of Vallejo, supra,* 2 Cal.2d 351, 381-383.) The trial court has broad equitable power to arrive at a just arrangement as to each defendant. (See *Rancho Santa Margarita* v. *Vail, supra,* 11 Cal.2d at pp. 558-562.)

Since the San Fernando basin water rights heretofore claimed by defendants Glendale and Burbank have not included the return flow rights which we have concluded are theirs, they have not had occasion to seek injunctive protection of these rights. They will be entitled to apply for such protection after remand by moving to amend their pleadings or other appropriate procedure. (See *Bank of America* v. *Superior Court* (1942) 20 Cal.2d 697, 702 [128 P.2d 357]; *Pillsbury* v. *Superior Court* (1937) 8 Cal.2d 469.)

### Rights of Parties and Appropriate Relief in Sylmar Basin

The parties claiming ground water rights in the Sylmar basin are plaintiff, defendant City of San Fernando, and two private defendants, Moordigian and the Wellesley Company. Plaintiff has a prior right to the return flow derived from its deliveries of water it imports into the Sylmar basin from outside the ULARA, similar to its right to such return flow in the San Fernando basin. However, plaintiff's pueblo right, applicable to the native waters of the San Fernando basin does not extend to Sylmar basin native waters. The trial court's award of mutually prescriptive rights in the Sylmar basin's entire safe yield cannot be sustained even as a basis for determining rights in the *native* waters of the basin derived from precipitation within the ULARA because as previously discussed such award disregarded the exemption of cities' water rights from prescription under the 1935 amendment to Civil Code section 1007 and in addition applied incorrect principles in computing the commencement and running of the prescriptive period. Hence, the parties' rights to the native waters of the basin depend on factual issues which the trial court did not consider and which the parties will have an opportunity to litigate after remand.

The record before us indicates that the parties may be able to prove the following kinds of rights in the ground waters of the Sylmar basin:

1. In addition to plaintiff's rights in the return flow attributable to its delivered imports, plaintiff may be able to establish appropriative rights

to native ground water, based on its appropriations in excess of such return flow during periods of basin surplus.

2. Defendant San Fernando may show appropriative rights based on its takings during periods of basin surplus of (1) native ground water and (2) any portion of the return flow attributable to plaintiff's delivered imports not recaptured by plaintiff (hereafter referred to as "unrecaptured return flow").[99]

3. The private defendants may show overlying rights to native ground water for reasonable beneficial uses on their overlying land, subject to any prescriptive rights of another party.[100]

4. The private defendants may show appropriative rights to native ground water and unrecaptured return flow based on takings for nonoverlying beneficial uses during periods of basin surplus, subject to any prescriptive rights of another party.

5. Any of the parties may be able to show that the circumstances under which such party extracted water during a period of overdraft before commencement of the present action gave it a prescriptive right against the water rights concurrently held by a private defendant. The effect of the prescriptive right would be to give to the party acquiring it and take away from the private defendant against whom it was acquired either (1) enough water to make the ratio of the prescriptive right to the remaining rights of the private defendant as favorable to the former in time of subsequent shortage as it was throughout the prescriptive period (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 931-933) or (2) the amount of the prescriptive taking, whichever is less (*id.* at p. 937).[101]

[99]Defendant San Fernando submitted proposed findings and conclusions to the trial court which purported to determine that it had *overlying* water rights in the basin. However, the trial court properly found that the water extracted by San Fernando was devoted to the public use of supplying its inhabitants, and such water is outside the scope of any overlying right. (*City of San Bernardino* v. *City of Riverside, supra,* 186 Cal. 7, 29.)

[100]Overlying rights take priority over appropriative rights in that if the amounts of water devoted to overlying uses were to consume all the basin's native supply, the overlying rights would supersede any appropriative claims by any party to the basin's native ground water (*Corona Foothill Lemon Co.* v. *Lillibridge* (1937) 8 Cal.2d 522, 530-531 [66 P.2d 443]) except insofar as the appropriative claims ripened into prescriptive rights (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 926-927). Such prescriptive rights would not necessarily impair the private defendants' rights to ground water for *new* overlying uses for which the need had not yet come into existence during the prescriptive period. (*Tulare Dist.* v. *Lindsay-Strathmore Dist., supra,* 3 Cal.2d 489, 525-526.)

[101]Even though cities cannot *lose* their water rights by prescription, their *acquisition* of prescriptive ground water rights is subject to the limitations stemming from the lawful owner's self help set forth in *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 931-933.

Principles hereinbefore set forth will govern the trial court's determination on remand of (1) the existence of basin surplus or overdraft in relation to the parties' claims of appropriative rights and (2) the commencement and running of prescriptive periods affecting the parties' claims of prescriptive rights. The court should determine whether the total amount of water covered by all of the rights of the parties exceeds the available supply consisting of the basin's safe yield and any temporary surplus, less possible rights of non-parties.[102] If an insufficiency in the available supply is found to exist, such supply should be allocated as follows: (1) Plaintiff should be allocated the ground water it requires for reasonable beneficial use from the part of the supply shown to constitute return flow, attributable to plaintiff's delivered imports. (2) Private defendants should be awarded the full amount of their overlying rights, less any amounts of such rights lost by prescription, from the part of the supply shown to constitute native ground water. (3) The rest of the available supply should be allocated among the holders of appropriative and prescriptive rights in accordance with the principle that "the one first in time is first in right" (Civ. Code, § 1414). (*City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at p. 926; *City of San Bernardino* v. *City of Riverside, supra,* 186 Cal. 7, 28 (priority principle applies to prescriptive as well as appropriative rights).)

The provisions for the Sylmar basin in the present judgment include a "physical solution" under which defendant San Fernando is allowed to extract up to 850 acre feet per year in excess of its restricted pumping right, plaintiff is required to reduce its extractions by the same amount, and San Fernando must pay plaintiff for each such excess acre foot the sum of $10 plus the current average cost per acre foot to plaintiff of purchasing MWD water. These provisions of the judgment are based on findings that ground water from the Sylmar basin is defendant San Fernando's sole source of supply, that to limit San Fernando to its restricted pumping right would impose undue hardship on it whereas availability of the additional ground water would enable it to meet its needs, and that the arrangement would not impose any hardship or burden on plaintiff. Plaintiff objects to the provisions on the grounds that (1) the compensation to be paid by San Fernando does not reflect plaintiff's true cost of MWD water and (2) in any event the provision is not a true physical solution by which the holder of a junior right provides

---

[102]The trial court found that no water was being pumped from the San Fernando, Sylmar or Verdugo basins by persons or entities not parties to the action in 1964-1965. Jurisdiction was retained to consider the effect of any subsequent pumping by nonparties on the amounts of pumped water allowed each party under the judgment.

a substitute supply for the holder of the senior right (*Rank* v. *Krug* (S.D. Cal. 1956) 142 F.Supp. 1, 164-165, mod. and affd. 293 F.2d 340, 307 F.2d 96, revd. on other grounds, 372 U.S. 609 [10 L.Ed.2d 15, 83 S.Ct. 999]) but amounts to a condemnation of the plaintiff's property for the benefit of another city in violation of Code of Civil Procedure sections 1240, subdivision 3 and 1241, subdivision 3. We need not consider these contentions because on November 12, 1971, as an aftermath of the severe damage to San Fernando's water system from the earthquake of February 9, 1971, San Fernando joined the MWD and ever since has been able to purchase MWD water. Hence the court's findings have been superseded by new facts which do not support the provisions of the judgment in question.

Although the present provisions for a physical solution in the Sylmar basin cannot stand, the trial court will be free on remand to consider any need for one or more other forms of physical solution which may appear from the present record or from additional proof. The general principles stated in our discussion of possible physical solutions in the San Fernando basin apply also to the Sylmar basin.

### Status of Judgment as to Verdugo Basin

In the Verdugo basin the trial court's judgment awarded prescriptive rights to defendants City of Glendale and Crescenta Valley County Water District. Since we have rejected plaintiff's claim that its pueblo right extends to the Verdugo basin, we perceive no adverse effect on plaintiff's interests from the portions of the judgment adjudicating rights in that basin. Although plaintiff delivers imported Owens water to the part of its Sunland-Tujunga service area located within the basin, plaintiff has never extracted ground water from the basin and apparently has no facilities for doing so.

None of the defendants has appealed. Plaintiff's appeal raised for review only the portions of the judgment adverse to its interests and any reversal should not extend to those portions which can remain without injuriously affecting plaintiff or otherwise creating an injustice. (See *Blache* v. *Blache* (1951) 37 Cal.2d 531, 538 [233 P.2d 547]; *Lake* v. *Superior Court* (1921) 187 Cal. 116, 119-120 [200 P. 1041].) There is nothing adverse to plaintiff in the trial court's adjudication of rights in the Verdugo basin. Plaintiff contends that the judgment erroneously enjoins it from making future appropriations of surplus water from the basin. The judgment does not go that far. It declares that defendants Glendale and Crescenta Valley County Water District "and no other

party" own water rights in the basin and enjoins *those two defendants* from taking from the basin more than the amounts specified by the judgment. The judgment's declaration that plaintiff owns no Verdugo basin water rights is correct. If plaintiff should acquire rights to the basin's water in the future, the present judgment would not bar it from asserting them. (*Lake Merced Golf & Country Club* v. *Ocean Shore R.R. Co.* (1962) 206 Cal.App.2d 421, 435 [23 Cal.Rptr. 881].) Accordingly, there is no ground for reversal of those provisions of the judgment which declare and limit rights to extract water from the Verdugo basin.[103]

### Appeal from Judgment for Reference Expense

In addition to the appeal from the principal judgment, plaintiff appeals from a judgment in favor of the State Water Resources Control Board determining the board's total expenses as referee to be $493,264 and apportioning $344,547 of this expense against plaintiff, $69,473 against defendant Glendale, $66,816 against defendant Burbank, and $12,428 against former defendants who were no longer before the court but had previously paid their apportioned amount under orders for interim payments. Plaintiff does not dispute the amount of the total expense but contends that its apportioned share of the total is excessive.

Prior to the judgment, the expense had been "equitably apportioned by the board against the parties to the suit" (Wat. Code, § 2043) as follows: One half, or $246,632 was apportioned against plaintiff and the other half was apportioned among the defendants in proportion to their average annual extractions from the ULARA during the five years preceding commencement of the action. Plaintiff and defendants filed objections to the board's apportionment (Wat. Code, § 2045) and after hearing the objections the court entered the judgment in accordance with the "apportionment . . . the court deems equitable" (Wat. Code, § 2048). The judgment states that the referee's total expense other than the amount charged to the former defendants is apportioned against defendants Glendale and Burbank "in the proportion that their respective mutually prescriptive rights bear to the total mutually prescriptive rights in the [ULARA]" as declared by the judgment on the merits and that the balance of the referee's expense is apportioned against plaintiff.

---

[103]Our decision not to disturb the substantive provisions of the judgment declaring rights and restricting extractions in the Verdugo basin does not limit the trial court's discretion on remand to modify the judgment's provisions common to all three basins insofar as such modification may be appropriate in light of our reversal as to the San Fernando and Sylmar basins.

Plaintiff complains that the trial court erred in requiring plaintiff to bear the share of the expense seemingly allocable under the trial court's formula to San Fernando, Crescenta Valley County Water District and the private defendants and in refusing to admit evidence purporting to show that valuable assistance had been rendered to the referee by plaintiff in furtherance of the reference. We need not consider these objections. Amounts which the judgment for reference expense expressly required the parties to pay for the services ordered to be performed by the water board as referee appointed by the court will be includible in the costs which may be allowed in the judgment on the merits pursuant to section 1032 of the Code of Civil Procedure. (*Moss* v. *Underwriters' Report, Inc.* (1938) 12 Cal.2d 266, 274 [83 P.2d 503].) The purpose of the statutory scheme for determination, apportionment and payment of reference expenses (Wat. Code, §§ 2040-2043, 2045-2048) is to allocate immediate responsibility for timely reimbursement of the board's outlay in conducting the reference and not to interfere with the rules for recovery of costs in civil actions.[104] Thus, any error in the apportionment under the judgment for reference expense could be corrected by an appropriate award of costs under the principal judgment. These circumstances precluded any prejudice to plaintiff from the apportionment in the judgment for reference expense.[105]

The judgment for the expense of the State Water Resources Control Board, successor to the State Water Rights Board, as referee is affirmed. The principal judgment is reversed and the cause is remanded for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

Respondent's petitions for a rehearing were denied July 30, 1975.

---

[104]The statutory arrangement is similar to that for payment of the compensation of court-appointed experts, which is apportioned and charged to the parties in the first instance and may thereafter be allowed as costs. (Evid. Code, § 731, subd. (c); *Rabinowitch* v. *Cal. Western Gas Co.* (1967) 257 Cal.App.2d 150, 161-162 [65 Cal.Rptr. 1]; *Estrin* v. *Fromsky* (1942) 53 Cal.App.2d 253, 255 [127 P.2d 603].)

[105]Plaintiff's separate objections to the award of costs against it in the principal judgment raise issues which are moot as our reversal of that judgment sets the case at large except as restricted by this opinion. (*Monson* v. *Fischer* (1933) 219 Cal. 290 [26 P.2d 6].)

APPENDIX

Certain footnotes which are unusually long or which contain factual data of interest to the parties but not necessary to an understanding of the opinion appear in this appendix instead of in the margin of the text.

---

[22]Before listing the asserted defects in the source materials presented to the *Vernon* court, the trial court's finding 55 states: "The only Spanish and Mexican documents and translations thereof presented to the court in the *Vernon* case were furnished by attorneys for the City of Los Angeles." It is undisputed, however, that the transcript on appeal, containing many such translations, was prepared by the attorneys for the city's opponent.

The finding sets forth the asserted defects in the *Vernon* materials under eight subdivisions lettered (a) through (h), each of which will be discussed seriatim:

(a) The finding refers generally to asserted errors and omissions in the *Vernon* appeal transcript. Under this heading defendants claim omissions from four sections of the Plan of Pitic, which is agreed to have stated principles generally applicable to Spanish-American pueblos including Los Angeles. From section 6 of said plan there is omitted (1) an immaterial reference to pastures and to crops planted in pastures and (2) a citation of Law 5, Title 17, Book IV, of the Laws of the Indies which, however, is set out two pages later in the transcript. From section 7 of the plan is omitted a proviso subjecting the pueblo's rights outside the pueblo limits to the terms of subsequent grants of such outside lands, but defendants can point to no Spanish or Mexican grants purporting to restrict plaintiff's pueblo water right. The omissions from sections 20 and 24 of the plan are material, if at all, *only* to the supervisory powers of superior governmental officials over pueblo affairs, a situation fully described in the *Vernon* opinion (106 Cal. at pp. 245-246). Moreover, section 20 is quoted in full in *Lux* (69 Cal. at pp. 327-328). In addition to these omissions from the Plan of Pitic, defendants complain that the appeal transcript omits from its summary of a 1785 opinion by an advisor to the commandant general a reference to Law 5, Title 17, Book IV of the Laws of the Indies, on which defendants rely as establishing the principle of commonality of water use. In fact, Law 5 is not omitted but is cited and is accurately paraphrased in the transcript's summary of the opinion. Finally, defendants complain that omissions from the transcript's paraphrasing of orders of the commandant general of 1791 and 1793 give the impression that there were to be no grants of lands to private parties outside the pueblo. The paraphrasing of the orders does not negate the possibility of such grants; it merely states that they may not be made by presidio captains. The transcript elsewhere recites details of the four Spanish and Mexican grants to private parties of land in the ULARA located closest to the pueblo.

(b) The finding states that the city's brief in *Vernon* copied from the brief in another case which did not deal with water rights and thus distorted the other brief's arguments. Neither the finding nor defendants gives examples of any distortions. Examination of the excerpts from the two briefs in the present record shows that the *Vernon* brief fully disclosed the source of this material and that the variations from the other brief's wording were within proper editorial limits.

(c) The finding states that the city's brief omitted a translation of "the most basic water law," Law 5, Title 17, Book IV of the Laws of the Indies, providing that the use of all pastures, woods and waters be common to all citizens of the Indies. As already indicated in connection with the finding's subdivision (a), the citation and substance of this law were fully set out in the transcript. The substance of the law was also stated in the city's brief where it was attributed simply to the "laws of the Indies."

(d) The finding points out an omission in the translation in the city's brief of Law 7, Title 17, Book IV of the Laws of the Indies which, correctly translated, provides that "[t]he woods, pastures, and waters of the settlements . . . must be common to Spaniards and Indians." The omission is obviously typographical since it leaves an incomplete

sentence. The law is correctly cited and its substance correctly stated 11 pages later in the brief. Contrary to defendants' contention, the correct version does not indicate that it applies simply to Indian pueblos.

(e) The finding refers to a presentation to the *Vernon* court of a statement by the Spanish writer Escriche, which, as described in the finding, "stated that if a pueblo needed water because it had no other source of supply and if an owner of a well or spring were compensated by the pueblo, it could take the water from the owner." The finding then points out that "[t]his requirement to pay compensation was completely omitted in the material presented to the [*Vernon*] court." Defendants claim this omission was an important and misleading distortion. But the finding itself distorts Escriche's statement. Escriche said that if the pueblo takes spring or well water needed for its inhabitants, the owner of the spring or well may demand compensation "if the pueblo has not freed itself from the obligation of compensation by having acquired the use of the water by means of title or prescription." As discussed earlier, plaintiff's position is that the pueblo water right freed the pueblo from the obligation to pay compensation for spring or well water, the taking of·which would deplete the water available from the river. The complete substance of Escriche's statement is set forth in *Lux* v. *Haggin, supra,* 69 Cal. at pages 324-325, as representing the applicable law when the territory which included California was ceded to the United States, and the opinion of the *Vernon* court makes clear it was familiar with *Lux.* In any event the law of rights to spring or well water was unlikely to have influenced the thinking of the *Vernon* court because all of the water there in controversy was the surface flow of the river, not water from under the ground.

(f) The finding here also deals with three asserted omissions in the presentation of material from a text edited by Mariano Galvan Rivera. The first omission is of a reference to Law 5, Title 17, Book IV of the Laws of the Indies. As pointed out under (c), *ante,* Law 5 was cited and its substance was fairly presented to the *Vernon* court. The second omission concerns a distinction between a general right to take river water freely for personal and domestic use as contrasted with a prohibition against taking river water onto one's property for irrigation without royal permission. The substance of this material distinction *is* stated in the *Vernon* brief's summary of Rivera. The third omission is of material "wherein this editor [Rivera] included the methods used for measuring water when shortages arose and noted that 'justice and reason' was to be used in measuring water 'as much outside as inside this noble city.' " The material is an exposition on how to measure water concluding with a self-congratulatory statement that "this writing" shows "a simple route, secure in justice and reason," for measuring water "with exactitude" within or without "this" city, the city being unidentified. The material is not concerned with the resolution of competing claims of city and other water users but with measurement of water as a means of implementing the rights of water users wherever they may be located.

(g) The finding here further makes an additional reference to the asserted omission of statements about the rights of landowners in the waters from springs and wells on their land. The availability of this material to the *Vernon* court has already been discussed in connection with subdivision (e) of the finding.

(h) The finding also states that the city's brief quoted extensively from "notes" prepared by H.W. Halleck, a member of the California bar, on the case of *Hart* v. *Burnett,* (1860) *supra,* 15 Cal. 530, that *Hart* dealt with the rights of pueblos in land and came to some conclusions that are questionable in the light of a United States Supreme Court case decided subsequent to *Vernon,* and that the nature and extent of the water rights of pueblos under Spanish and Mexican law were not discussed in *Hart.* Defendants claim that the city's brief in *Vernon* gave the impression that the *Hart* material dealt with more than land rights but the one "example" they give is the only such instance in the nine pages of the brief which quote and paraphrase extracts from the *Hart* notes. At the point in question the notes are simply listing the needs which had to be met by the lands

*(Appendix continued on following page.)*

available within the pueblo: home sites, family gardens for grain and vegetables, public lands for municipal government, parks, streets, market places, woodlands, "and the mechanic or poor laborer, who was not engaged in agriculture, required range for his horses and cows." The brief then interpolates the following sentence: "As to those who were engaged in agriculture, water for irrigation was certainly a necessity." The insertion of this isolated truism into the summary of the *Hart* notes was unfortunate but could not have seriously misled or influenced the *Vernon* court.

[26]Up to the year 1909-1910, plaintiff's ground water extractions and surface diversions from the ULARA were equal to the amount of water which plaintiff delivered for use within its territory. The subsequent difference between these two figures, prior to the introduction of Owens water in 1913-1914, indicates the extent of the minor additions to plaintiff's supply referred to in the text:

| Water Year | Acre feet taken from ULARA | Acre feet delivered for use | Difference |
|---|---|---|---|
| 1910-1911 | 53,730 | 55,020 | 1,290 |
| 1911-1912 | 57,500 | 59,360 | 1,860 |
| 1912-1913 | 60,160 | 63,700 | 3,540 |

[27]The record contains no safe yield figures for the ULARA or any of its subareas prior to 1928. The referee determined the ULARA's safe yield from normal native supply for three years as follows:

| Water year | Native safe yield in acre feet |
|---|---|
| 1949-1950 | 62,100 |
| 1954-1955 | 57,700 |
| 1957-1958 | 54,700 |

These figures are probably less than the native safe yield of 1913-1914. Plaintiff's safe yield computations for the years 1928-1929 to 1964-1965 show a marked decline in native safe yield beginning with the year 1949-1950 apparently due to increasing urbanization of the ULARA. According to plaintiff's figures, the average native safe yield for the years 1940-1941 through 1948-1949 was 11.1 percent higher than the native safe yield for 1949-1950 and the average for 1928-1929 through 1939-1940 was 8.5 percent higher than the 1949-1950 native safe yield. Applying these percentages to the referee's figure for 1949-1950 may give a rough estimate of the native safe yield of the ULARA prior to urbanization:

| | |
|---|---|
| Referee's statement of native safe yield for 1949-1950: | 62,100 |
| Increased by 8.5 percent: | 67,400 |
| Increased by 11.1 percent: | 69,000 |

[28]The referee's determinations of the native safe yield of the San Fernando subarea are as follows:

| Water year | Native safe yield in acre feet |
|---|---|
| 1949-1950 | 54,390 |
| 1954-1955 | 50,440 |
| 1957-1958 | 47,500 |

The San Fernando subarea's native safe yield was probably higher in 1913-1914. Plaintiff's computations for the San Fernando subarea, which commence with 1940-1941, indicate that the average native safe yield during the years 1940-1941 through

1948-1949 was 12.7 percent higher than the native safe yield for 1949-1950. Increasing the referee's 1949-1950 figure of 54,390 by 12.7 percent gives 61,298 acre feet as a rough estimate of the native safe yield of the San Fernando subarea prior to urbanization.

[29]By June 30, 1914, three months before the end of the water year, plaintiff's distribution mains were receiving 18 to 20 second feet of Owens water, a rate equivalent to over 13,000 acre feet per year.

[30]In the water year 1913-1914 plaintiff diverted 34,290 acre feet of Owens River water into the Haiwee Reservoir, a link in its aqueduct system in Inyo County. The comparable figure remained below 100,000 until 1917-1918 when it was 194,730. It averaged approximately 200,000 acre feet a year for the next decade and thereafter gradually increased so as to exceed an annual 300,000 acre feet in the 1940's and 1950's.

[31]Plaintiff's population grew from 319,198 in 1910 to 567,673 in 1920. Practically all of this increase took place in parts of the city other than the annexed territory in the San Fernando Valley.

[32]In *City of L. A.* v. *City of Glendale, supra,* 23 Cal.2d 68, it was stipulated in October 1939 between plaintiff and defendants Glendale and Burbank that 27.5 percent of the Owens water used for irrigation in the San Fernando Valley "has entered and is now entering" the valley's underground supply. In the present case the referee's studies of three water years showed that the following percentages of water delivered to users in the ULARA entered the underground supply:

| Water year | Percentage |
| --- | --- |
| 1949-1950 | 25.9 |
| 1954-1955 | 27.0 |
| 1957-1958 | 26.5 |

[33]The referee determined the ULARA's safe yield derived from imported and native waters only for three years, as follows:

1949-1950

| | | |
| --- | --- | --- |
| From import: | 38,700 acre feet | 38.4 percent |
| From native supply: | 62,100 acre feet | 61.6 percent |
| Total | 100,800 acre feet | 100.0 percent |

1954-1955:

| | | |
| --- | --- | --- |
| From import: | 42,700 acre feet | 42.5 percent |
| From native supply: | 57,700 acre feet | 57.5 percent |
| Total | 100,400 acre feet | 100.0 percent |

1957-1958:

| | | |
| --- | --- | --- |
| From import: | 42,900 acre feet | 44.0 percent |
| From native supply: | 54,700 acre feet | 56.0 percent |
| Total | 97,600 acre feet | 100.0 percent |

For earlier years the proportionate contribution of imported water to the safe yield must have been markedly less. The annual figures in plaintiff's safe yield studies commencing with 1928-1929 indicate that the average safe yield from import for the years 1928-1929 through 1939-1940 was only 65.9 percent of the safe yield from import for the year 1949-1950 whereas the average *native* safe yield for those earlier years was 108.5 percent of the 1949-1950 native safe yield. Applying these percentages to the

*(Appendix continued on following page.)*

referee's safe yield figures for 1949-1950, shown above, produces these results as a rough estimate for 1928-1929 through 1939-1940:

| Safe yield from import | (65.9 percent of 38,700) | 25,500 acre feet | 27.4 percent |
|---|---|---|---|
| Native safe yield | (108.5 percent of 62,100) | 67,400 acre feet | 72.6 percent |
| Total safe yield | | 92,900 acre feet | 100.0 percent |

Prior to 1940 all of the imported water contributing to the safe yield of the ULARA was Owens water imported by plaintiff. Thereafter such imported water included minor but increasing amounts of MWD water imported from the Colorado River. The proportions of ULARA imports from these two sources were as follows:

| Water year(s) | Percentage from Owens River | Percentage from Colorado River |
|---|---|---|
| 1939-1940 | 99.9 | 0.1 |
| 1940-1941 to 1944-1945 | 99.4 | 0.6 |
| 1945-1946 to 1949-1950 | 98.3 | 1.7 |
| 1950-1951 to 1954-1955 | 96.3 | 3.7 |
| 1955-1956 to 1957-1958 | 92.9 | 7.1 |

Of the total Colorado imports into the ULARA during this period, plaintiff imported 46 percent into its Narrows service area, and the remaining 54 percent was imported by defendants Glendale, Burbank, and Crescenta Valley County Water District and former defendant La Canada Irrigation District.

[35]As already pointed out, plaintiff was probably using all of the San Fernando subarea's safe yield in 1913-1914, even after the Owens inflow had commenced, and needed water for a population which increased from 319,198 in 1910 to 567,673 in 1920. (See fns. 27-31, *supra,* and accompanying text.)

By contrast, the principal defendants now claiming rights in the San Fernando subarea were then in their infancy. Burbank in 1910 was an unincorporated village of about 1,000 inhabitants. It was incorporated in 1911, and its population grew to an estimated 1,500 in 1915 and to 2,913 in 1920. Glendale was incorporated in 1906. Its population was 2,746 in 1910, an estimated 7,000 in 1914, and 13,536 in 1920. However, at first it received all its water from the Verdugo subarea. It acquired its first well in the San Fernando subarea in 1914 and its second well in 1916.

Of the remaining four defendants which the trial court found were extracting over 100 acre feet per year from the San Fernando subarea for any continuous five-year period between the water year 1941-1942 and the filing of the complaint on September 30, 1955, one, Forest Lawn, commenced such extractions in 1914 and the other three commenced in 1922, 1940, and 1941 respectively.

[51]The evidence referred to in the text was as follows:

(1) A report of Quinton, Code, and Hamlin, made in 1911 at the request of plaintiff's board of water commissioners concerning disposition of surplus waters of the Los Angeles Aqueduct, stated: "The above estimate of water resources takes no note of return water which will be available, in addition to the amount noted above, after the irrigation of large areas for a few years. This return water, principally from the underflow in the San Fernando Valley, may be used again, and thus becomes in fact an addition to the water resources of the City."

(2) Samuel B. Nelson, who had worked for plaintiff's department of water and power since 1926 and became its general manager and chief engineer in 1961, testified: "Well, reading the Quinton, Code, Hamlin report, and reading the reports that were available prior to the construction of the Los Angeles Aqueduct, it is quite evident that the engineers who had the responsibility for seeing that the City of Los Angeles did have an

adequate water supply realized that when this imported supply arrived, that there would be a surplus and that was the purpose, as I understand it, of some of these reports and discussions as to what to do with the surplus . . . . [T]he comment was made almost in every reference that if it was used any place other than the San Fernando Valley, there would be no opportunity for recovery of any return flow that might result from seepage of irrigation water down into the underground basin."

(3) The report of plaintiff's board of public services commissioners (successor of the board of water commissioners and predecessor of the board of water and power commissioners) for the year ending June 30, 1924, stated: ". . . It seems that by a close study in the rise of the water in wells in the San Fernando Valley that the predictions made as to the possible recovery of some of that water will be more than verified, as instead of recovering 25% of the water so used as predicted in the Hamlin and Code report, the amount will be in excess of 35% and perhaps even greater than that. The time has now come when we may have direct recourse to that supply and work is being prosecuted diligently to that end."

[52]Some of this excluded evidence consisted of further official reports of the board of water and power commissioners and its predecessors which, like the reports which were admitted (see fn. 51). indicated that plaintiff, in planning and operating the aqueduct, anticipated the availability to it of ground water produced by a substantial return flow from the imported water delivered to users for irrigation in the San Fernando Valley. Some of the excluded reports also indicated plaintiff's anticipation that the valley area annexed by plaintiff in 1915 would become urbanized. Defendants contend that plaintiff's intent could be expressed only by official action of its city council. (But see *Shelton* v. *City of Los Angeles* (1929) 206 Cal. 544, 548-549 [275 P. 421]; *Mesmer* v. *Board etc.* (1913) 23 Cal.App. 578, 582-583 [138 P. 935] (autonomous powers of plaintiff's water board); *Ide* v. *United States, supra,* 263 U.S. 497, 506-507 (U.S. Reclamation Service's prior intention to recapture seepage from its irrigation project evidenced by official reports of its director and of Secretary of Interior).)

Also rejected were offers to prove by the testimony of two veteran officials of plaintiff's department of water and power that they had learned from deceased departmental employees that it was the common reputation in the community when importation of Owens water was commenced that plaintiff planned to distribute the water to users in the San Fernando Valley with the intent to recapture the part of the water that returned to the ground after use. (See former Code Civ. Proc., § 1870, subd. 11, permitting evidence of "[c]ommon reputation existing previous to the controversy, respecting facts of a public or general interest more than thirty years old" (the Evidence Code being inapplicable, Evid. Code, § 12, subd. (b)); *Vernon Irrigation Co.* v. *City of Los Angeles, supra,* 106 Cal. 237, 254; *Simons* v. *Inyo Cerro Gordo Co.* (1920) 48 Cal.App. 524 [192 P. 144]; cf. *Ames* v. *Empire Star Mines Co., Ltd.* (1941) 17 Cal.2d 213, 224 [110 P.2d 13].)

Plaintiff also relied on testimony of engineer witnesses at the *Glendale* trial in 1939 tending to show plaintiff's awareness of the availability of an additional ground supply from a return flow of imported water delivered in the San Fernando Valley. However, the testimony was introduced at the trial in the present case only for the limited purpose of showing the scope of the *Glendale* judgments (one against Glendale and one against Burbank) as res judicata.

[56]Plaintiff's imports of Owens water to Sylmar, in acre feet, were 5,750 in 1949-1950, 5,650 in 1954-1955 and 5,620 in 1957-1958.

[57]The referee allocated the Sylmar basin's safe yield into acre feet derived from average import and from normal native supply as follows:

*(Appendix continued on following page.)*

| | 1949-1950 | 1954-1955 | 1957-1958 |
|---|---|---|---|
| From import | 1,680 | 1,930 | 2,120 |
| From native supply | 3,790 | 3,630 | 3,560 |

(It should be noted that the trial court's findings appear to adopt the determinations of San Fernando's expert Laverty rather than those of the referee concerning the Sylmar safe yield, but the record before us does not include any allocation by Mr. Laverty between safe yield from import and safe yield from native supply.)

[58]The amounts of water extracted by plaintiff from the Sylmar basin for its Mission Wells service area, in acre feet, were 2,460 in 1949-1950, 2,190 in 1954-1955, and 1,690 in 1957-1958.

[59]It does not appear that defendant San Fernando imports water into the Sylmar basin even though it joined the Metropolitan Water District in November 1971. The watermaster's reports to the trial court since the judgment show that all MWD water imported by San Fernando through the water year 1972-1973 was delivered in the San Fernando basin and not in the Sylmar basin.

[80]As explained in footnote 84, *post,* the referee assumed zero rising water outflow in its safe yield computations, but its analysis underlying this assumption was crucial to the parties' controversy over the correct meanings of "overdraft" and "surplus."

[81]The parties' arguments concerning waste from high ground water levels focus principally on the outflow of rising water past Gauging Station F57 and thence to the ocean. However, the referee's report and plaintiff's rejected offer of testimony by its expert Todd indicated that high ground basin levels might also produce waste through evaporation and sewer infiltration. The evidence of a correlation between high ground basin levels and rising water waste pertained to the San Fernando basin and the ULARA as a whole but not to the Sylmar or Verdugo basins separately.

[82]Precipitation during the 29-year base period varied between 50 percent and 224 percent of normal. The safe yield studies for the years 1949-1950, 1954-1955 and 1957-1958 showed that the "normal native supply" derived from precipitation contributed well over half of the safe yield for those years. The contribution was made through direct rain on the land use areas, the stream system and the conservation measures of the Los Angeles County Flood Control District.

[83]There was evidence that waste in the form of rising water outflow in fact occurred after extractions had overtaken safe yield. The trial court found that the safe yield for San Fernando basin (91 percent of the ULARA valley fill) was exceeded by extractions therefrom beginning in 1941-1942. These extractions continued to increase each year through 1949-1950. In 1943-1944, ULARA ground water levels reached their maximum for the 29-year base period, 611,000 acre feet above 1957-1958 levels. Rising water outflow at Gauging Station F57 reached the high point of 28,600 acre feet in 1941-1942, remained above the 25,000 mark through 1943-1944, then gradually dropped off until it disappeared in 1949-1950 only to appear once more in 1951-1952 at 3,110 acre feet.

[84]The referee's safe yield studies for the years 1949-1950, 1954-1955 and 1957-1958 recognize the possibility of rising water waste if extractions are limited to safe yield. The referee states that "safe yield is related . . . to the amount of storage space available to carry over recharge occurring in years of above average supply to years of deficient supply," and that operation of the ground water reservoir under safe yield conditions over the 29-year base period would require 210,000 acre feet of storage above the

1957-1958 level and 150,000 acre feet below that level, or a total of 360,000 acre feet. Although the referee found that ground water in storage was 280,000 acre feet above the 1957-1958 level in 1949-1950 and almost 80,000 acre feet above that level in 1954-1955, it assumed for purposes of the safe yield studies to provide a uniform basis for comparison that 1957-1958 ground water levels prevailed in all three of the years studied—1949-1950, 1954-1955 and 1957-1958. From a correlation of rising water with ground water levels, it concluded that upon this assumption no rising water outflow would have occurred in any of those years. The referee also noted (as of July 1962) that after 1957-1958 at least 150,000 acre feet had been taken from storage below the 1957-1958 levels. The referee made no safe yield studies that assumed any ground water levels other than those of 1957-1958.

The referee's approach required that if rising water outflow were found, it should be entered as a natural depletion item decreasing the safe yield. The projected safe yield operation would then be based on an assumed regular occurrence of rising water waste on into the indefinite future. A temporary increase in extractions sufficiently in excess of safe yield to lower ground water levels to the point where rising water waste would be eliminated would not only augment the beneficial supply to the extent of such increase but also justify a higher figure for safe yield itself by eliminating rising water waste as a depletion item from the safe yield computation.

[87]Based on extensive studies and testimony by Max Bookman, one of defendants' hydrological experts, the trial court found that during the 29-year base period (1928-1929 to 1956-1957) (1) plaintiff's spreading of imported water contributed to the occurrence of rising water in the San Fernando basin, (2) plaintiff had the facilities to capture all rising water in the basin and prevent its outflow, (3) rising water in the basin could have been captured by reasonable methods of extraction and diversion, and (4) it was not necessary to remove ground water permanently from storage to prevent rising water outflow from the basin.